1

2

3

4

5

6                        IN THE UNITED STATES DISTRICT COURT

7                    FOR THE EASTERN DISTRICT OF CALIFORNIA

8   RICHARD ALEX WILLIAMS,

9              Petitioner,                    No. CIV S-03-0721 DFL JFM P

10        vs.

11  C.K. PLILER, Warden, et al.,

12             Respondent.                    FINDINGS AND RECOMMENDATIONS

13  _____/

14             Petitioner is a state prisoner proceeding with counsel with an application for a writ

15  of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his August 3, 1998, jury

16  conviction on charges of murder, CAL. PENAL CODE § 187(a), with the special circumstance that

17  the murder was committed "by means of discharging a firearm from a motor vehicle,

18  intentionally at another person outside the vehicle with the intent to inflict death," CAL. PENAL

19  CODE § 190.2(a)(21), and two counts of attempted murder, CAL. PENAL CODE §§ 664, 187(a).

20  For all three counts, the jury found true allegations that petitioner was personally armed with a

21  handgun.  CAL. PENAL CODE § 12022(a).  The court initially sentenced petitioner on October 16,

22  1998, to three consecutive life terms plus three years: in count one, life without the possibility of

23  parole, plus a one-year enhancement; in count two, life with the possibility of parole, plus a one-

24  year enhancement; and in count three, life with the possibility of parole, plus a one-year

25  enhancement.  Following remand by the California Court of Appeal for the Third Appellate

26  District, the court sentenced petitioner on August 2, 2002, on counts two and three to a

1

1   cumulative total of 10 years and eight months, consecutive to the term of life without parole plus

2   one year.

3                    Petitioner alleges numerous errors that entitle him to habeas relief.  First,

4   petitioner claims that the trial court violated the constitutional guarantee against double jeopardy

5   by unjustifiably dismissing the first jury selected in his case.  Second, petitioner argues that the

6   State violated his right to equal protection when it impermissibly challenged a minority juror.

7   Third, petitioner argues that an eyewitness identification made in this case was unduly

8   suggestive.  Fourth, petitioner argues that the court violated Confrontation Clause and due

9   process principles by admitting into evidence prior inconsistent statements for substantive

10  purposes made by declarants who did not testify at trial.  Fifth, petitioner claims that the trial

11  court permitted fundamentally unfair testimony about threats to and intimidation of a key

12  witness.  Sixth, petitioner argues that the trial court permitted the introduction of overly

13  prejudicial, uncharged character evidence when it allowed testimony about .25 caliber shell

14  casings found in petitioner's car.  Seventh, petitioner argues that the evidence against him was

15  insufficient.  Eighth, petitioner claims that the trial court erred in its instruction to the jury

16  regarding the elements of first degree murder.  Ninth, petitioner claims that the evidence at trial

17  was insufficient to support the true finding as to the special circumstance of discharging a firearm

18  from a vehicle.  Finally, petitioner states that habeas relief is warranted as a result of the

19  cumulative impact of the errors and irregularities committed by the trial judge and prosecutor

20  during the trial.

21                               FACTS[1]

22          Late on the afternoon of August 12, 1996, 17-year-old Marvel
            Chase was shot to death at the wheel of his 1977 Mercury Cougar
23          while stopped at the intersection of 48th Avenue and Martin Luther

24  _____

25          [1]  The facts are taken from the opinion of the California Court of Appeal for the Third
    Appellate District in People v. Williams, No.# C031377 (September 11, 2001) (hereinafter
26  Opinion), a copy of which is attached as Exhibit C to petitioner's petition for writ of habeas
    corpus, filed April 8, 2003.

King Boulevard.  Chase's passengers, 16-year-old Jacoby Spratling and 20-year-old Marquelle Dedmon, escaped injury.

A few minutes earlier, Chase had driven slowly past a group of African-American males standing in front of a duplex on Wesley Avenue.  One young man wore a green shirt, and the rest wore red.  The group looked at the Cougar as it drove by, and Spratling looked back at them as if to say, "What are you guys?"

As the Cougar drove down 48th Avenue toward Martin Luther King Boulevard, it met a green Mustang coming from the opposite direction.  The Mustang's driver and passenger looked "real hard" at Chase, Dedmon, and Spratling.  The three young men looked back.  The Mustang continued toward Wesley Avenue, and the Cougar continued toward Martin Luther King Boulevard.

As Chase pulled up to the stop sign at Martin Luther King Boulevard, the Mustang, which had apparently circled around, slowly pulled alongside.  Once again, the drive and passenger in the Mustang gave everyone in the Cougar a "hard look."  Within seconds, the passenger pulled out a long chrome semiautomatic handgun.  Everyone in the Cougar ducked down when the shooting started.  Chase jumped in the back seat, yelling that he was hit.  Spratling and Dedmon managed to get the Cougar to the parking lot of a nearby AAMCO Transmission Center where they summoned paramedics.  Chase died on the way to the hospital from a bullet through his heart.  The criminalist, Faye Springer, concluded that the .38 special or .357 Magnum bullets that struck the driver's side of the Cougar were fired from the same gun, "most likely" a revolver.  Because two of the bullets were never found, she would not rule out the possibility that two of the bullet holes were caused by .25-caliber bullets.

Spratling and Dedmon recounted the circumstances of the shooting to sheriff's deputies at the AAMCO shop and to detectives at the sheriff's station.  Spratling also showed detectives the duplex on Wesley Avenue where he had seen the group of young men wearing red and green.  The ensuing investigation led to defendant's arrest a month later.

Based on information obtained in the hours immediately following the August 12 shooting, Sheriff's Detectives Marci Minter and Stan Reed found a dirty green 1968 Mustang registered to defendant in the parking lot of a condominium complex on Chandler Drive around 10:00 o'clock the same evening.  Photos taken at the lot revealed a broken side-wing window on the driver's side.  Detective Minter believed the damage was caused by a bullet fired from inside the car.  She also observed a small caliber shell casing on the middle back seat of the Mustang.  Detective Minter knocked on the door of defendant's residence, but no one answered.  She had the Mustang towed to the sheriff's property

warehouse, where she and Detective Reed took Polaroid photographs of the car the following day.  Closer examination of the Mustang revealed three more .25-caliber casings around and under the back seat.

Witness identification of defendant and the green Mustang were pivotal issues at trial.  Spratling was a key prosecution witness who testified on both issues.  He described the driver of the green Mustang as a light-skinned African-American, 17 to 20 years old, slim, with long braided hair.  According to Spratling, the driver wore a green Nike air shirt, but was not the man in a green shirt that Spratling had seen in front of the duplex on Wesley just before the shooting.  On August 13, Detectives Minter and Reed showed Spratling a five-person lineup which included defendant in photo No. 4.  Spratling thought the men in photos No. 3 and No. 4 could have been the driver.  Reed asked what he liked and disliked about those particular photos.  Spratling stated that he liked the overall appearance of both, but felt the person depicted in No. 4 was "too small."  Several months later, Spratling positively identified defendant after seeing him at a brief court proceeding.  He also identified defendant as the driver at trial.

The detectives showed Polaroid pictures of the Mustang to Spratling, and asked him if it was the car involved in the shooting.  Spratling replied that the body style and color of the Mustang were "good," but it looked "too shiny" to be the same car.  According to Spratling, the car in the photograph could have been the suspect Mustang if the paint was "a lot more dull."

Corey Schuler was another important witness for the prosecution.  At trial, he expressed concern about the impact of his testimony on the safety of his family.  Schuler nonetheless recounted that he lived near the intersection of 48th Avenue and Wesley on August 12, 1996.  He knew Aaron Struthers, a large 19-year-old who lived in a duplex around the corner.  About a half hour before the shooting, Schuler saw a thin, short-haired, Black male between 18 and 25 years old talking to Struthers.  The man appeared upset, motioned to a group of people gathered down the block, and threatened to "grab [his] strap."  Schuler watched Struthers and the thin man walk off around the corner.  About 20 minutes later, Schuler got a glimpse of a green Mustang driving westbound toward Martin Luther King from Wesley.  The driver was a light-skinned African American male with braids.  Schuler heard five or six gunshots from the direction of 48th Avenue and Martin Luther King Boulevard a few minutes later.  He walked to his fence and saw the same green Mustang speeding eastbound on 48th Avenue toward Wesley.  This time Schuler saw both the driver and the passenger, who was the same young man he had seen yelling at the corner a few minutes earlier.  He confirmed his earlier description of the driver, adding that he was slender, the same age as the passenger, but with a lighter skin color.  Schuler flagged down a

sheriff's unit, and told the deputies what he had seen.  He described the car as a 1966 or 1967 Mustang sedan with stock rims.

On September 4, 1996, the detectives showed Schuler the same photo lineup they had presented to Spratling.  Based on hair style and skin complexion, Schular [sic] picked No.2, No.4, and No. 5 as "possibilities" for the driver of the Mustang.  Schuler could not identify defendant at trial, but stated he fit the general description of the person he saw on August 12th.

Schuler also viewed Polaroid photos of the impounded Mustang on September 4.  He stated that it "appear[ed] to be the same car," except for the rims and condition of the paint.  Schuler said the rims in the picture were definitely not the rims he had seen on the suspect Mustang.  According to Detective Minter's report, Schuler also stated the suspect Mustang had inverted taillights like the Mustang in the photos.  Schuler disputed this fact at trial.  He testified that if Minter's report was correct, he made an honest mistake because he remembered seeing outverted taillights.  He also indicated there was body damage on the Mustang he had seen.  At the close of cross-examination, Schuler expressed doubt that the Mustang in the detective's photographs was the Mustang involved in the shooting.  During trial, other witnesses provided conflicting evidence on the type of rims defendant had on his Mustang before August 12.

Trial testimony also revealed additional information about events that took place at the Wesley Avenue duplex the afternoon of the shooting.  In 1996, defendant was friends with Aaron Struthers and Ramsey Franklin.  All three were rappers.  Investigators found Franklin's fingerprints on the exterior chrome trim of the Mustang's passenger door.  Lacking sufficient evidence to charge Franklin, the prosecution nonetheless theorized that he was the passenger in the Mustang.

Struthers lived with his mother Christine Jordan and sister Odessa Sanders at the Wesley Avenue duplex where Spratling saw the gathering of young men a few minutes before the August 12 shooting.  Jordan testified at trial that she and Struthers were home that afternoon.  She confirmed there had been a group of boys outside the duplex at that time.  According to Jordan, Franklin came inside and went to Struther's bedroom.  He left after Jordan told her son she did not want to hear any rapping that day.  Franklin was already gone when Struthers left the duplex around 4:00 p.m. with two other friends.  Jordan testified that she was unaware any of her son's friends owned a green Mustang.

When Sanders returned home on August 12, Jordan told her that someone had been shot around the corner.  According to Sanders, her mother said that "'[Franklin] had come over . . . to rap . . . And then when he was coming over, the people down the street was

calling them names, and he came back and told my brother, . . . that
. . . they was trying to jump him or something.  My brother went
around there with him, and then they came back and then
[Franklin] had called some other boys to – they had went around
there, and that's when I heard some boy had got shot.'"  Sanders
also indicated in a prior hearing that her mother told her that
"'[Franklin] had come over there and . . . started some mess or
something . . . ¶ . . . ¶ . . .  She had told me that something
happened around the corner.  Somebody got shot.  I don't think we
knew he was killed until later, but [Franklin] had . . . something to
do with it.'"  At trial, Jordan denied making the statements to
Sanders.

Someone shot at Jordan's duplex two nights after Chase was
killed.  Jordan believed the attack was in retaliation for the August
12 shooting, because one of the victims had pointed out her
residence to police.  She told the investigating officer that "the
guys that were in the green Mustang had done the shooting," and
the people in the Mustang "were at the house and had left and had
done the shooting."  Jordan denied those statements at trial.

Jordan admitted at trial that she had talked with her son Struthers
about what happened while he was with Franklin on August 12.
She was aware that Struthers had exercised his Fifth Amendment
privilege and refused to testify.

Jury selection began in defendant's first trial on Thursday,
November 6, 1997.  Shortly thereafter, the court determined that
Dedmon refused to testify in the prosecution's case.  The court
continued trial to December 15, 1997, and excused the unsworn
jury over defense objection.  The court ultimately declared a
mistrial when the jury selected in the first trial was unable to reach
a verdict.  Defendant's retrial – the subject of this appeal – began
on July 7, 1998.

(People v. Williams, slip op. at 3-10.)

## ANALYSIS

I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or

/////

6

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

II. Petitioner's Claims

A. Dismissal of First Jury Violated Constitutional Guarantee Against Double Jeopardy

Petitioner's first claim is that the dismissal of the first jury violated his constitutional guarantee against Double Jeopardy. Petitioner contends that dismissal of this jury, after selection but prior to being sworn, violated his rights under the Fifth Amendment. Petitioner argues that he should not have been forced to "run the gauntlet" a second time after the

7

trial judge dismissed the first chosen jury due to the need to take a 33-day delay that was caused

by a key prosecution witness' refusal to testify. Green v. United States, 355 U.S. 184, 190 (1957).

The last reasoned rejection of this claim is the decision on petitioner's direct

appeal by the Court of Appeal for the State of California, Third Appellate District.  The state

appellate court rejected this claim on the ground that:

> [Petitioner] argues he is entitled to reversal because the court
> erroneously excused the unsworn jury and continued the trial when
> Marquelle Dedmon refused to testify for the prosecution.  He
> maintains the court's ruling violated both statutory law and
> constitutional protections against double jeopardy.  We conclude
> there is no merit in [petitioner's] arguments.
>
> A. Factual Background:
>
> On November 12, 1997, the jury had been selected, but not yet
> sworn.  The court conducted a hearing outside the jury's presence
> regarding Dedmon's refusal to testify.  The prosecution explained
> that it planned to call Dedmon as its first witness, and maintained
> he had no legal basis for refusing to speak.  Dedmon confirmed his
> position in response to questions by the court.  He hinted that he
> was concerned about the safety of his family.  Dedmon also
> indicated incarceration for contempt was of little consequence
> because he was already in custody awaiting trial in Nevada.  The
> court decided to allow Dedmon a day in which to change his mind.
>
> On the following day, Dedmon again refused to testify at trial
> because of the danger to his family.  The court summarized the
> chambers discussion: "I don't mind stating on the record that we
> had a candid discussion about the implication of all this.  I said in
> there, "I'll say here, that I believe the People were genuinely
> surprised by the witness'[s] decision not to testify, and that would
> constitute good cause for continuing the trial."
>
> Defense counsel objected to the continuance.  He argued the
> prosecutor had been aware of Dedmon's position before he
> transferred Dedmon to Sacramento, and therefore could not claim
> "surprise."  The prosecutor responded that although he was aware
> of Dedmon's position through his investigators, Dedmon waived
> extradition, discussed the case freely with the investigators, and
> provided consistent information that [petitioner] killed Marvel
> Chase.  The investigators left the prosecutor with the impression
> "they didn't feel that he really was serious that he wasn't going to
> testify."  The prosecutor believed Dedmon would testify once he
> brought him before the court in Sacramento.  The court continued
> the trial to December 15, 1997, and excused the unsworn jurors.

B. California Statutory Law:

The Trial Jury Selection and Management Act governs jury selection and the swearing of jurors in both civil and criminal trials. (Code Civ. Proc., § 190 et seq.) Code of Civil Procedure section 231 sets forth the number of peremptory challenges available at trial, and continues:

"(d). . . When each side passes consecutively, the jury shall then be sworn, unless the court, for good cause, shall otherwise order. . .

"(e) If all parties on both sides pass consecutively, the jury shall then be sworn, unless the court, for good cause, shall otherwise order . . . ."

[Petitioner] argues the court violated the commands of Code of Civil Procedure section 231 "when [it] refused to have the first selected jury sworn and aborted the trial simply because a witness had refused to testify." He maintains the record does not support the court's finding of good cause for "dismissing a selected jury" or for granting the continuance. [Petitioner] contends the prosecutor's claimed surprise "was nothing more than 'gamesmanship' and manipulation to obtain a new jury."

In this case, the finding of good cause under Code of Civil Procedure section 231, subdivision (d) not to swear the jury on completion of voir dire turns on a finding of good cause for continuance under section 1050, subdivision (e). If the continuance was proper, there was ample reason to excuse the jury and begin the selection process anew rather than hold the jury in limbo for over a month.

The court has broad discretion to grant or deny the request for continuance. (*People v. Smithey* (1999) 20 Cal.4th 936, 1011.) When seeking a continuance to secure the attendance of a witness, the moving party must show "'he had exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven.'" (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.) In exercising its broad discretion to determine good cause, the court must consider "'"not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion."'" (*Ibid.*)

The record supports the court's finding of good cause on the facts of this case. The prosecution exercised due diligence by arranging for Dedmon's transport from Nevada and timely appearance in

Sacramento.  He was one of two eyewitnesses to the drive-by murder, and his testimony on the identity of the driver was material to the prosecution case.  Dedmon's testimony could not be viewed as merely cumulative of Spratling's where the victims based their identification on two brief encounters with the men in the Mustang.  The prosecution could reasonably anticipate witness identification would be a key issue at trial, and therefore make every effort to find eyewitnesses willing and able to testify.  The continuance was warranted by Dedmon's unexpected refusal to testify.

Moreover, [petitioner] does not explain how he was prejudiced by the decision not to swear the jury, and no prejudice appears apart from the inherent prejudice of delay.  Indeed, on December 15, 1997, [petitioner] joined in the prosecution's motion for a further continuance in order to obtain a witness that was unavailable.  In any event, the delay resulted from the grant of a continuance, not from the court decision not to swear the jury.

[Petitioner] cites several cases involving dismissal of sworn jurors or juries on good cause under Penal Code sections 1089 and 190.4.  (See *People v. Lucas* (1995) 12 Cal.4th 415, 483; *People v. Compton* (1971) 6 Cal.3d 55, 60; *People v. Hamilton* (1963) 60 Cal.2d 105, 124-126, overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 638 fn.2, 649; and *Paulson v. Superior Court* (1962) 58 Cal.2d 1, 6.)  Good case under section 1089 requires showing of the juror's inability to perform his or her duty as a trial juror.  The inability must appear as a demonstrable reality.  (*People v. Williams* (2001) 25 Cal.4th 441, 447-448.)  [Petitioner] offers no authority to support the suggestion the same test for good cause applies to the excusal of unsworn jurors pursuant to Code of Civil Procedure section 231, subdivision (d).[Footnote omitted]

There is nothing in the record to support [petitioner]'s suggestion the prosecutor was manipulating the process in order to affect the composition of the jury.  As a reviewing court, we will not second-guess the court's finding that "the People were genuinely surprised by [Dedmon's] decision not to testify."  (*People v. Jones* (1990) 51 Cal.3d 294, 314; *In re Paul C.* (1990) 221 Cal.App.3d 43, 54.)

C.  <u>Constitutional Protections:</u>

[Petitioner] also contends the court violated constitutional protections against double jeopardy when it excused the unsworn jury.  He maintains there is a theoretical possibility jeopardy attaches upon the selection of the jury because "California defendants are <u>in fact</u> exposed to the risk of conviction by an unsworn jury and affirmance on appeal of a guilty verdict returned by an unsworn jury."  (Underscoring in original.)  According to [petitioner], this risk exists in California because the requirement of a sworn jury is purely one of statutory, not constitutional, law.

1  [Petitioner] objected to the continuance on grounds the prosecutor failed to establish good cause under statutory law.  He therefore waived the constitutional issue on appeal.  (*People v. Carpenter* (1997) 15 Cal.4th 312, 385.)

2

3

4  In any event, [petitioner] acknowledges there is no California authority to support his arguments.  As we explained, a California criminal defendant is not placed in jeopardy until the jury is duly impaneled and sworn.  (*Curry v. Superior Court* (1970) 2 Cal.3d 707, 712; see also *Crist v. Bretz* (1978) 437 U.S. 28, 37-38 [57 L.Ed.2d 24, 32-33], applying the same rule.)  The court excused the jury in this case before it was sworn.

5

6

7

8  (People v. Williams, slip op. at 10-15.)

9  The Double Jeopardy Clause of the Fifth Amendment protects individuals from

10  the perils associated with repeated prosecutions by the State for the same offense.  Gree v. United

11  States, 355 U.S. 184, 187-88 (1957).  Jeopardy attaches when "the jury is empaneled and sworn."

12  Crist v. Bretz, 437 U.S. 28, 35 (1978).  This settled rule of federal constitutional law "serves as

13  the lynchpin for all double jeopardy jurisprudence," reflecting and protecting an individual's

14  interest in retaining a chosen jury and is essential to protecting the finality of judgment.  Crist,

15  437 U.S. at 38 (quoting Bretz v. Crist, 546 F.2d 1336, 1343 (9th Cir. 1976).

16  The Court of Appeal properly characterized the constitutional principles

17  underlying its decisions and applied them to the facts of this case.  At the time the court

18  dismissed the jury, the simple fact was that they had not been sworn.  Consequently, jeopardy

19  had not attached.  The court's ruling was neither contrary to, nor an unreasonable application of

20  federal law.

21  Furthermore, there was no error in the Court of Appeal's interpretation of

22  California state law.  The trial court may grant continuances based upon "good cause."  CAL. CIV.

23  PROC. CODE § 1050(e)(2006).  The trial court's determination that good cause supported the

24  prosecution's request for a continuance was not in error and does not require habeas relief.

25  Federal habeas court has no authority to review challenges to state-court

26  determinations of state-law questions.  Estelle v. McGuire, 502 U.S. 62, 68 (1991).  Habeas

1   review is limited to determining whether a conviction violated the Constitution, laws, or treaties

2   of the United States.  28 U.S.C. § 2241; Rose v. Hodges, 423 U.S. 19, 21 (1975).  Without citing

3   any support for his position, petitioner contends that the California statute permits convictions by

4   unsworn juries.  However, regardless of the merits of this claim, interpretation of this state law

5   issue is reserved to the state court.  See Estelle, 502 U.S. at 68.  As noted above, the judge's

6   dismissal of the jury prior to being sworn does not violate any constitutional principles under the

7   Fifth Amendment.

8           In addition, petitioner has failed to demonstrate that there exists any state

9   established liberty interest in the statutory scheme for selecting and impaneling a California jury

10  sufficient to warrant habeas relief.  See Hewitt v. Helms, 459 U.S. 460 (1983).  While state court

11  findings about state law matters are generally precluded from habeas review, where the state sets

12  its own statutory requirements, denial of that mandated procedure may violate a liberty interest

13  protected by the Fourteenth Amendment.  Fetterly v. Paskett, 997 F.2d 1295, 1300 (1993).  The

14  state court found no liberty interest in the requirement that an empaneled jury must be sworn

15  unless good cause is shown, CAL. CIV. PROC. CODE § 231(d)(2006), and that legal determination

16  cannot be disturbed in a federal habeas petition.  Wainwright v. Goode, 464 U.S. 78, 84 (1983).

17          There was no error in the finding that good cause existed for granting the

18  prosecution's request for a continuance and dismissing the jury because of the resulting delay.

19  As one of the victims in the case, there is no doubt as to the importance of the witness'

20  testimony.  Furthermore, the record fails to demonstrate any malevolent motive on the part of the

21  prosecution in requesting a delay.  The Court of Appeal correctly noted the genuine surprise on

22  the part of the prosecution and there does not appear to have been any tactical advantage

23  resulting from the delay as petitioner's subsequent trial resulted in a hung jury.  Finally, any

24  prejudice to petitioner was not apparent given their subsequent request for a further continuance.

25  The court recommends denial of petitioner's first claim.

26  /////

12

B.  Batson Violation

Petitioner's second claim is that the State impermissibly exercised a peremptory challenge against a juror.  According to petitioner, the prosecution's removal of an African-American juror was racially motivated and without any legitimate neutral basis, violating petitioner's right to equal protection under the law.  Petitioner argues that under the applicable legal standard, the prosecutor's actions amounted to a prima facie case of purposeful discrimination in violation of Batson v. Kentucky, 476 U.S. 79 (1986).

The California Court of Appeal addressed this claim as follows:

Citing *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), defense counsel challenged the prosecutor's use of a peremptory challenge to remove the last African-American from the jury.  [Petitioner] contends the trial court used the wrong test in ruling the defense counsel failed to establish a prima facie case of discrimination. . . . We conclude there was no error[.]

A.  Factual Background:

During jury selection, Prospective Juror Thompson revealed to the court in private that she had received summary probation for shoplifting while a college student in 1981.  When the other prospective jurors returned to the courtroom, she described a "bad experience" four years before with two law enforcement officers she claimed pulled her over for "no reason."  Thompson also noted two cases where she believed defendants had been treated unfairly because of their race.  These included the Pratt Black Panthers case and the William Mobia Jamal capital case.  The prosecutor exercised a peremptory challenge against Ms. Thompson.

At the hearing on [petitioner's] *Wheeler* motion, the court explained to defense counsel, "Since it's the burden of the moving party to establish a prima facie case of discrimination as well as make the record, I'll give you the opportunity to proceed first, and you must show from all the circumstances in this case a strong likelihood that the persons challenged were challenged due to group classification rather than specific bias."

Thereafter, defense counsel argued the prosecutor excused Thompson because she was African-American.  He noted that two African-American jurors had voted not guilty in [petitioner's] first trial resulting in a hung jury.

The court found that [petitioner] failed to establish a prima facie case under *Wheeler*.  It gave the prosecutor the opportunity to make

13

a record, although the prosecutor was not required to do so in light of the court's findings.  The prosecutor explained he was concerned about several matters revealed during voir dire: (1) Thompson's prior petty theft; (2) her desire to discuss the incident only in private; (3) the age at which she committed the petty theft; (4) her bad experience with law enforcement; (5) her response to the jury questionnaire, including the view that the criminal justice system treated some people unfairly; and (6) her perceived unwillingness to work together with other jurors.

The court again concluded [petitioner] failed to sustain his burden to establish a prima facie case of discrimination.

B.  Discussion:

"If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in a timely fashion and make a prima facie case of such discrimination to the satisfaction of the court.  First, . . . he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule.  Third, from all the circumstances of the case he must show a *strong likelihood* that such persons are being challenged because of their group association."  (*Wheeler*, *supra*, 22 Cal.3d at p. 280, emphasis added, fn. omitted.)  Under *Batson*, decided by the United States Supreme Court eight years after *Wheeler*, the defendant must show facts and relevant circumstances that *raise an inference* that the prosecution excluded the prospective juror because of race.  (*Batson*, *supra*, 476 U.S. at p. 96, [90 L.Ed.2d at pp. 87-88].)  California courts have read the state and federal tests together to require that [petitioner] show a strong likelihood of discrimination.  (See *People v. Turner* (1994) 8 Cal.4th 137, 164.)

"There is a presumption a party exercising a peremptory challenge is doing so on a constitutionally firm ground."  (*People v. Bernard* (1994) 27 Cal.App.4th 458, 465, disapproved on other grounds in *People v. Box* (2000) 23 Cal.4th 1153, 1188, fn. 7.)  When considering the denial of a *Wheeler* motion, we also give considerable deference to the trial court's ruling.  (*People v. Sanders* (1990) 51 Cal.3d 471, 501.)  We will affirm if a review of the entire voir dire record "'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question."  (*People v. Howard* (1992) 1 Cal.4th 1132, 1155.)

Two years after the trial in this case, the Ninth Circuit ruled in *Wade v. Terhune* that "the *Wheeler* standard, as currently interpreted by the California courts, does not satisfy the constitutional requirement laid down in *Batson*."  (*Wade v. Terhune* (2000) 202 F.3d 1190, 1192.)  In that case, the defense

relied on both *Wheeler* and *Batson* in challenging the prosecutor's peremptory challenge in the state trial court. (*Wade v. Terhune*, *supra*, at p. 1194.) The California Supreme Court clarified the matter in *People v. Box*, explaining that in California, a "strong likelihood" means a "reasonable inference." (*People v. Box*, *supra*, 23 Cal.4th at p. 1188, fn. 7.)

We begin by noting the *Batson* test was not, in fact, at issue in this case. [Petitioner's] motion was based solely on *Wheeler*. The court recited the "strong likelihood" test, and denied the motion on the ground [petitioner] did not establish a prima facie case of discrimination under that standard. [Petitioner] does not dispute that he failed to satisfy the requirements of *Wheeler*. In any event, there is no basis for [petitioner's] claim the trial court applied the wrong test since "strong likelihood" means the same as "reasonable inference" under California law. (*People v. Box*, *supra*, 23 Cal.4th at p. 1188, fn. 7.)

Even if we were to conclude [petitioner] established a prima facie case of discrimination under *Wheeler*, the voir dire record and hearing transcript demonstrates [petitioner's] motion was doomed to fail. During voir dire, Prospective Juror Thompson raised several matters the prosecutor could and expressly did reasonably view as grounds for peremptory challenge. Although not required to do so after the court made its ruling, the prosecutor nonetheless detailed his reasons for challenging Thompson. Those reasons were, in fact, proper.

(People v. Williams, slip op. at 16-20.)

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution. See Batson, supra; Johnson v. California, 545 U.S. 162 (2005). So-called Batson claims are evaluated pursuant to a three-step test:

First, the movant must make a prima facie showing that the prosecution has engaged in the discriminatory use of a peremptory challenge by demonstrating that the circumstances raise "an inference that the prosecutor used [the challenge] to exclude veniremen from the petit jury on account of their race." [Citation omitted.] Second, if the trial court determines a prima facie case has been established, the burden shifts to the prosecution to articulate a [gender]-neutral explanation for challenging the juror in question. [Citation omitted.] Third, if the prosecution provides such an explanation, the trial court must then rule whether the movant has carried his or her burden of proving the existence of purposeful discrimination.

15

1   Tolbert v. Page, 190 F.3d 985, 987-88 (9th Cir. 1999) (en banc).  The Court of Appeal correctly

2   noted that in this context "strong likelihood" means a "reasonable inference" under California

3   law.  People v. Box, 23 Cal.4th 1153, 1188, n.7 (2000).

4           The trial court may have erred by initially applying the unconstitutional "strong

5   likelihood" test.  Cooperwood v. Cambra, 245 F.3d 1042, 1047 (9th Cir. 2001); (Reporter's

6   Augmented Transcript [hereinafter "RAT"] at 1730.)  "[T]he trial judge should have only

7   required petitioner to proffer enough evidence to support an 'inference' of discrimination."

8   Johnson, 545 U.S. at 166.  In some cases, when considered in light of the "relevant circumstances

9   surrounding a peremptory challenge," United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th

10  Cir. 1994), such an inference may be drawn by the State's use of a peremptory challenge on the

11  single remaining African-American juror.  See Fernandez v. Roe, 286 F.3d 1073 (9th Cir. 2002).

12  However, "[o]nce  a prosecutor has offered a race-neutral explanation for the peremptory

13  challenges and the trial court has ruled on the ultimate question of intentional discrimination, the

14  preliminary issue of whether the defendant had made a prima facie showing becomes moot."

15  Hernandez v. New York, 500 U.S. 352, 359 (1991); U.S. v. Murillo, 288 F.3d 1126, 1135-36

16  (9th Cir. 2002)(quoting Batson, 476 U.S. at 359.  Unlike the trial court in Johnson, supra, the

17  trial court in the instant case went on to provide a record as to why the prosecution exercised

18  peremptory challenges of these two potential jurors.[2]

19          The trial court in the instant case applied the more stringent review of Wheeler,

20  which in turn applied the pre-Wade v. Terhune "strong likelihood" standard.  "[W]here the

21  [state] court has applied the wrong legal standard, AEDPA's rule of deference does not apply."

22  Fernandez, 286 F.3d at 1077.  Under this circumstance, a district court may review *de novo* the

---

24  [2]  The trial judge in Johnson did not ask the prosecutor to explain the rationale for his
    strikes; rather, the judge found Johnson had failed to establish a prima facie case under the
25  governing state precedent, People v. Wheeler, supra, reasoning that there had not "been shown a
    *strong likelihood* that the exercise of the peremptory challenges were based upon a group rather
26  than an individual basis."  Johnson, at 2414.  The trial court in the instant case ruled upon a
    Wheeler motion (RAT 1729).

1   question of whether a defendant made a prima facie showing of a <u>Batson</u> violation. <u>Id.</u>; <u>see also</u>

2   <u>Cooperwood</u>, 245 F.3d at 1046-47.   As a result, this court will perform a *de novo* review of the

3   record to determine whether the state court's denial of petitioner's <u>Batson</u> claim was error.   <u>See</u>

4   <u>Paulino v. Castro</u>, 371 F.3d 1083 (9th Cir. 2004)(excusal of five out of six black jurors by means

5   of five out of six peremptories raised an inference of discrimination; case remanded for

6   prosecution to provide race-neutral reasons for the apparently biased pattern of peremptories and

7   determine whether the prosecutor violated <u>Batson</u>.)

8            "In evaluating the race neutrality of an attorney's explanation, a court must

9   determine whether, assuming the proffered reasons for the peremptory challenges are true, the

10  challenges violate the Equal Protection Clause as a matter of law."  <u>Hernandez</u>, 500 U.S. at 359.

11  "At this step, 'the issue is the facial validity of the prosecutor's explanation.   Unless a

12  discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be

13  deemed race-neutral.'"  <u>Stubbs v. Gomez</u>, 189 F.3d 1099, 1105 (9th Cir. 1999) quoting

14  <u>Hernandez</u>, 500 U.S. at 360.  "It is not until the *third* step that the persuasiveness of the

15  justification becomes relevant – the step in which the trial court determines whether the opponent

16  of the strike has carried his burden of proving purposeful discrimination."  <u>Purkett v. Elem</u>, 514

17  U.S. 765, 768 (1995) (emphasis in original).  For purposes of step two, the prosecutor's

18  explanation need not be "persuasive, or even plausible."  <u>Purkett</u>, 514 U.S. at 768.

19           As noted above, the state court of appeal found that the prosecutor's proffered

20  reasons for exercising peremptory challenges were proper.   The prosecutor explained that he

21  exercised his peremptory challenges because the African-American juror had engaged in petty

22  theft at the relatively mature age of 21, but had seemed hesitant about discussing the incident in

23  public; the juror had indicated a previous negative incident with police officers; the juror had

24  given answers that indicated specific bias against the prosecutor and State; the juror believed the

25  criminal justice system treated people unfairly; and the juror was single and never married,

26  indicating to the prosecutor that she may not be receptive to working in groups such as a jury.

1  (RAT 1732-1735.)  That finding is fully supported by the record and by applicable principles of

2  federal law.

3     In the third step of a <u>Batson</u> challenge, the trial court has "the duty to determine

4  whether the defendant has established purposeful discrimination," <u>Batson</u>, 476 U.S. at 98, and

5  therefore must evaluate the "persuasiveness" of the prosecutor's proffered reasons, <u>see</u> <u>Purkett</u>,

6  514 U.S. at 768.  In determining whether a petitioner has carried this burden, the Supreme Court

7  provides that "a court must undertake 'a sensitive inquiry into such circumstantial and direct

8  evidence of intent as may be available.' "  <u>Batson</u>, 476 U.S. at 93 (quoting <u>Arlington Heights v.</u>

9  <u>Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 266 (1977)); <u>see also</u> <u>Hernandez</u>, 500 U.S. at 363.

10  "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for

11  purposeful discrimination."  <u>Purkett</u>, 514 U.S. at 768; <u>see also</u> <u>Lewis v. Lewis</u>, 321 F.3d 824, 830

12  (9th Cir. 2003)("[I]f a review of the record undermines the prosecutor's stated reasons, or many

13  of the proffered reasons, the reasons may be deemed a pretext for racial discrimination.")

14     Here, the prosecution explained that he exercised his peremptory challenge as to

15  the juror for numerous reasons not related to her membership in a protected group.  Based on

16  these reasons, the trial judge found no pretext in the prosecutor's use of peremptory challenge.

17  According to the judge, the prosecutor "did a pretty good job in articulating his factors and

18  reasons in choosing these particular jurors."  RAT 1737.  To the trial court, the prosecutor's

19  demeanor or credibility were consistent with these reasons.  <u>See</u> Hernandez, 500 U.S. at 365

20  ("[T]he best evidence often will be the demeanor of the attorney . . . evaluation of the

21  prosecutor's state of mind based on demeanor and credibility lies peculiarly within the trial

22  judge's province.")  Absent clear and convincing evidence to the contrary, deference to the trial

23  court's opinion that the prosecutor is telling the truth is required.  <u>Miller-El v. Dretke</u>, 54 U.S.

24  231, 240 (2005).

25  /////

26  /////

18

The prosecutor provided legitimate[3] and "reasonably specific" reasons for the prosecution to exercise its peremptory challenges.  Batson, 476 U.S at 98 n.20.  Outside the presence of the other jurors, the juror stated that "[she] shoplifted some items while [she] was a student at Cal State Los Angeles from the campus student store." (RAT 1692-1693.)  Based on this event, and the juror's unwillingness to discuss it in open court, the prosecutor was "concerned." (RAT 1733.)  According to the prosecutor, this concern, and the juror's age at the time of the incident caused him to question how minor the incident truly was, and to have doubts about the juror's honesty.  Id.

In addition, the prosecutor was particularly concerned with the juror's feelings toward law enforcement, noting that multiple responses on the juror's questionnaire indicated a "specific bias" towards the State.  (RAT 1734.)  See Mitleider v. Hall, 391 F.3d 1039 (9th Cir. 2004)(finding no grounds for habeas relief where trial court considered prosecutor's concerns of bias toward law enforcement a valid basis for excusal).  The juror also indicated that she had a bad experience with two police officers who had pulled her over in the early 1990's in Long Beach, California.  (RAT 1695.)  The juror agreed with the proposition that the criminal justice system treats some individuals differently because of their race.  (RAT 1696.)  The juror described two names with which she was familiar, William Mobia Jamal,[4] and Geronimo Pratt,[5] and stated that racial or ethnic issues were involved in Mr. Pratt's case.  (RAT 1697.)

Evaluation of the entire record shows the legitimacy of the prosecutor's stated reasons for exercising his peremptory challenge.  See Hernandez, 500 U.S. at 363.  The

---

[3]  A "legitimate reason" is a reason that does not deny equal protection.  See Hernandez, 500 U.S. at 359; cf. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255 ("The explanation provided must be legally sufficient to justify a judgment for the defendant.")

[4]  The juror stated the name William Mobia Jamal, and described some facts around the conviction of a Philadelphia journalist who murdered a police officer on December 9, 1981.  The correct name of the defendant in that case is Mumia Abu-Jamal.

[5]  Geronimo Pratt was convicted in 1972 of murder and kidnaping.  His sentence was overturned in 1997.

1   prosecutor exercised a peremptory challenge on another juror prior to excusing the African-

2   American juror.  (RAT 1697.)  If the prosecutor's motive in exercising his peremptory challenge

3   had been racially based, it is difficult to reason why he would have waited.  Furthermore, the

4   record fails to demonstrate that retained other non-minority jurors with backgrounds or opinions

5   similar to the excused African-American.  See Lewis v. Lewis, 321 F.3d at 824 (employing

6   comparative analysis to Batson issues).  For example, dismissed prospective juror Desroachers

7   indicated that she may have had a specific bias toward law enforcement based upon treatment

8   that her brother received during a previous criminal matter.  (RAT 1707.)

9           As a result of the law in place at the time of its findings, the trial court applied an

10  impermissibly harsh standard to petitioner's prima facie Batson case.  However, the judge's

11  solicitation from the prosecutor of neutral reasons for his peremptory challenge negated any error

12  that may have occurred.  The reasons set forth by the prosecutor were legitimate and race-neutral

13  reasons for exercising his peremptory challenges.  Relief is not warranted as there is no reason to

14  believe that the trial judge committed clear error in overruling petitioner's objection.

15          C.  Identification Procedures Employed by Law Enforcement

16          Petitioner's third claim is that sheriff's investigators used improperly suggestive

17  procedures in eliciting an eyewitness identification from a key prosecution witness.  Petitioner

18  argues that the eyewitness' in-court confrontation with petitioner at a pre-trial hearing was

19  improper.  Petitioner contends that information the eyewitness had received about petitioner from

20  other witnesses in the case, combined with petitioner's status as a defendant, combined to

21  produce an unreliable and prejudicial identification.

22          The California Court of Appeal addressed this claim as follows:

23          [Petitioner] maintains Spratling's positive identification of him as
            the driver was the product of an inherently suggestive identification
24          procedure, based on Spratling's knowledge of [petitioner's] name
            rather than his personal observation as a victim of the crime.
25          [Petitioner] argued in his earlier motion to suppress that when
            Spratling identified [petitioner] in earlier court proceedings, he
26          "had already heard or felt because of other information that he had

                                        20

from other people unconnected to the case or connected to the case, that Richard did it." The court ruled that the jury could determine "what engendered this particular identification," and give the identification its appropriate weight. Thereafter, the court instructed the jury on eyewitness identification. On appeal, [petitioner] contends the court erred in denying his motion to suppress testimony about the pretrial identification.

A pretrial procedure that is unnecessarily suggestive and conducive to "irreparable mistaken identification" denies a defendant due process unless the prosecution demonstrates the subsequent in-court identification is based on an independent, untainted source. (*People v. Caruso* (1968) 68 Cal. 2d 183, 187-188; *Moore v. Illinois* (1977) 434 U.S. 220, 225-226 [54 L.Ed.2d 424, 431-432]; *Stovall v. Denno* (1967) 388 U.S. 293, 301-302 [18 L.Ed.2d 1199, 1206].) Resolution of the issue involves a consideration of the totality of the circumstances. (*Id.* at p. 302 [18 L.Ed.2d at p. 1206]; *People v. James* (1976) 56 Cal.App.3d 876, 884.) Based on our review of the record, we conclude the court properly denied the motion to suppress.

Spratling had the opportunity to view the driver of the Mustang both times the car pulled next to the Cougar. The passengers in the two cars exchanged "hard looks" each time the two cars approached each other. Based on what he had seen, Spratling described the driver as a light-skinned African American, 17 to 20 years of age, slim, with long braided hair. When the detectives showed Spratling a photo lineup the day after the shooting, he selected two men he said could have been the driver. One was the [petitioner]. [Petitioner] does not challenge the propriety of the photo lineup.

[Petitioner's] theory that Spratling learned from "other people unconnected to the case or connected to the case [] that Richard did it" was not supported by an offer of proof. Nor did it render the subsequent identification unreliable as a matter of law in light of Spradling's [sic] two opportunities to see the driver shortly before the shooting, his later description of the driver, and selection of [petitioner] from the photo spread as a possible suspect. Although the prosecutor indicated in the first trial that Dedmon was the source of information that "it was Richard," evidence Spratling knew the name of the driver merely contradicted prosecution evidence of the independent source of his identification. In these circumstances, the court properly left it to the jury duly instructed on eyewitness identification to determine whether Spratling's identification was based on his own "honest recollection" or what others had told him.

(People v. Williams, slip op. at 22-23.)

/////

21

1    Due process requires identification free from impermissible suggestion by law

2 enforcement.  United States v. Love, 746 F.2d 477, 478 (9th Cir. 1984).  In determining the

3 validity of an in-court identification, the totality of the circumstances must be examined.

4 Simmons v. United States, 390 U.S. 377, 384 (1968).  Several factors, including the opportunity

5 of the witness to view the criminal at the time of the crime, the witness' degree of attention, the

6 accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by

7 the witness at the confrontation, and the length of time between the crime and the confrontation

8 should be considered in assessing the reliability of the witness' identification and whether the

9 confrontation leading to the identification was impermissibly or unduly suggestive.  Neil v.

10 Biggers, 409 U.S. 188, 196 (1972).

11    The Court of Appeal's ruling on this issue was neither contrary to, nor an

12 unreasonable application of federal law.  Indeed, the Court of Appeal properly applied the

13 relevant test in its analysis.  (People v. Williams, slip op. at 22-23.)  The mere fact that the

14 witness was unable to single out petitioner in the initial line-up, and had seen him in custody at a

15 preliminary hearing were of little consequence given the factors surrounding the initial

16 identification.  See Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995).

17    The Constitution prohibits only unnecessary or impermissibly suggestive pretrial

18 identifications.  Neil, 409 U.S. at 196.  Due to the State's strong interest in conducting court

19 proceedings, it cannot be said that an identification made at a pretrial hearing violates due

20 process.  Johnson, 63 F.3d 929; Baker v. Hocker, 496 F.2d 615, 617 (9th Cir. 1974).  Nothing in

21 the pretrial procedures suggest that they were impermissibly suggestive.  Indeed, defense retained

22 the right to request a neutral seating arrangement or engage in cross-examination.  Johnson, 63

23 F.3d at 929.

24    Furthermore, the identification of petitioner by Mr. Spratling was not rendered

25 fundamentally unfair simply because the witness learned petitioner's name subsequent to the

26 shooting.  Johnson, 63 F.3d at 929("The bare fact that a confrontation was suggestive does not

1  alone establish constitutional error.")  Even if the court were to assume that Mr. Spratling's

2  awareness of petitioner's name and his confrontation at the pre-trial hearing was unduly

3  suggestive, significant indicia of reliability remain.  Manson v. Brathwaite, 432 U.S. 98, 106

4  (1977).  Mr. Spratling described in detail his observations of petitioner immediately prior to and

5  at the time of the shooting, describing his height, build, skin color, and hair style.  (RT 190-200).

6  The evidence detailed how petitioner and Mr. Spratling exchanged two separate "hard looks"

7  within 30 seconds of each other that lasted approximately five seconds each.  (RT 182, 83, 210,

8  213.)  Mr. Spratling described these looks from petitioner as being "very attentive" and focused

9  only on the victims.  (RT 182, 183.)  On the first pass, Mr. Spratling observed these looks from

10  seven feet away.  (RT 187.)  Mr. Spratling was "almost positive" with his in-court identification

11  during the trial, stating "I seen him with my own two eyes and, I mean, like it isn't like I'd forget

12  his face, you know."  (RT 198.)  Immediately after the incident, the victim described to

13  detectives a person fitting petitioner's description and identified him in one of the two photos

14  selected in the photographic lineup[6].  Id.; RAT 1118 (describing lineup as occurring

15  approximately 24 hours after the shooting).  Mr. Spratling denied defense counsel's contention

16  that the identification was influenced by Petitioner's appearance in court, stating, "I went on my

17  judgment based on the facts that I had in my mind . . . [o]f the person that I seen driving the green

18  Mustang on August 12th.  (RT 627.)

19        Nothing in the record suggests any substantial likelihood of misidentification.

20  Brathwaite, 432 U.S. at 114-116; see also Gray v Klauser, 282 F.3d 633 (9th Cir. 2002), reversed

21  and remanded on other grounds, (upholding identification by witness that "had a good

22  opportunity to view [the defendant]," was paying a relatively high degree of attention, accurately

23  described most of the physical characteristic of petitioner, and was fairly sure at the photo lineup

24  three days after the incident.)  There was no impermissible or suggestive pre-trial identification

25

26        _____

[6] Petitioner does not challenge the initial photographic lineup in this habeas petition.

1    and abundant adequate and independent grounds to ensure the reliability of Mr. Spratling's

2    identification of petitioner as the driver of the green Mustang used in the shooting.  The court

3    does not find any due process violation associated with the victim's identification of petitioner.

4         D.  Prior Inconsistent Statements

5              Petitioner next claims that the trial court erred when it admitted prior inconsistent

6    statements that petitioner claims were made by non-testifying declarants.  The result was double

7    hearsay with no recognized exception and a violation of petitioner's right to confront the

8    witnesses against him.  Petitioner argues that the trial court's admission of these statements under

9    an exception to the hearsay rule impermissibly resulted in their consideration as substantive

10   evidence that tended to prove or disprove a fact in question.

11             The California Court of Appeal addressed this claim as follows:

12             As we explained, Christine Jordan's trial testimony regarding the
               events of August 12, 1996, differed from earlier statements she
13             made to her daughter and the deputy who investigated the August
               14 shooting at the duplex. [Footnote omitted.] Defense counsel
14             sought exclusion of the prior inconsistent statements on the
               grounds of lack of personal knowledge, multiple hearsay, undue
15             prejudice, and relevancy.  In denying the defense motion, the court
               ruled that "[w]here she got that knowledge and how she has that
16             knowledge is just one of the factors, or a couple of factors the jury
               is going to assess and consider in assessing credibility."  It
17             encouraged both counsel to explore the question in detail at trial.
               The court also gave the parties notice it might change its ruling,
18             and find the statements hearsay, after hearing all of the testimony.

19             On appeal, [petitioner] argues the court erred in admitting Jordan's
               prior inconsistent statements for the truth of the matter asserted
20             because there was insufficient evidence those statements were
               based on her personal knowledge.  He argues the court should have
21             made the determination rather than giving the question to the jury.
               Alternatively, [petitioner] urges that "assuming Jordan's personal
22             knowledge was sufficiently established for the question to go to the
               jury, the trial court recognized that the jury could reasonably find
23             that the source for Jordan's inconsistent statement was not her
               personal knowledge but the hearsay of another – her son Aaron
24             Struther[s] and/or police.  Under these circumstances, the trial
               court's 'inconsistent statement' instruction was erroneous because
25             it allowed the jury to consider Jordan's inconsistent statements for
               the truth of the matter asserted even if the jury found that the
26             source for her statements was her son Aaron Struther[s].  In effect,

24

1   the instruction allowed the jury to convict [petitioner] upon the
    hearsay of Struther[s], for which there was no hearsay exception."
2   (Underscore in original.)  There is no merit in [petitioner's]
    argument.

3
    Evidence Code section 1235 provides that "[e]vidence of a
4   statement made by a witness is not made inadmissible by the
    hearsay rule if the statement is inconsistent with his testimony at
5   the hearing and is offered in compliance with Section 770."
    Evidence Code 770 states that "[u]nless the interests of justice
6   otherwise require, extrinsic evidence of a statement made by a
    witness that is inconsistent with any part of his testimony shall be
7   excluded unless: [¶] (a) The witness was so examined while
    testifying as to give him an opportunity to explain or to deny the
8   statement; . . . ."  The parties agree that the prior inconsistent
    statement must be based on the declarant's personal knowledge.
9   (*People v. Williams* (1997) 16 Cal.4th 153, 199-200.)

10  We conclude there is sufficient evidence to support the court's
    decision to admit the inconsistent statements.  The prosecutor
11  argued Jordan's earlier statements were based on personal
    knowledge because: (1) she was present when the green Mustang
12  would have been there; and (2) she was present when Struthers and
    Franklin returned and made a phone call.  Jordan's statements were
13  consistent with counsel's representations.  Defense counsel
    declined to explore the source of her knowledge during cross-
14  examination.  On this record, we cannot say the court erred in
    admitting the prior inconsistent statements and thereafter allowing
15  the jury to consider them.

16  We also conclude the jury was properly instructed on how to deal
    with Jordan's inconsistent statements once they were received in
17  evidence.  The standard instructions informed the jury it could
    consider the statements "for the purpose of testing the credibility of
18  the witness" and also "as evidence of the truth of the facts as stated
    by the witness on such former occasions." [Footnote omitted.]
19  (CALJIC No. 2.13.)  Evidence of the witness's personal knowledge
    and prior inconsistent statements were factors for the jury to
20  consider in determining credibility.  (CALJIC No. 2.20.)  Under
    these instructions, the jury could reject entirely Jordan's prior
21  inconsistent statements if it determined Jordan was merely
    repeating what she had heard from others.

22

23  (People v. Williams, slip op. at 23-26.)

24          As noted above, a federal habeas court has no authority to review challenges to

25  state-court determinations of state-law questions.  Estelle, 502 U.S. at 68.  Habeas review is

26  limited to determining whether a conviction violated the Constitution, laws, or treaties of the

25

1   United States.  28 U.S.C. § 2241; Rose, 423 U.S. at 21.  A federal habeas court "cannot review

2   questions of state evidence law" and may only consider "whether the petitioner's conviction

3   violated constitutional norms."  Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999).  There

4   was no such violation in this case.

5          The Sixth Amendment, as incorporated through the Due Process Clause of the

6   Fourteenth Amendment, guarantees to a defendant the right to confront the witnesses against

7   him.  Pointer v. State of Texas, 380 U.S. 400 (1965).  "The clause admits, where necessary, the

8   admission of certain hearsay statements against a defendant despite the defendant's ability to

9   confront the declarant at trial."  Maryland v. Craig, 497 U.S. 836, 847 (1990).  In order to

10  conform to the requirements of the Constitution, evidence must generally be excluded unless it

11  contains some guarantee of trustworthiness.  Ohio v. Roberts, 448 U.S. 56, 66 (1980).  Indicia of

12  reliability are found in "firmly rooted hearsay exception[s]" or where the statement is supported

13  by "a showing of particularized guarantees of trustworthiness."  Id.

14         Spontaneous declarations and statements made for medical purposes are two

15  examples of firmly rooted exceptions to the hearsay rule that do not implicate the Sixth

16  Amendment.  White v. Illinois, 502 U.S. 346, 357 (1992).  There is no indication in the case law

17  that such an exception exists for the prior inconsistent statements at issue in this case.  As such,

18  the Court of Appeal's properly focused on Ms. Jordan's presence at the time that the events to

19  which the statements referred would have occurred as sufficient indicia of their reliability.

20         Confrontation issues may result when the witness' prior statement concerns what

21  others may have told her.  See Guardado v. Stainer, 30 F.3d 139 (9th Cir. 1994)(granting habeas

22  relief where trial court improperly admitted prior inconsistent statement based upon statements by

23  a third party.)  However, the record fails to provide any indication that the source of the witness's

24  prior inconsistent statement was a third party.  The Court of Appeal correctly noted that the

25  witness testified to being present when the events that were the focus of her statements could have

26  occurred.  (RAT 964.)  While petitioner argues that the witness based her prior inconsistent

1   statement on the comments of her son, at trial the witness repeatedly affirmed that no one had told

2   her what had happened.  (RAT 975, 980, 1083, 1084.)  Indeed, at trial the witness denied even

3   making the statement, let alone that she had simply relayed information told to her by someone

4   else.  Furthermore, there was no indication that the witness offered any objection, hesitation, or

5   qualification in her prior statement.  (RAT 1128.)

6          Where an evidentiary basis for the admitted evidence exists, and the witness

7   testifies and is given the opportunity to explain the inconsistency, the Confrontation Clause is not

8   violated.  California v. Green, 399 U.S. 149 (1970).  As properly instructed by the judge, the jury

9   could consider Ms. Jordan's statements both for their truth, as well as for assessing her credibility.

10  The Court of Appeal's ruling was neither contrary to, nor an unreasonable application of federal

11  law.

12         E.  Witness Testimony About Threats and Intimidation

13         Petitioner's fifth claim is that the trial court erred when it permitted testimony from

14  a witness about the threat he felt from petitioner and his family.  Petitioner claims that the

15  admission of this testimony violated his rights under the 14th Amendment.  According to

16  petitioner, the prejudicial effect of the admitted testimony outweighed its probative value.

17         The California Court of Appeal addressed this claim as follows:

18         Corey Schuler approached the prosecutor during a break in the
       trial, and expressed concern about testifying.  The court examined
19         Schuler outside the presence of the jury.  Schuler confirmed he was
       concerned for his safety and the safety of his family following an
20         incident involving Aaron Struthers.  The court determined that the
       incident was relevant in explaining Schuler's inconsistent
21         testimony, and allowed Schuler to testify over defense objections.
       Thereafter, Schuler explained to the jury that he was married with
22         three children, feared that his testimony endangered their safety,
       and believed this fear affected his testimony.  He testified that
23         Struthers had made the hand gesture of pointing a "trigger finger"
       toward him during a rap performance at church.  The incident
24         occurred just after Schuler testified in an earlier proceeding.

25         [Petitioner] contends the court abused its discretion in allowing
       Corey Schuler to testify about his belief that Aaron Struthers
26         threatened him, when there is no evidence linking [petitioner] to

27

1   the claimed threat and no evidence that Schuler changed his
2   testimony.  We conclude the evidentiary ruling was well within the
    court's discretion.

3   "Evidence a witness is afraid to testify is relevant to the credibility
    of that witness and is therefore admissible. [Citations.] Testimony
4   a witness is fearful of retaliation similarly relates to that witness's
    credibility and is also admissible. [Citation]" (*People v. Gutierrez*
5   (1994) 23 Cal.App.4th 1576, 1587, 1588.)  Contrary to
    [petitioner's] argument, "[i]t is not necessary to show threats
6   against the witness were made by the defendant personally, or the
    witness's fear of retaliation is directly linked to the defendant for
7   the evidence to be admissible. [Citation.]" (*Id.* at p. 1588.)

8   In this case the threat was relevant to the credibility of this
    important eyewitness.  The prosecutor had already identified
9   inconsistencies between the details of Schuler's trial testimony and
    his earlier statements.  On this record, the court could reasonably
10  conclude the probative value of the testimony outweighed any
    potential prejudice to [petitioner].

11

12  (People v. Williams, slip op. at 26-28.)

13       A state court's evidentiary ruling is not subject to federal habeas review unless the

14  ruling violates federal law, either by infringing upon a specific federal constitutional or statutory

15  provision or by depriving petitioner of the fundamentally fair trial guaranteed by due process. See

16  Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir.

17  1991).  Even when evidence is erroneously admitted, the federal habeas court cannot interfere

18  absent some apparent violation of fundamental due process and the right to a fair trial.  See Hill v.

19  United States, 368 U.S. 424, 428 (1962); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993).

20  Accordingly, a federal court cannot disturb a state court's decision to admit evidence on due

21  process grounds unless the admission of the evidence was "arbitrary or so prejudicial that it

22  rendered the trial fundamentally unfair."  See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir.

23  1995); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986);  see also Mancuso v. Olivarez, 292

24  F. 3d 939, 956 (2002) (a writ of habeas corpus will be granted for an erroneous admission of

25  evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the

26  /////

1  adversary system will not be competent to uncover, recognize, and take due account of its

2  shortcomings.'" (quoting Barefoot v. Estelle, 463 U.S. 880, 899 (1983)).

3       In addition, the Constitution entitles a criminal defendant to a fair trial, not a

4  perfect one. E.g., United States v. Hasting, 461 U.S. 499, 508-509 (1983); Bruton v. United

5  States, 391 U.S. 123, 135 (1968). Consequently, in order to obtain habeas relief on the basis of

6  evidentiary error, petitioner must show that the error was not harmless under Brecht v.

7  Abrahamson, 507 U.S. 619 (1993). To grant relief, the habeas court must find that the error had

8  "'a substantial and injurious effect' on the verdict." Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir.

9  2001) (quoting Brecht, 507 U.S. at 623). Petitioner has failed to meet his "heavy burden" in this

10  case. Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).

11       Corey Schuler testified that he feared retaliation against himself or his family as a

12  result of his testimony. (Reporter's Transcript [hereinafter "RT"] 677, 690.) The witness

13  described two incidents that caused him to form such a belief. In the first, an acquaintance of

14  petitioner's made what Mr. Schuler perceived to be a threatening gesture. (RT 674, 692.) In the

15  second, Mr. Schuler's young children were beaten up and picked on in a local playground. (RT

16  693.) Both of these incidents caused Mr. Schuler to fear being a witness in this case. (RT 694.)

17       Introduction of evidence of threats and intimidation solely in an attempt to paint a

18  picture of a defendant's character may violate due process. See Dudley v. Duckworth, 854 F.2d

19  967 (7th Cir. 1988), cert. denied, 490 U.S. 1011 (1989); see also United States v. Burton, 525

20  F.2d 17, 19 (2d Cir. 1975)(suggesting that threat evidence may "suggest decision on an improper

21  basis, commonly though not necessarily, an emotional one[.]") However, when introduced to

22  explain a witness' inconsistent statements or hesitancy at trial, the evidence can be proper. See

23  Gomez v. Ahitow, 29 F.3d 1128, 1139 (9th Cir. 1994)(finding that evidence of anonymous threats

24  made to witness were admissible to explain inconsistency in testimony); see also United States v.

25  Delillo, 620 F.2d 939, 945-46 (2d Cir. 1980)(discussing the government's ability to introduce

26  evidence of threats to explain contradictory or inconsistent testimony by their witnesses). It was

1  for this purpose that the evidence was admitted as Mr. Schuler stated that his testimony had been

2  impacted by the perceived threats.  (RT 677, 689)

3          Evidence of threats becomes more relevant when it relates to a key witness.  See

4  Gomez, 29 F.3d at 1139.  There was no doubt that the testimony given by Mr. Schuler was central

5  to both sides in this case.  The State noted Mr. Schuler's original description given the sheriff's

6  deputies of petitioner's mustang prior to receipt of the threats.  (RT 1204-05.)  Mr. Schuler's

7  testimony, and its various forms was highlighted by petitioner as well in his closing argument.

8  (RT 1245.)

9          The trial judge examined the witness to ascertain whether or not the witness'

10  account of the perceived threat was credible.  See United States v. Guerrero, 803 F.2d 783, 786

11  (3rd Cir. 1986)(describing balancing test to be undertaken when evidence of threats is admitted).

12  There is little doubt that the evidence from Mr. Schuler was critical to the State's case.  Id. at 785-

13  86.  Mr. Schuler testified to witnessing a young man he later described as the passenger in the

14  Mustang angry and talking about getting his gun just moments before the shooting.  (RT 592-94.)

15  He testified that he saw someone matching petitioner's description driving the Mustang toward

16  the shooting five minutes before hearing gunshots.  (RT 644.)  He also stated that he saw the

17  Mustang suspected in the shooting hurrying away from the scene immediately after hearing

18  gunshots.  (RT 647-48.)  When the vehicle passed by for the second time, after the gunshots

19  sounded and traveling at a high rate of speed, Mr. Schuler paid closer attention to the occupants,

20  seeing a passenger as well as someone fitting petitioner's description in the driver's seat.  (RT

21  657.)

22          However, at the trial, Mr. Schuler wavered in his description of the vehicle and the

23  person behind the wheel.  (RT 707, 787-88.)  As the vehicle used in the shooting and the identity

24  of its driver were central to the prosecution's case, the need to explain Mr. Schuler's contradictory

25  testimony was apparent.  See Guerrero, 803 F.2d at 786.  ([W]e believe that the factors tending to

26  establish the "need for the evidence" include the importance and centrality to the ultimate issue in

1    the case . . . , and the availability of other evidence to establish the fact sought to be proven by the

2    threat evidence."  Other than Mr. Spratling, no other witness testified to seeing the Mustang

3    leaving the scene or petitioner behind the wheel at the time of the shooting.)

4           The prejudicial effect of the testimony is significantly impacted by the fact that

5    there was no evidence the threat was made or directed by petitioner.  However, the threatening

6    gesture came from Aaron Struthers, a young man seen with the suspected shooter immediately

7    prior to the murder.  (RT 592, 692.)  Furthermore, there is no requirement of a nexus between the

8    threats and petitioner.  See Gomez, 29 F.3d at 1139.  Given the probative value of Mr. Schuler's

9    testimony, the trial court's admission of the threat evidence was neither contrary to, nor an

10   unreasonable application of federal law.

11          F.  Admission of Evidence About .25 Caliber Shell Casings

12          Petitioner argues that the trial court committed error when it permitted the

13   introduction of evidence about .25 caliber shell casings found in petitioner's vehicle.  Petitioner

14   argues that the evidence was unrelated to the case, serving only as improper character and

15   propensity evidence.  Petitioner claims that this violation of his right to due process entitles him to

16   relief.

17          The California Court of Appeal addressed this claim as follows:

18          [Petitioner] also argues the court abused its discretion admitting
             into evidence of [sic] the four .25 caliber casings found by
19          Detective Minter in [petitioner's] Mustang.  He insists "any
             minimal relevancy was substantially outweighed by prejudice
20          created if the jury found that the casings were not connected to the
             August 12 shooting, i.e., inherently prejudicial 'other crimes'
21          evidence."  We conclude the evidence was properly admitted under
             the prosecution's theory that two guns were used in the shooting.
22
             Evidence is relevant if it has "any tendency in reason to prove or
23          disprove any disputed fact that is of consequence to the
             determination of the action."  (Evid. Code, § 210.)  Here, there was
24          evidence in addition to the .25 caliber casings which supported the
             theory both defendant and his passenger fired at the Cougar.
25          Detective Minter explained that the casings found in the Mustang
             would have been ejected from a semiautomatic, since casings from
26          bullets fired from a revolver would have remained inside the

                                              31

cylinder.  Spratling testified the passenger fired a semiautomatic.
Criminalist Faye Springer stated that all the projectiles found in the
Cougar were .357 or .38 caliber and shot from a revolver.  There
were six holes in the body of the Cougar, but only four projectiles
were recovered.  Springer was unable to exclude a .25 as one of
those bullets.

It is, of course, true that the court has discretion under Evidence
Code section 352 to exclude evidence if the probative value is
substantially outweighed by the probability its admission will
result in undue prejudice.  However, "[t]he prejudice which
exclusion of evidence under Evidence Code section 352 is
designed to avoid is not the prejudice or damage to a defense that
naturally flows from relevant, highly probative evidence.  '[A]ll
evidence which tends to prove guilt is prejudicial or damaging to
the defendant's case.  The stronger the evidence, the more it is
"prejudicial."'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)
Instead, the statute seeks to avoid "prejudging" a person or cause
on the basis of extraneous factors.  (*People v. Zapien* (1993) 4
Cal.4th 929, 958.)

The record in this case reveals the .25-caliber casings were highly
probative of the two gun theory, and not unduly prejudicial under
the accepted reading of Evidence Code section 352.  Accordingly,
there was no abuse of discretion.

(People v. Williams, slip op. at 28-29.)

        As explained above, a state court's evidentiary ruling is not subject to federal

habeas review unless the ruling violates federal law, either by infringing upon a specific federal

constitutional or statutory provision or by depriving petitioner of the fundamentally fair trial

guaranteed by due process. See Pulley, 465 U.S. at 41; Jammal, 926 F.2d at 919-20.  Even when

evidence is erroneously admitted, the federal habeas court cannot interfere absent some apparent

violation of fundamental due process and the right to a fair trial.  See Hill, 368 U.S. at 428, 82

S.Ct at 468; Jeffries, 5 F.3d at 1192.  Accordingly, a federal court cannot disturb a state court's

decision to admit evidence on due process grounds unless the admission of the evidence was

"arbitrary or so prejudicial that it rendered the trial fundamentally unfair."  See Walters, 45 F.3d at

1355; Colley, 784 F.2d at 990; see also Mancuso, 292 F. 3d at 956.

        Petitioner has failed to meet his "heavy burden" in this case.  Boyde, 404 F.3d at

1172.  The admitted evidence of .25 caliber shell casings found in petitioner's car is entirely

1  consistent with the prosecution's theory that both petitioner and the passenger used a weapon.

2  (RT 1181, 1185, 1215.)  Bullets recovered from the victim's car came from a .357 or .38 caliber

3  revolver.  (RT 1037.)  However, only four of the six bullets that made holes in the victim's

4  vehicle were recovered.  (RT 1032, 1042.)  Due to the unrecovered bullets, Faye Springer, the

5  ballistics expert used by the State in this case, could not identify the type of ammunition that made

6  two of the holes in the side of the victim's car.  (RT 1049.)

7          Furthermore, Mr. Spratling testified to knowing the difference between a revolver

8  and semi-automatic handgun, and described the gun he saw in the shooting as a semi-automatic,

9  stating that it "couldn't have been a revolver."  (RT 215-16.)  Petitioner is correct that the Ms.

10  Springer could not conclusively say that more than one gun had been used in the shooting based

11  upon the bullets recovered from the scene and the size of holes made in the victim's vehicle.  (RT

12  1041.)  However, petitioner's contention that this somehow establishes the irrelevance of the .25

13  caliber ammunition is misplaced as Ms. Springer could also not state that only one gun had been

14  used in the shooting.  Id.; RT 1050.  Furthermore, Ms. Springer testified that a .25 caliber shell

15  would eject from a semi-automatic handgun, the same type of gun seen by Mr. Spratling.  (RT

16  1040.)  Given the nature of the State's theory of the case and the other evidence supporting that

17  theory, the trial court's admission of the .25 caliber shell casings was neither contrary to, nor an

18  unreasonable application of federal law.

19          G. Sufficiency of Evidence of First Degree Murder

20          Petitioner claims that the evidence at trial was insufficient to convict him of first

21  degree murder.  According to petitioner, the State failed to prove that he was either directly

22  involved in the murder, or an aider and abetter.  Petitioner argues that the questionable

23  identifications relied upon by the State amounted to mere conjecture as opposed to guilt beyond a

24  reasonable doubt.

25  /////

26  /////

1    The California Court of Appeal addressed this claim as follows:

2    Defendant asserts there is insufficient evidence to support his
     conviction of the charged crimes as either perpetrator or as an aider
3    and abettor.  He argues the prosecution identification evidence
     "amounted to nothing more than speculation and suspicion and was
4    dependent upon guesswork and surmise."  There is no merit to this
     argument.

5
     In considering the sufficiency of the evidence, we "review the
6    whole record in the light most favorable to the judgment below to
     determine whether it discloses substantial evidence – that is,
7    evidence which is reasonable, credible, and of solid value – such
     that a reasonable trier of fact could find the defendant guilty
8    beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d
     557, 578.)  "[W]e do not reweigh the evidence; the credibility of
9    witnesses and the weight accorded to the evidence are matters
     exclusively within the province of the trier of fact." (*People v.*
10   *McCleod* (1997) 55 Cal.App.4th 1205, 1221.)  Substantial
     evidence includes circumstantial evidence and reasonable
11   inferences flowing therefrom. (*People v. Cole* (1994) 23
     Cal.App.4th 1672, 1678.)

12
     Although conflicting in part, trial testimony placed [petitioner's]
13   Mustang at the scene of the crime, identified [petitioner] as the
     driver, and raised the possibility both a semiautomatic and revolver
14   were involved in the shooting. [Footnote omitted.] We conclude
     this evidence, and reasonable inference drawn from this evidence,
15   support [petitioner's] conviction as a perpetrator or as an aider and
     abettor.

16

17   (People v. Williams, slip op. at 29-31.)

18           When a challenge is brought alleging insufficient evidence, federal habeas corpus

19   relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

20   more favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond

21   a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  The court must review the

22   entire record when the sufficiency of the evidence is challenged on habeas.  Adamson v. Ricketts,

23   758 F.2d 441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986)

24   (en banc), rev'd, 483 U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the

25   testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate

26   facts."  Jackson, 443 U.S. 307, 319.  "The question is not whether we are personally convinced

                                              34

1  beyond a reasonable doubt.  It is whether rational jurors could reach the conclusion that these

2  jurors reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  Under Jackson, the federal

3  habeas court determines sufficiency of the evidence in reference to the substantive elements of the

4  criminal offense as defined by state law.  443 U.S. 307, 324 n.16.

5        Under California law, the jury could have concluded that petitioner unlawfully

6  killed another human being with malic aforethought, CAL. PENAL CODE § 187(a), or aided and

7  abetted another who committed first degree murder, CAL. PENAL CODE § 31.  In spite of the fact

8  that he did not conclusively identify petitioner until months later, Mr. Spratling resolutely,

9  repeatedly, and without hesitation stated under oath that petitioner was the person driving the

10 green Mustang used in the shooting.  (RT 190-200, 252.)  Mr. Schuler corroborated this

11 identification, describing someone fitting petitioner's description driving from the scene at a high

12 rate of speed immediately after he heard the shots.  (RT 647-48.)  Mr. Schuler also described how

13 the passenger in the Mustang had appeared angry moments before the shooting and stated that he

14 was going to get his "strap," or weapon.  (RT 592-94.)  The victim was killed by a .38 caliber

15 bullet, (RT 1042), a revolver that, according to Mr. Spratling, was different from the type of gun

16 used by the passenger in the vehicle, (RT 216).  Petitioner owned a green Mustang, (RT 896), and

17 while shell casings found in that car were .25 caliber, expert testimony did not preclude the use of

18 two guns in the shooting, (RT 1037, 1041), nor were all of the bullets that made holes in the

19 victim's car recovered, (RT 1032, 1042).

20       Furthermore, while there was some question raised about whether petitioner's

21 green Mustang was the one involved in the shooting, sufficient evidence existed to permit the jury

22 to draw that conclusion.  Sheriff's deputies testified that Mr. Schuler originally told them that

23 petitioner's vehicle was the one he saw leaving the shooting.  (RT 923.)  Mr. Spratling observed

24 petitioner at the wheel at the time of the shooting.  (RT 199.)

25       Whether the jury concluded that petitioner fired the fatal shot, or simply drove the

26 vehicle used in the shooting, there is ample evidence to support their verdict.  The prosecution

1  "need not affirmatively 'rule out every hypothesis except that of guilt'; and . . . a reviewing court

2  'faced with a record of historical facts that supports conflicting inferences must presume--even if it

3  does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in

4  favor of the prosecution, and must defer to that resolution.'" Wright v. West, 505 U.S. 277, 296-97

5  (1992) (quoting Jackson, 443 U.S. at 326)).  There was no error in the finding that sufficient

6  evidence supports the jury's verdict in this case.

7       H. Trial Court's Jury Instruction Regarding Express Malice Aforethought

8            Petitioner argues that the trial court's jury instruction regarding an essential

9  element of first degree murder was in error.  According to petitioner, the court failed to

10 specifically instruct that express malice aforethought was an essential element to the crime of first

11 degree murder based upon firing a weapon from a vehicle.  Petitioner contends that this error

12 requires granting of his habeas petition.

13           The California Court of Appeal addressed this claim as follows:

14           [Petitioner] contends he is entitled to reversal because the court did
             not instruct the jury that express malice aforethought murder was
15           an essential element of first degree murder based on the discharge
             of the firearm from a motor vehicle.  Relying on a footnote in
16           *People v. Rodriguez* (1988) 66 Cal.App.4th 157, 164, footnote 5,
             he suggests the drive-by murder instruction, which omitted all
17           mention of "express malice aforethought," permitted the jury "to
             convict [[petitioner]] of first degree murder based on implied
18           malice murder – a non-existent crime."  We conclude there was no
             error in instructing the jury.

19
             "'The trial court is required to instruct sua sponte only on general
20           principles of law relevant to issues raised by the evidence. . . .'"
             (*People v. Lang* (1988) 49 Cal.3d 991, 1023.)  "'It need not instruct
21           on specific points or specific theories which might be applicable to
             a particular case, absent a request for such an instruction.'" (*People
22           v. Ramsey* (2000) 79 Cal.App.4th 621, 630.)

23           In this case, the court properly instructed the jury on the definition
             of murder, malice aforethought, deliberate and premeditated
24           murder, and drive-by murder in accordance with CALJIC Nos.
             8.10, 8.11, 8.22, and 8.25.1.  The instruction on drive-by murder
25           traced the language of section 189, stating: "Murder which is
             perpetrated by means of discharging a firearm from a motor vehicle
26           *intentionally at another person outside the vehicle when the*

1      *perpetrator specifically intended to inflict death* is murder of the
first degree." (Emphasis added.)  This instruction, along with the
2      other instructions relating to murder, correctly informed the jury on
the elements of first degree murder.  [Petitioner] waived the
3      instructional issue on appeal by failing to request clarification or
amplification of the murder instruction at trial.
4

5 (People v. Williams, slip op. at 31-32.)

6            In general, a challenge to jury instructions does not state a federal constitutional

7 claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456

8 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to

9 warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable,

10 erroneous, or even "universally condemned,"' but must violate some due process right guaranteed

11 by the Fourteenth Amendment."  Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting

12 Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail on such a claim petitioner must

13 demonstrate that the "ailing instruction . . . so infected the entire trial that the resulting conviction

14 violates due process.'"  Middleton v. McNeil, 541 U.S. 433, 124 S. Ct. 1830, 1832 (2004) (quoting

15 Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. 147)).  In making its determination, this court

16 must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a

17 component of the entire trial process.'"  Prantil, 843 F. 2d at 317 (quoting Bashor v. Risley, 730

18 F.2d 1228, 1239 (9th Cir. 1984)).

19            An error in the giving of jury instructions is a "trial error" as distinct from a

20 "structural defect."  Arizona v. Fulminante, 499 U.S. 279, 309-10 (1991); Drayden v. White, 232

21 F. 3d 704, 709 (9th Cir. 2000).  A federal court may grant habeas relief based on trial error only

22 when that error "'had substantial and injurious effect or influence in determining the jury's

23 verdict.'"  Brecht, 507 U.S. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

24 If a reviewing court is in "grave doubt" as to whether the error had such an effect, the petitioner is

25 entitled to the writ.  Coleman v. Calderon, 210 F.3d 1047, 1051 (9th Cir. 2000).

26 /////

1    Petitioner did not object to the jury instructions.  Timely objection is a necessary

2    prerequisite in order to permit the trial court to correct any instructional mistakes before the jury

3    retires.  See Leary v. United States, 395 U.S. 6, 32 (1969).  Absent an objection, the court is not

4    permitted to review the due process claim made by petitioner.  Osborne v. Ohio, 495 U.S. 103,

5    123 (1990).

6    Petitioner contends that the trial court's instruction impermissibly enlarged the

7    elements of Cal. Penal Code § 190.2(a)(21) to include implied malice aforethought.  The

8    judicial enlargement of a criminal statute violates the federal due process right to fair warning of

9    what constitutes criminal conduct.  See Bouie v. City of Columbia, 378 U.S. 347, 353 (1964);

10   LaGrand v. Stewart, 133 F.3d 1253, 1260 (9th Cir. 1987).  The crucial test of whether a statute

11   has been impermissibly enlarged is "whether the construction actually given the statute was

12   foreseeable."  McSherry v. Block, 880 F.2d 1049, 1053 (9th Cir. 1989).

13   The Court of Appeal's finding was neither contrary to, nor an unreasonable

14   application of federal law.  The challenged instruction tracked the standard instruction.  As a

15   result, it cannot be said to have been unforeseeable and impermissible.  See Webster v. Woodford,

16   369 F.3d 1062, 1075 (9th Cir. 2004).

17   Furthermore, federal habeas relief would not be warranted even if petitioner had

18   properly objected to the instruction.  The court instructed the jury on the elements of murder,

19   noting that murder under section 187 required "malice aforethought" and explained what that term

20   meant to include both express and implied malice aforethought.  (RT 1136, 1154-55.)  In addition,

21   as it concerned the special circumstances, the trial judge stated that conviction required an intent

22   to discharge a firearm at another person with an intent to inflict harm.  (RT 1137, 1157.)

23   Petitioner claims that the express or implied malice aforethought requirement

24   contained in the first degree murder instruction impermissibly bleeds into the drive-by shooting

25   instruction.  According to petitioner, murder committed from a vehicle requires only intent, or

26   express malice.  Consequently, the trial court's instruction that drive-by murder under section

1    190.2(a)(21) equals first-degree murder must therefore improperly incorporate both the express

2    and implied aspects of malice aforethought.

3              Petitioner claims that the drive-by murder instruction must be limited to express

4    malice in order to bring it in conformity with People v. Rodriguez, 66 Cal.App.4th 157, 164, fn. 5

5    (1988)(Sections 189 and 190.2(a)(21) . . . , require that the shooting out of a vehicle be both

6    "intentionally at another person" and "with the intent to inflict death.") The trial court instruction

7    did not include any malice component in its explanation of the elements of section 190.2(a)(21),

8    murder which is perpetrated by means of discharging a firearm from a motor vehicle.  (RT 1157.)

9    As such, it must be presumed that the jury found express malice.  To find implied malice, the jury

10   would have had to find recklessness, or a conscious disregard for human life.  Lara v. Ryan, 455

11   F.3d 1080, 1086 (9th Cir. 2006).  One who consciously *disregards* human life cannot also act

12   with the conscious *objective* of bringing about their desired result.  Id.

13             As explained by the trial court in its instructions, discharging a firearm from a

14   vehicle requires a specific intent to target another person and an intent to inflict death.  As a result

15   of this intent requirement, it necessarily follows that to be convicted of the crime, one must be

16   more than reckless; the act cannot be one of implied malice.  Id. (quoting People v. Gallagher, 69

17   N.Y.2d 525, 529, 508 N.E.2d 909 (N.Y.1987)("The act is either intended or not intended; it

18   cannot simultaneously be both.")  Even assuming that the trial court erred in its failure to instruct

19   on express and implied malice as they relate to section 190.2(a)(21), the error was inconsequential

20   as the jury necessarily found petitioner acted with express malice when it returned a guilty verdict

21   under section 190.2(a)(21) because the jury could not have simultaneously found petitioner

22   possessed the requisite intent to inflict death while also being reckless.  See Keating v. Hood, 191

23   F.3d 1053, 1063 (9th Cir. 1999)(finding reversal not required where the jury relied upon the

24   legally correct theory to convict the defendant.)  Based on its findings, the jury clearly found no

25   recklessness, rather, an intentional act designed to bring about a desired result.  The jury's finding

26   indicates that it found express malice.

I. <u>Sufficiency of Evidence Relating to Special Circumstance Allegation</u>

Petitioner claims that there was insufficient evidence to support the jury's conclusion that he met the requirements of the special circumstance charge.  Petitioner argues that there was no credible evidence linking him with any handgun used in this crime.  As a result, the elements of discharging a firearm from a vehicle cannot be met.  According to petitioner, there was no eyewitness testimony and insufficient physical evidence that he possessed or used a handgun at any time.

The California Court of Appeal addressed this claim as follows:

> The amended information alleged as a special circumstance in count one that [petitioner] committed murder "by means of discharging a firearm from a motor vehicle, intentionally at another person or persons outside the vehicle with the intent to inflict death, . . . ."  [Petitioner] argues the jury's true finding must be reversed and the allegation dismissed because "the evidence is insufficient for a finding that [he] was the actual killer or aided and abetted the passenger with the intent to kill."  Even if we were to assume for purposes of [petitioner's] argument that the jury rejected the two-gun theory and convicted [petitioner] of murder as an aider and abettor, we conclude circumstantial evidence and the reasonable inferences flowing from that evidence support the finding [petitioner] acted with an intent to kill.
>
> As the Supreme Court recently explained in *People v. Prettyman* (1996) 14 Cal.4th 248, "an aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages, or instigates, the commission of the crime.'" (*Id.* at p. 259, quoting *People v. Beeman* (1984) 35 Cal.3d 547, 561.)
>
> "'[An aider and abettor] is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets . . . ¶ It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator.  His knowledge that an act which was criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonable foreseeable offense committed as a consequence by the perpetrator.  It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of

the target offense, which . . . must be found by the jury' [Citation.] Thus, . . . a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for the other crime that is the 'natural and probably consequence' of the target crime." (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 261, quoting *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5.)

*In re Jose D.* (1990) 219 Cal.App.3d 582 involved a challenge to the sufficiency of the evidence that Jose D. was an aider and abettor to a drive-by shooting in which the victim died.  The court rejected [petitioner's] argument, stating: "The record contains sufficient evidence that [petitioner] drove the car on the sidewalk as he was following the girls and deliberately maneuvered the car within three feet of them as [his accomplice] Aaron G. pointed a gun at them.  [Petitioner] parked the car in front of the house as Aaron G. aimed the gun and shot Ismael Lopez.  This supports the conclusion that he acted with the requisite knowledge and intent as an aider and abettor in each of the three offenses."  (*Id.* at p.585.)

Similarly, the record in this case supports the jury's implied finding defendant had the requisite knowledge and intent.  [Petitioner] *twice* pulled the Mustang close to the Cougar.  In the first encounter, [petitioner] slowed the Mustang next to the Cougar.  He and the passenger gave Chase, Dedmon, and Spratling "hard looks."  [Petitioner] then pulled the Mustang ahead and "came back around" next to the Cougar as it stopped at an intersection.  [Petitioner] and the passenger once again turned "hard looks" on the victims, and the passenger began shooting.  [Petitioner] encouraged and facilitated the passenger in his deadly purpose by maneuvering the Mustang close to the Cougar.  A jury could reasonably infer from these circumstances that [petitioner] had the intent to kill.

(People v. Williams, slip op. at 32-34.)

As explained above, when a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light more favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt.  Jackson, 443 U.S. at 319.  Without granting the argument, the Court of Appeal assumed that the jury rejected the State's two gun theory.  Consequently, a finding under section 190.2(a)(21) could only be made if it were proven that petitioner aided and abetted someone who did shoot a firearm from the green Mustang driven by petitioner with the intent to kill.  See CAL. PENAL CODE § 31.  "Judged by the elements defined in

1  California law," <u>Jackson</u>, 443 U.S. at 324 n.16, the jury could have concluded that petitioner aided

2  and abetted someone who did discharge a firearm with the requisite intent while in a vehicle.

3  Cal. Penal Code § 190.2(a)(21).

4        As noted by the Court of Appeal, petitioner was the owner and operator of a

5  vehicle that was used in a drive-by shooting.  (RT 896).  It cannot be argued credibly that

6  petitioner was unaware of the intended acts of his passenger.  Along with his passenger, petitioner

7  engaged in "hard looks" towards the victims on two instances.  (RT 182, 83, 210, 213.)  Indeed,

8  after initially passing the victims, petitioner turned his vehicle around and pulled alongside the

9  victim's car a second time.  (RT 201, 203, 207-08.)  Furthermore, petitioner was driving with a

10  passenger who was upset enough to arouse the attention of neighbors immediately prior to the

11  shooting and who had stated that he was going to get his gun.  (RT 592-94.)

12        These facts provide a basis upon which reasonable jurors could conclude that

13  petitioner aided and abetted the commission of a offense with a firearm in violation of Cal.

14  Penal Code § 190.2(a)(21).  The prosecution "need not affirmatively 'rule out every hypothesis

15  except that of guilt'; and . . . a reviewing court 'faced with a record of historical facts that supports

16  conflicting inferences must presume--even if it does not affirmatively appear in the record--that

17  the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that

18  resolution.'"  <u>Wright</u>, 505 U.S. at 296-97 (quoting <u>Jackson</u>, 443 U.S. at 326)).

19  The Court of Appeal's evaluation of the evidence establishing petitioner's status as an accomplice

20  to the person who actually fired the weapon was not contrary to, nor an unreasonable application

21  of federal law.

22        J. <u>Cumulative Impact of Errors and Irregularities</u>

23        Petitioner's final claim is that the cumulative impact of the numerous errors and

24  irregularities committed by the prosecutor and the trial court require granting of his habeas

25  petition.  According to petitioner, even if no single error warrants relief, the sum total of many

26  /////

1  small errors committed during the course of his trial deprived him of his right to due process.

2  Petitioner states that granting of his petition is the only way to address these alleged irregularities.

3              As explained above, petitioner has failed to establish that any of his allegations of

4  error amounted to a constitutional violation.  While several substantial errors may nevertheless be

5  so prejudicial to warrant relief, see United States v. de Cruz, 82 F.3d 856, 868 (9th Cir. 1996), that

6  is not the situation in this case.  Petitioner has not demonstrated any error occurred in his trial.  As

7  such, there is no valid claim of cumulative error.  See United States v. Carreno, 363, F.3d 883,

8  889 n.2 (9th Cir. 2004).

9              For the foregoing reason, IT IS HEREBY RECOMMENDED that petitioner's

10  application for a writ of habeas corpus be denied.

11              These findings and recommendations are submitted to the United States District

12  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

13  after being served with these findings and recommendations, any party may file written objections

14  with the court and serve a copy on all parties.  Such a document should be captioned "Objections

15  to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file

16  objections within the specified time may waive the right to appeal the District Court's order.

17  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

18  DATED:  December 19, 2006.

19

20                                    UNITED STATES MAGISTRATE JUDGE

21

22  13/habeas

23  Williams.0721.F&R.wpd

24

25

26