1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

RICHARD ALEX WILLIAMS,

10              Petitioner,              No. 2:03-cv-0721-JAM JFM (HC)

11      vs.

12  CHERYL PLILER,

13              Respondent.              FINDINGS & RECOMMENDATIONS

14  _____/

15          Petitioner is a state prisoner, proceeding through counsel, with an amended

16  application for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his

17  1998 conviction on one count of murder, in violation of Cal. Penal Code § 187(a)[1], with the

18  special circumstance that the murder was committed "by means of discharging a firearm from a

19  motor vehicle, intentionally at another person outside the vehicle with the intent to inflict death,"

20  § 190.2(a)(21), and two counts of attempted murder, in violation of §§ 664, 187(a).  Petitioner is

21  presently serving a sentence of life imprisonment without the possibility of parole as to the

22  murder conviction, and an aggregate determinate term of 10 years and eight months for his

23  convictions on the attempted murder charges.

24

25  _____

26      [1] All future statutory references will be to the California Penal Code unless noted
    otherwise.

1

1    This action is before the undersigned on remand from the Ninth Circuit Court of

2 Appeals following this court's March 17, 2008 denial of petitioner's writ of habeas corpus.  On

3 remand, the issue is whether the state trial prosecutor exercised a peremptory challenge to

4 exclude an African-American prospective juror on account of her race in violation of the Equal

5 Protection Clause of the Fourteenth Amendment.  Batson v. Kentucky, 476 U.S. 79 (1986).  The

6 court is directed to determine whether race played "a substantial part" in the prosecutor's

7 decision to exclude the prospective juror.  See Crittenden v. Ayers, 624 F.3d 943 (9th Cir. 2010).

8                                                                FACTS

9    On August 15, 1996, the Sacramento County District Attorney's Office filed a

10 complaint charging petitioner with one count of murder, in violation of § 187(a), with a special

11 circumstance that the murder had been perpetrated by discharging a firearm from a motor vehicle

12 at a person outside said motor vehicle, and two counts of attempted murder, in violation of

13 §§ 187(a) and 664.[2]  Clerk's Transcript ("CT") I at 18-20.  As to all three charges, it was alleged

14 pursuant to § 12022.5(a) that petitioner had personally used a firearm.  Id.

15    Petitioner was tried twice on these charges.  The first trial resulted in a hung jury

16 after two African American jurors voted not guilty.  See CT II at 310-12; Excerpts of Record[3]

17 ("ER") at 325-27.  On retrial, jury selection commenced on July 7, 1998 with the distribution of

18 juror questionnaires.  See CT II at 313.  On July 8, 1998, voir dire began, and on July 9, 1998,

19 Detria Thompson ("Thompson"), an African-American woman, was called as a prospective

20 juror.  ER at 104, 192 and 245.

21 /////

22 /////

23 ─────────────────

24    [2] A recitation of the facts underlying these charges is unnecessary to the resolution of the
Batson claim presently before this court.

25    [3] The record in this case is voluminous.  Thus, for ease of reference, citation will be
26 made, when available, to the Excerpts of Record filed by petitioner in the Ninth Circuit Court of
Appeals.

A.      Voir Dire of Thompson

During voir dire, Thompson was initially questioned briefly by defense counsel. ER at 245-46.  She was then questioned by the prosecutor, who began by referring to a notation on Thompson's juror questionnaire indicating that she wished to discuss a matter privately.  Id. at 246.  The trial court thus excused the jury for a break and, outside of the presence of the other prospective jurors, Thompson shared information regarding a petty theft conviction while she was a student at California State University, Los Angeles.  See id. at 246-48.  Thompson stated that, while attending the university, she was caught shoplifting some items from a campus bookstore and charged with petty theft, to which she pled guilty and received summary probation.  Id.  When asked whether she felt she was treated fairly, Thompson answered affirmatively and noted that the incident did not have an effect on her education.  Id. at 247. Following this discussion, the other prospective jurors were allowed to return to the courtroom. Id. at 248.

Back in the presence of the other jurors, the prosecutor questioned Thompson about certain responses that she provided on the juror questionnaire, including one response concerning her prior experience with police officers:

> [PROSECUTOR]: Miss Thompson, you mentioned in your questionnaire that you had had a particularly bad experience with a law enforcement officer.  A motorcycle officer who pulled you over for what you felt was no reason.
>
> [THOMPSON]: Yes.
>
> [PROSECUTOR]: When did that occur?
>
> [THOMPSON]: There were actually two cops.  I didn't indicate that.  It happened probably four years ago.  Four or five years ago.
>
> [PROSECUTOR]: Is that in Sacramento?
>
> [THOMPSON]: It was in Long Beach.
>
> [PROSECUTOR]: Both times?
>
> [THOMPSON]: Umm, I believe I only mentioned one incident.  That was in Long Beach.

[PROSECUTOR]: Okay.  So there were two times you felt you were pulled over for no reason.

[THOMPSON]: Once. I'm referring to what happened in Long Beach. I don't think I said more than once.

[PROSECUTOR]: Okay. What was the other bad experience that you felt you had?

[THOMPSON]: I said one bad experience.

[PROSECUTOR]: Oh, I'm sorry. Okay.

ER at 248-49.

Next, the prosecutor asked Thompson what she meant when she indicated that she disagreed strongly with the proposition "If the prosecution brings someone to trial, that person is probably guilty." ER at 249.  Thompson responded, "I mean that I wouldn't assume that because someone is brought forward by the prosecution that they're guilty." Id.

Finally, the prosecutor asked Thompson about her opinion that the criminal justice system treats some people unfairly:

[PROSECUTOR]: . . . [T]here's some questions about race, and you felt that, umm, criminal justice system intentionally or unintentionally treats people unfairly because of their race or their ethnic background.

[THOMPSON]: That can happen, yes.

[PROSECUTOR]: And that you felt that specifically happened in a couple of cases and you mentioned Mr. Pratt, and there's another name I'm not familiar with that case.  Who is that?

[THOMPSON]: William Mobia Jamal[4].

[PROSECUTOR]: Can you briefly explain what that case was about?

[THOMPSON]: What I read about the case, I believe he is or was in Philadelphia and he was a journalist and he was accused of murdering a police officer.  And the information that I read seemed to indicate that he did not receive a fair trial.  And there has been some media coverage on that case.  He's been appealing his case for a number of years now.

/////

---

[4]  The correct name of the defendant in that case is Mumia Abu-Jamal.

4

[PROSECUTOR]: And [ ] your belief about that was based on the account that you had read?

[THOMPSON]: A few accounts, yes.

[PROSECUTOR]: About Mr. Pratt? What is that based on?

[THOMPSON]: What is the case based on?

[PROSECUTOR]: No, I'm familiar with that one. Why don't you feel he received a fair trial?

[THOMPSON]: I believe he was acquitted after 30 years, or something like that. 25 to 30 years, that he had been convicted and he served time in prison for a long period of time, and eventually he was acquitted.

[PROSECUTOR]: Was he acquitted, or did he get a new trial because of it, or do you know?

[THOMPSON]: I believe it was a new trial.

[PROSECUTOR]: Do you know if that had anything to do with racial or ethnic issues?

[THOMPSON]: Probably.  Partially, he was a Black Panther, and I think that probably had something to do with it.  And I'm sure there were politics involved as well.

ER at 250-51.

Thompson was ultimately excused when the prosecutor exercised a peremptory strike as to her.  ER at 258.

B.     The _Wheeler_ Hearing

After Thompson was stricken, petitioner filed a motion to dismiss the entire jury panel pursuant to People v. Wheeler, 22 Cal.3d 258 (Cal. 1978).[5]  ER at 324.  On July 16, 1998, the trial court held a hearing on the motion:

THE COURT: Okay.  You can, umm, if I understand your motion, you are making the motion to dismiss the entire panel by reason of the prosecutor's use of
/////

---

[5]  In Wheeler, the California Supreme Court held that peremptory challenges may not be used to exclude from a jury all or most members of a cognizable group solely on the ground of presumed "group bias."  Wheeler is "the California counterpart to Batson."  Yee v. Duncan, 463 F.3d 893, 896 (9th Cir. 2006).

peremptory challenges to strike jurors on the ground of group bias alone based on the People versus Wheeler; is that correct?

[DEFENSE COUNSEL]: That is one motion, yes.

THE COURT: Since it's the burden of the moving party to establish a prima facie case of discrimination as well as make the record, I'll give you the opportunity to proceed first, and you must show from all the circumstances in this case a strong likelihood that the persons challenged were challenged due to group classifications rather than specific aims.  First, you must show that the jurors struck are members of some identifiable group or cognizant group [–] you indicated they were black or African American, and therefore [–] that is I'd like to ask you, Mr. Gold [the prosecutor], do you wish to stipulate that for the purposes of the representative cross section rule that the jurors struck are all members of the same cognizable group?

[PROSECUTOR]: Your Honor, are you saying jurors plural, or singular.

THE COURT: Well, I think similar in regards to the actual jurors struck.

[PROSECUTOR]: I would agree that the one juror in question was African American.

THE COURT: Okay. [Defense counsel.]

[DEFENSE COUNSEL]: Thank you. I do not have her name, however I believe she was juror number – well, it was Diedra [*sic*] Thompson, I believe was her name.  She's African American.  Female who was struck by the District Attorney.  This is interesting in this case, because I believe that it was a use of the peremptory challenge, because she was African American.  Number one, in the first trial of [petitioner] it was a hung jury.  Initially it was hung 10 to two, my understanding, and eventually was hung 11 to one.  The two jurors who voted for not guilty were African American.  One of those jurors was removed during the deliberation process, leaving one African American juror.  That juror held out and voted not guilty throughout.

In this case, I think that there was an intention to exclude African American jurors for that same reason.  The threat or the concern that they might vote not guilty or have a reasonable doubt.  In this particular instance, while Miss Thompson had a prior petty theft, some 15 years or more ago, which incident that occurred at her school, she was at the university, apparently she stole some books or something to that effect.  She was placed on probation, she acknowledged that nothing was done to her in the process in terms of being treated wrongfully.  She admitted wrongdoing, she was on probation, she cleared probation and she eventually graduated from that university.  I don't think that there was anything about her, particularly, that would otherwise cause the prosecutor to use his peremptory challenge.  I think that, um, given the nature of this case, the persons who are involved in this case and even given the fact that out of 70 people that we had to select from, there were only three African Americans out of the whole pool.  So the – it was very easy to use the peremptory challenge in that manner, /////

and that is what was done.  I don't think that there was any legitimate reason to excuse the juror, and the only reason why it was done was because of her race.

THE COURT: [Prosecutor], I'll give you the opportunity if you wish to state anything.  I'm not requiring.

[PROSECUTOR]: Okay.  Umm, I would state my reasons.  I would also ask the Court, though, to perhaps make a ruling for the record whether prima faci[e] case has been made.  I understand the law is if you rule there has not been a prima facie, I don't have to give reasons.

THE COURT: That's why I am not requiring you.  I do not believe a prima facie case has been met, but I will give you an opportunity to make a record if you desire.

[PROSECUTOR]: I will take the opportunity, your Honor.  I would note, however, a couple of factors.  I think [defense counsel] said it was a pool of 70.  I believe it was a pool of 65.  I don't agree there was just three African Americans.  I can say there appeared to be three people that were clearly African American, but I don't know if there's mixtures or what the other makeup of all the other people were.  And I don't think that's on the record.  So I don't agree with that.  I would mention that the last case has absolutely nothing to do with my choices in this case, or any of the result in that, I would mention that Miss Thompson I had passed several times before she arrived.  When she arrived, I believe she was number 34.  I found it unusual that her petty theft, one, because she had discussed it in private.  If it was a minor incident, I believe a lot of people talk candidly about problems in their past.  DUIs, things like that.  She felt she wanted to talk about it privately.  That concerned me some.  What she also indicated [was] that it occurred when I believe she was 21 years old.  She said it happened in 1981.  She was – she's 38 years old.  I find it unusual that you are stealing something when you are 21 years of ago.  To me, that's a problem.  And it also goes to the issue of honesty.  It's not, say, a DUI that may have unrelated credibility problems.  Honesty is something that's important, and she had stolen something in the past.  That concerned me.

She had indicated that she had had a bad experience with an officer.  It was unclear where in her questionnaire she mentioned she had a bad experience.  When I asked her in court about it, it was unclear whether it was one or two, and I felt the interaction between questions I asked her, there was some tension that I was feeling from her, just questioning her.

She mentioned that as to questions 38 and 39, which are purposefully worded, I guess, in a[n] ambiguous way to get certain response, she indicated that the People bring someone to trial, question asked are they probably guilty.  She strongly disagreed with that.  I have a problem with that.  I can understand someone saying I disagree with it somewhat.  When you strongly disagree, that shows a specific bias.  You may not trust law enforcement or you may not trust the prosecution and feel they are simply bringing people to trial that they don't believe are guilty or have no evidence.  I'm concerned about that.

/////

7

She also indicated that she strongly agrees that it is better to let guilty people go free, rather than risking an innocent person.  There are other responses she could have checked.  To me that shows specific bias.  That concerns me.

She had indicated that she felt the criminal justice system specifically treats people unfairly.  That's a specific bias that she has.  And that was in question 46.  I'm concerned about any person that believes the system treats people unfairly.  I'm concerned about having those people participate as a juror in a criminal justice system from the People's point of view.

She also indicated that this unfairness was clearly documented or documented in her response, and that's as to question 46.

She is a single person who has never been married.  That is a minor point, but I believe in a group setting people are going to have to work together.  People are going to have to be tolerant of each other's views.  And I generally like people who are married, living with people, people who are in a relationship where there is communication going on, group interaction.  And I sometimes have a problem with single people who have never . . . been married.  They may be a very strongly opinionated person that may not work well in a group setting.

I also felt, based on the process that both of the lawyers agreed to, that the Court had provided us with the random list, so we had the opportunity to know who was coming up next in order, and we had the questionnaires that we had read, and I believe that there were other jurors that were better suited to hear this case that were after Miss Thompson, that I felt a lot more comfortable with that were better jurors in my opinion than Miss Thompson.  So for all of those reasons, she was excused.

ER at 324-29.

The trial court eventually denied petitioner's <u>Wheeler</u> motion.  ER at 330-32.  Thereafter, following a jury trial, petitioner was convicted on all charges on August 3, 1998.  CT 441-46.  The jury also found the arming allegations and the special circumstance allegation to be true.  <u>Id.</u>  The court initially sentenced petitioner on October 16, 1998 to three consecutive life terms plus three years: in count one, life without the possibility of parole, plus a one-year enhancement; in count two, life with the possibility of parole, plus a one-year enhancement; and in count three, life with the possibility of parole, plus a one-year enhancement.  Following remand by the California Court of Appeal for the Third Appellate District, the court re-sentenced petitioner on August 2, 2002 on counts two and three to a cumulative total of 10 years and eight months, consecutive to the term of life without parole plus one year for count one.

RELEVANT PROCEDURAL BACKGROUND

A.      State Direct Appeal

        On petitioner's direct appeal, the California Court of Appeal addressed

petitioner's Batson claim as follows:

        Citing *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), defense
counsel challenged the prosecutor's use of a peremptory challenge to remove the
last African-American from the jury.  [Petitioner] contends the trial court used the
wrong test in ruling the defense counsel failed to establish a prima facie case of
discrimination. . . . We conclude there was no error[.]

        A.  Factual Background:

        During jury selection, Prospective Juror Thompson revealed to the court
in private that she had received summary probation for shoplifting while a college
student in 1981.  When the other prospective jurors returned to the courtroom, she
described a "bad experience" four years before with two law enforcement officers
she claimed pulled her over for "no reason."  Thompson also noted two cases
where she believed defendants had been treated unfairly because of their race.
These included the Pratt Black Panthers case and the William Mobia Jamal
capital case.  The prosecutor exercised a peremptory challenge against Ms.
Thompson.

        At the hearing on [petitioner's] *Wheeler* motion, the court explained to
defense counsel, "Since it's the burden of the moving party to establish a prima
facie case of discrimination as well as make the record, I'll give you the
opportunity to proceed first, and you must show from all the circumstances in this
case a strong likelihood that the persons challenged were challenged due to group
classification rather than specific bias."

        Thereafter, defense counsel argued the prosecutor excused Thompson
because she was African-American.  He noted that two African-American jurors
had voted not guilty in [petitioner's] first trial resulting in a hung jury.

        The court found that [petitioner] failed to establish a prima facie case
under *Wheeler*.  It gave the prosecutor the opportunity to make a record, although
the prosecutor was not required to do so in light of the court's findings.  The
prosecutor explained he was concerned about several matters revealed during voir
dire: (1) Thompson's prior petty theft; (2) her desire to discuss the incident only
in private; (3) the age at which she committed the petty theft; (4) her bad
experience with law enforcement; (5) her response to the jury questionnaire,
including the view that the criminal justice system treated some people unfairly;
and (6) her perceived unwillingness to work together with other jurors.

        The court again concluded [petitioner] failed to sustain his burden to
establish a prima facie case of discrimination.

        /////

9

B.  Discussion:

"If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in a timely fashion and make a prima facie case of such discrimination to the satisfaction of the court.  First, . . . he should make as complete a record of the circumstances as is feasible.  Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule.  Third, from all the circumstances of the case he must show a *strong likelihood* that such persons are being challenged because of their group association."  (*Wheeler*, *supra*, 22 Cal.3d at p. 280, emphasis added, fn. omitted.)  Under *Batson*, decided by the United States Supreme Court eight years after *Wheeler*, the defendant must show facts and relevant circumstances that *raise an inference* that the prosecution excluded the prospective juror because of race.  (*Batson*, *supra*, 476 U.S. at p. 96, [90 L.Ed.2d at pp. 87-88].)  California courts have read the state and federal tests together to require that [petitioner] show a strong likelihood of discrimination.  (See *People v. Turner* (1994) 8 Cal.4th 137, 164.)

"There is a presumption a party exercising a peremptory challenge is doing so on a constitutionally firm ground."  (*People v. Bernard* (1994) 27 Cal.App.4th 458, 465, disapproved on other grounds in *People v. Box* (2000) 23 Cal.4th 1153, 1188, fn. 7.)  When considering the denial of a *Wheeler* motion, we also give considerable deference to the trial court's ruling.  (*People v. Sanders* (1990) 51 Cal.3d 471, 501.)  We will affirm if a review of the entire voir dire record "'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question."  (*People v. Howard* (1992) 1 Cal.4th 1132, 1155.)

Two years after the trial in this case, the Ninth Circuit ruled in *Wade v. Terhune* that "the *Wheeler* standard, as currently interpreted by the California courts, does not satisfy the constitutional requirement laid down in *Batson*."  (*Wade v. Terhune* (2000) 202 F.3d 1190, 1192.)  In that case, the defense relied on both *Wheeler* and *Batson* in challenging the prosecutor's peremptory challenge in the state trial court.  (*Wade v. Terhune*, *supra*, at p. 1194.)  The California Supreme Court clarified the matter in *People v. Box*, explaining that in California, a "strong likelihood" means a "reasonable inference."  (*People v. Box*, *supra*, 23 Cal.4th at p. 1188, fn. 7.)

We begin by noting the *Batson* test was not, in fact, at issue in this case. [Petitioner's] motion was based solely on *Wheeler*.  The court recited the "strong likelihood" test, and denied the motion on the ground [petitioner] did not establish a prima facie case of discrimination under that standard.  [Petitioner] does not dispute that he failed to satisfy the requirements of *Wheeler*.  In any event, there is no basis for [petitioner's] claim the trial court applied the wrong test since "strong likelihood" means the same as "reasonable inference" under California law.  (*People v. Box*, s*upra*, 23 Cal.4th at p. 1188, fn. 7.)

Even if we were to conclude [petitioner] established a prima facie case of discrimination under *Wheeler*, the voir dire record and hearing transcript demonstrates [petitioner's] motion was doomed to fail.  During voir dire, Prospective Juror Thompson raised several matters the prosecutor could and

expressly did reasonably view as grounds for peremptory challenge.  Although
not required to do so after the court made its ruling, the prosecutor nonetheless
detailed his reasons for challenging Thompson.  Those reasons were, in fact,
proper.

People v. Williams, slip op. at 16-20.

        The California Supreme Court summarily denied review on December 17, 2001.

ER at 48.  Petitioner did not file a state habeas petition.

B.      Federal Habeas Petition

        On April 9, 2003, petitioner filed a petition for writ of habeas corpus raising the

following claims: (1) the trial court violated the constitutional guarantee against double jeopardy

by unjustifiably dismissing the first jury selected in petitioner's case, (2) the State violated

petitioner's right to equal protection when it impermissibly challenged a minority juror; (3) an

eyewitness identification made in this case was unduly suggestive, (4) the court violated the

Confrontation Clause and due process principles by admitting into evidence prior inconsistent

statements for substantive purposes made by declarants who did not testify at trial, (5) the trial

court permitted fundamentally unfair testimony about threats to and intimidation of a key

witness, (6) the trial court permitted the introduction of overly prejudicial, uncharged character

evidence when it allowed testimony about .25 caliber shell casings found in petitioner's car, (7)

the evidence against petitioner was insufficient, (8) the trial court erred in its instruction to the

jury regarding the elements of first degree murder, (9) the evidence at trial was insufficient to

support the true finding as to the special circumstance of discharging a firearm from a vehicle,

and (10) habeas relief is warranted as a result of the cumulative impact of the errors and

irregularities committed by the trial judge and the prosecutor during the trial.

        On December 20, 2006, the undersigned issued findings and recommendations

recommending that the petition be denied.  Doc. No. 23.  As to petitioner's Batson claim,

deference was given to the trial court's opinion that the prosecutor was telling the truth and it

was concluded that the prosecutor's stated reasons for exercising a peremptory challenge were

valid. <u>Id.</u> at 13-20.  It was also determined that the record failed to demonstrate that retained non-minority jurors were similarly situated to the excused juror, yet in conducting the third step of the <u>Batson</u> analysis, a comparative juror analysis was conducted only as to a stricken juror instead of to the retained jurors.  <u>See id.</u> at 20.

On May 29, 2007, petitioner filed objections to the findings and recommendations.  Doc. No. 38.  On March 17, 2008, the Honorable Ralph R. Beistline adopted the findings and recommendations in full and denied petitioner's application for a writ of habeas corpus.  Doc. No. 40.

Petitioner then appealed to the Ninth Circuit Court of Appeals.  On January 25, 2011, the Ninth Circuit reversed the judgment of this court as to petitioner's <u>Batson</u> claim.  The appellate court concluded that it was error to accord deference to the trial court's credibility determination because the record reflects that the state trial court did not conduct the third step of analysis as required by <u>Batson</u>.  The appellate court also concluded that it was error to conduct a limited comparative juror analysis by comparing the stricken juror to one other struck juror as opposed to jurors who were allowed to serve.  With reference to <u>Crittenden v. Ayers</u>, 624 F.3d 943 (9th Cir. 2010), the Ninth Circuit remanded this matter solely on petitioner's <u>Batson</u> claim with direction to "conduct a full step-three inquiry that includes a proper comparative juror analysis," including consideration of all of the juror questionnaires from petitioner's trial.

## STANDARDS FOR A WRIT OF HABEAS CORPUS

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an  unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable  determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")  The court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

## ANALYSIS

This court will examine petitioner's Batson claim *de novo* because the California Court of Appeal employed the incorrect legal standard by using the "strong likelihood" test in determining whether petitioner had established a prima facie case instead of an "inference" test.  Williams v. Runnels, 432 F.3d 1102, 1110 (9th Cir. 2006) ("because the state appellate court used the improper 'strong likelihood' standard for evaluating Williams' Wheeler/Batson claim, the district court was required to review the matter *de novo*."); Paulino v. Castro, 371 F.3d 1083, 1090 (2004) (federal court of appeals examined Batson claim *de novo* because the state court used the wrong legal standard when analyzing whether defendant made a prima facie showing of

bias); <u>Wade v. Terhune</u>, 202 F.3d 1190, 1195 (9th Cir. 2000) (holding that when the state court uses the wrong legal standard, the rule of deference required by 28 U.S.C. § 2254(d)(1) does not apply).

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution. <u>See</u> <u>Batson</u>; <u>Johnson v. California</u>, 545 U.S. 162 (2005).  So-called <u>Batson</u> claims are evaluated pursuant to a three-step test:

> First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations].  Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes.  [Citations .]  Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]

<u>Johnson</u>, 545 U.S. at 168 (footnote omitted); <u>Tolbert v. Gomez</u>, 190 F.3d 985, 987-88 (9th Cir. 1999) (en banc).

A.    <u>The Prima Facie Case for Discrimination</u>

At the first step of the <u>Batson</u> analysis, petitioner must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." <u>Johnson</u>, 545 U.S. at 168 (footnote omitted).  In order to establish a prima facie case of racial discrimination, a petitioner must show that "(1) the prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motived by race." <u>Boyd v. Newland</u>, 467 F.3d 1139, 1143 (2006) (citing <u>Batson</u>, 476 U.S. at 96, and <u>Cooperwood v. Cambra</u>, 245 F.3d 1042, 1045-46 (9th Cir. 2001)).  A prima facie case of discrimination "can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" <u>Johnson v. California</u>, 545 U.S. at 169

(quoting Batson, 476 U.S. at 94.)[6]  In evaluating whether a petitioner has established a prima

facie case, a reviewing court should consider the "'totality of the relevant facts' and 'all relevant

circumstances' surrounding the peremptory strike." Boyd, 467 F.3d 1146 (quoting Batson, 476

U.S. at 94, 96).   The petitioner's burden at the first Batson step is "not an onerous burden."

Crittenden, 624 F.3d at 955.  As the Supreme Court clarified in Johnson v. California, 545 U.S.

162, 170 (2005),

> We did not intend the first step to be so onerous that a defendant would have to
> persuade the judge – on the basis of all the facts, some of which are impossible
> for the defendant to know with certainty – that the challenge was more likely than
> not the product of purposeful discrimination.  Instead, a defendant satisfies the
> requirements of Batson's first step by producing evidence sufficient to permit the
> trial judge to draw an inference that discrimination has occurred.

In this case, petitioner objected to the peremptory strike of Thompson as racially

motivated based, in part, on Thompson's membership in a cognizable racial group.  ER at 325-26.

Although the prosecutor's peremptory strike of an African-American prospective juror does not,

by itself, support an inference that discrimination occurred, see United States v. Vasquez-Lopez,

22 F.3d 900, 902 (9th Cir. 1994), it is afforded weight in combination with the other factors

offered by defense counsel, including the fact that petitioner is African American, his first trial

resulted in a hung jury after the only two African-Americans on that jury voted not guilty, and

that, of the 65 or 70 potential jurors, Thompson was the only African-American juror who could

serve.[7]  Upon consideration of these circumstances, the court finds that petitioner has produced

---

[6]  In Batson, defense counsel timely objected to the prosecutor's use of peremptory
challenges because they resulted in striking "all black persons on the venire." Id., 476 U.S. at
100.  The Supreme Court held that this was a sufficient basis to find an inference of racial
discrimination and that the trial court erred when it "flatly rejected the objection without
requiring the prosecutor to give an explanation for his action." Id.

[7]  At the hearing on petitioner's Wheeler motion, defense counsel asserted that there were
only three African-American jurors in the jury pool and that, of those three, Thompson was the
only African American who could serve.  ER at 326.  The record reflects that one woman was
dismissed because her husband was involved in a car accident during voir dire, see ER at; CT II
at 315, but the record is silent as to the third African American prospective juror.  At the hearing,
the prosecutor countered that it was not possible to determine how many people in the jury pool
were African American, though he conceded that three were "clearly" so.  See ER at 326-27.  In

1  evidence sufficient to draw an inference that discrimination occurred.  Thus, petitioner satisfies

2  the first Batson step.

3  B.       The Prosecutor's Proffered Race-Neutral Reasons

4              At the second step of the Batson analysis, "the issue is the facial validity of the

5  prosecutor's explanation."  Hernandez v. New York, 500 U.S. 352, 360 (1991).  At this step, "a

6  neutral explanation in the context of our analysis here means an explanation based on something

7  other than the race of the juror."  Id. at 360.  "Unless a discriminatory intent is inherent in the

8  prosecutor's explanation, the reason offered will be deemed race-neutral."  Stubbs v. Gomez, 189

9  F.3d 1099, 1105 (9th Cir. 1999) (quoting Hernandez, 500 U.S. at 360).  For purposes of step two,

10 the prosecutor's explanation need not be "persuasive, or even plausible."  Purkett v. Elem, 514

11 U.S. at 765, 768 (1995).  Indeed, "to accept a prosecutor's stated nonracial reasons, the court need

12 not agree with them."  Kesser v. Cambra, 465 F.3d at 351, 359 (9th Cir. 2006).  "It is not until the

13 third step that the persuasiveness of the justification becomes relevant--the step in which the trial

14 court determines whether the opponent of the strike has carried his burden of proving purposeful

15 discrimination."  Purkett, 514 U.S. at 768.

16             Here, though the trial judge concluded that petitioner did not make a prima facie

17 showing, he nonetheless granted the prosecutor an opportunity to make a record for his

18 peremptory strike of Thompson.  The prosecutor took the opportunity to set forth nine reasons for

19 striking Thompson[8]: (1) Thompson wanted to discuss her petty theft conviction in private, (2) the

20 _____

21 addition, during oral arguments before the Ninth Circuit Court of Appeals, respondent
   acknowledged that Thompson was the only African American prospective juror who could serve

22 on the jury.  See Ninth Circuit Oral Argument at 26:40, Williams v. Pliler, (No. 08-16806),
   available at http://www.ca9.uscourts.gov/media/view_subpage.php?pk_id=0000006645.

23             [8]  In the amended petition and the amended answer, both the petitioner and respondent,

24 respectively, identify a different number of race-neutral reasons purportedly offered by the
   prosecutor.  On review, the court finds that the nine reasons it has identified are accurate based

25 on a fair reading of the prosecutor's statements.  Additionally, the court notes that petitioner
   offers reasons that are not at all included in the prosecutor's statements as race-neutral reasons

26 for striking Thompson.  See Am. Pet. at 25.  These include Thompson's employment with the
   State of California, Thompson's statements as to whether she could return a guilty verdict if the

petty theft occurred when Thompson was 21, (3) Thompson's arrest for petty theft speaks to her

honesty, (4) Thompson had a bad experience with a police officer, (5) Thompson strongly

disagreed with the proposition "If the prosecution brings someone to trial, that person is probably

guilty," (6) Thompson strongly agreed with the proposition "It is better for society to let some

guilty people go free than to risk convicting an innocent person," (7) Thompson felt the criminal

justice system treats people unfairly because of their race, ethnic background or lifestyle, (8)

Thompson was single and never married, and, finally, (9) other jurors were better suited to hear

the case than Thompson.

Because none of the prosecutor's proffered reasons are facially on account of race,

the court finds that the prosecution has met its burden of offering race-neutral reasons.  Thus, the

state has met its burden at the second step of the Batson analysis.

C.      Purposeful Discrimination

1.      Legal Standard

An en banc panel of the Ninth Circuit in Kesser discussed the requirements of a

court in analyzing the third step of a Batson issue:

> At this stage, "the trial court determines whether the opponent of the strike
> has carried his burden of proving purposeful discrimination."  Purkett, 514 U.S. at
> 768.  Although the burden remains with the defendant to show purposeful
> discrimination, the third step of Batson primarily involves the trier of fact. After
> the prosecution puts forward a race-neutral reason, the court is required to
> evaluate "the persuasiveness of the justification."  Id.  To accept a prosecutor's
> stated nonracial reasons, the court need not agree with them.  The question is not
> whether the stated reason represents a sound strategic judgment, but "whether
> counsel's race-neutral explanation for a peremptory challenge should be
> believed."  Hernandez v. New York, 500 U.S. 352, 365, 111 S. Ct. 1859, 114
> L.Ed.2d 395 (1991) (plurality opinion).  "It is true that peremptories are often the
> subjects of instinct," and that "it can sometimes be hard to say what the reason
> is."  Miller–El, 125 S. Ct. at 2332.  "But when illegitimate grounds like race are in
> issue, a prosecutor simply has got to state his reasons as best he can and stand or
> fall on the plausibility of the reasons he gives."  Id.  "While subjective factors
> may play a legitimate role in the exercise of challenges, reliance on such factors
> /////

prosecution proved its case beyond a reasonable doubt, and Thompson's agreement with the
principles of aider and abetter liability.  Id.

alone cannot overcome strong objective indicia of discrimination...." <u>Burks v. Borg</u>, 27 F.3d 1424, 1429 (9th Cir. 1994).

The trier of fact may not turn a blind eye to purposeful discrimination obscured by race-neutral excuses. "[T]he prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." <u>Batson</u>, 476 U.S. at 98 n.20 (quoting <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 258, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). "A <u>Batson</u> challenge does not call for a mere exercise in thinking up any rational basis." <u>Miller–El</u>, 125 S. Ct. at 2332. Reasons must be "related to the particular case to be tried." <u>Batson</u>, 476 U.S. at 98. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." <u>Purkett</u>, 514 U.S. at 768.

The court need not accept any proffered rationale. We have recognized that "[w]hen there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it." <u>Johnson</u>, 3 F.3d at 1331. The court must evaluate the record and consider each explanation within the context of the trial as a whole because "'[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.'" <u>Hernandez</u>, 500 U.S. at 363, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (quoting <u>Washington v. Davis</u>, 426 U.S. 229, 242, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976)); <u>see also Miller–El</u>, 125 S. Ct. at 2324 (noting that <u>Batson</u> requires inquiry into "'the totality of the relevant facts' about a prosecutor's conduct" (quoting <u>Batson</u>, 476 U.S. at 94, 106 S. Ct. 1712, 90 L. Ed. 2d 69)); <u>Batson</u>, 476 U.S. at 93, 106 S. Ct. 1712, 90 L. Ed. 2d 69 ("In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence as may be available." (internal quotation marks omitted)). A court need not find all nonracial reasons pretextual in order to find racial discrimination. "[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination." <u>Lewis v. Lewis</u>, 321 F.3d 824, 830 (9th Cir. 2003); <u>see also United States v. Chinchilla</u>, 874 F.2d 695, 699 (9th Cir. 1989) ("Thus, the court is left with only two acceptable bases for the challenges.... Although these criteria would normally be adequately 'neutral' explanations taken at face value, the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against their sufficiency.").

<u>Kesser</u>, 465 F.3d at 359-60; <u>see also</u> <u>Green v. LaMarque</u>, 532 F.3d 1028, 1030 (9th Cir. 2008)

(discussing the court's inquiry at the third step of a <u>Batson</u> analysis).

This third step should include a review of the entire transcript of jury voir dire in

order to conduct a comparative analysis of the jurors who were stricken and the jurors who were

allowed to remain. <u>Boyd</u>, 467 F.3d 1144, 1149 ("We believe, however, that Supreme Court

precedent requires a comparative juror analysis even when the trial court has concluded that the

defendant failed to make a prima facie case"). See also Miller-El v. Dretke, 545 U.S. 231 (2005)

(using comparative analysis, in a case in which a prima facie showing had been made, to

determine whether the prosecutor had been motivated by racial bias in exercising peremptory

challenges).   A comparative juror analysis of challenged jurors and retained jurors of a different

race with comparable characteristics identified as objectionable by the prosecutor may show that

a prosecutor's facially race-neutral reasons are a pretext for discrimination and may be considered

at step three of a Batson analysis.  See Snyder v. Louisiana, 552 U.S. 472, 482-83 (2008);

Miller-El, 545 U.S. at 240; Mitleider v. Hall, 391 F.3d 1039, 1047 n.5 (9th Cir. 2004); Lewis v.

Lewis, 321 F.3d 824, 830-31 (9th Cir. 2003); Turner v. Marshall, 121 F.3d 1248, 1251-52 (9th

Cir. 1997) (as amended).   Thus, if a reason articulated by a prosecutor as a basis to strike a

prospective juror who is a member of a cognizable racial group applies equally to a retained juror

not of that race, the reason may be considered pretextual.  See Miller-El, 545 U.S. at 241 ("If a

prosecutor's proffered reason for striking a black panelist applies just as well to an

otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove

purposeful discrimination to be considered at Batson's third step") (citation omitted); see also,

e.g., McClain v. Prunty, 217 F.3d 1209, 1221 (9th Cir. 2000) ("A prosecutor's motives may be

revealed as pretextual where a given explanation is equally applicable to a juror of a different race

who was not stricken by the exercise of a peremptory challenge") (citation omitted).  "'[T]he

Constitution forbids striking even a single prospective juror for a discriminatory purpose.'"

United States v. Collins, 551 F.3d 914, 919 (9th Cir. 2009) (quoting United States v.

Vasquez–Lopez, 22 F.3d 900, 902 (9th Cir. 1994)).

   Petitioner bears the burden of persuasion to prove the existence of unlawful

discrimination.  Batson, 476 U.S. at 93.  "This burden of persuasion 'rests with, and never shifts

from, the opponent of the strike.'"   Johnson, 545 U.S. at 171 (quoting Purkett v. Elem, 514 U.S.

765, 768 (1995) (per curiam).  However, petitioner is "entitled to rely on the fact, as to which

there can be no dispute, that peremptory challenges constitute a jury selection practice that

permits 'those to discriminate who are of a mind to discriminate.'"  <u>Batson</u>, 476 U.S. at 96

(quoting <u>Avery v. Georgia</u>, 345 U.S. 559, 562 (1953)).

    2.   <u>Analysis</u>

      Before proceeding with the third <u>Batson</u> step, the court will correct two errors of

law put forth by respondent.  First, respondent asserts that *all* of the prosecutor's proffered

reasons must be shown to be pretextual for a finding of <u>Batson</u> error.  <u>See</u> Am. Answer at 1.  This

is clearly erroneous.  As the Ninth Circuit stated in the order remanding this matter,

> "A court need not find all nonracial reasons pretextual in order to find racial
> discrimination. If a review of the record undermines the prosecutor's stated
> reasons, *or many of the proffered reasons*, the reasons may be deemed a pretext
> for racial discrimination." <u>Kesser</u>, 465 F.3d at 360 (emphasis added). In <u>Kesser</u>,
> we cited approvingly to our decision in <u>United States v. Chinchilla</u>, 874 F.2d 695
> (9th Cir.1989), where we held that when two of the four reasons were pretextual,
> the prosecutor's reasons may be deemed a pretext for racial discrimination. 465
> F.3d at 360 (citing <u>Chinchilla</u>, 874 F.2d at 699).

<u>See</u> Doc. No. 50 at 5 n.3.

      Second, respondent suggests that comparative juror analysis lacks probative value

if there exists *any* difference between the struck juror and the empaneled juror(s).  <u>See</u>, <u>e.g.</u>, Am.

Answer at 28-30.  This is also erroneous.  As the Supreme Court clarified in <u>Kesser</u>, "[a] *per se*

rule that a defendant cannot win a <u>Batson</u> claim unless there is an exactly identical white juror

would leave <u>Batson</u> inoperable; potential jurors are not products of a set of cookie cutters."  545

U.S. at 247 n.6.

      With these standards in mind, the court now turns to the third step of the <u>Batson</u>

analysis and the prosecutor's proffered race-neutral reasons.

    a.   <u>Discussion of petty theft in private</u>

      On the juror questionnaire, Thompson was asked whether she had ever been

accused, arrested or charged with a crime, to which she wrote that she committed a petty theft in

1981l; she had also written "Private" next to the question.  ER at 476.  During voir dire,

Thompson discussed her petty theft conviction outside of the presence of the jury. ER at 246-48.

1          That this discussion took place in private provided the first race-neutral reason for

2   the prosecutor's use of a peremptory strike: "I found it unusual that . . . she had discussed it in

3   private.  If it was a minor incident, I believe a lot of people talk candidly about problems in their

4   past.  DUIs, things like that.  She felt she wanted to talk about it privately.  That concerned me

5   some."  ER at 327.

6          Examination of the voir dire transcript and the juror questionnaires reveals that no

7   other empaneled juror requested to be questioned or was in fact questioned about any matter in

8   private.  Nonetheless, without more, the court is unconvinced that a prospective juror's request to

9   speak of a criminal matter in private is cause for concern.   See Hernandez, 500 U.S. at 365.

10  Thompson may have wished to keep her conviction private because she was a public employee[9],

11  or because she was a private person in general, or because, as the prosecutor himself later noted, a

12  petty theft conviction speaks to an individual's honesty and, thus, carries more of a social stigma

13  than a DUI arrest.  And while the prosecutor deemed the conviction a "minor incident,"

14  Thompson may have viewed it as a major incident in an otherwise spotless criminal record that

15  caused her discomfort and embarrassment.  The simple fact is that the prosecutor's concern with

16  Thompson's request to speak privately was based on an unfounded characterization of that

17  request.  Absent further justification, this reason fails as a "'clear and reasonably specific'

18  explanation" that Batson requires.  Batson, 476 U.S. at 98 n.20.

19          Even if Thompson's request was concerning, the prosecutor failed to explain how

20  a prospective juror's request to discuss a criminal matter outside of the presence of the jury would

21  impact her ability to serve as a juror.  See Kesser, 465 F.3d at 364.  In the Amended Answer,

22  respondent argues that the prosecutor had a preference for individuals who can speak openly

23  about their own sensitive matters, as this reflects on their ability "to be fully engaged in candid

24  and open conversation[s] about the facts and law of a case."  Am. Answer at 17.  The prosecutor,

25  ────────────────

26      [9]  Thompson was a disability insurance specialist employed by the State of California.
    ER at 468.

however, did not provide this reason, and <u>Batson</u> prohibits consideration of conjectured reasons

for a peremptory strike.  <u>See</u> <u>Johnson</u>, 545 U.S. at 172; <u>see also</u> <u>Paulino</u>, 371 F.3d at 1090 ("[I]t

does not matter that the prosecutor might have had good reasons . . . [;] [w]hat matters is the real

reason they were stricken").  <u>See also</u> <u>Miller–El</u>, 545 U.S. at 252 ("[W]hen illegitimate grounds

like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or

fall on the plausibility of the reasons he gives.  A <u>Batson</u> challenge does not call for a mere

exercise in thinking up any rational basis.  If the stated reason does not hold up, its pretextual

significance does not fade because a trial judge, or an appeals court, can imagine a reason that

might not have been shown up as false.").

            b.      <u>Age at time of petty theft</u>

            The prosecutor next referred to the age at which Thompson committed the petty

theft as a factor in his dismissal of her.  According to Thompson's responses on the juror

questionnaire, the petty theft incident occurred in 1981; at the time of the jury voir dire in 1998,

Thompson was 38 years old.  ER at 468, 471.  Thus, Thompson was approximately 21 years old

when she stole items from the campus book store.  In justifying the peremptory strike, the

prosecutor stated, "I find it unusual that you are stealing something when you are 21 years of age.

To me, that's a problem."  <u>Id.</u> at 327.

            On its face, this explanation is reasonable: a prospective juror who commits a

crime at a mature age may be undesirable to a prosecutor.  Also, as respondent points out, none of

the seated jurors were convicted of a theft offense at the age of 21.  However, the undersigned is

again unpersuaded.  Initially, and contrary to respondent's suggestion, the fact that none of the

other empaneled juror were convicted of the same type of offense at the same age as Thompson is

not dispositive.  "A <u>per se</u> rule that a defendant cannot win a <u>Batson</u> claim unless there is an

exactly identical white juror would leave <u>Batson</u> inoperable."  <u>Miller-El</u>, 545 U.S. at 247 n.6.

            Besides, the prosecutor's concern with the age at which a crime was committed is

negated by his interaction with Juror 11, a 52-year-old non-African-American man with a colorful

criminal history that included a curfew violation, resulting in time spent in juvenile hall; a malicious mischief charge, resulting in one night in jail; and an unspecified alcohol-related offense, resulting in eight hours in a "drunk tank." ER at 416. Other than the curfew violation, which was clearly a juvenile offense, Juror 11 may very well have committed the other offenses at or around the age of 21. Were this reason a true concern for the prosecutor, one would expect him to question Juror 11 regarding his age at the time of his arrests. Yet the record reveals that not only did the prosecutor fail to ask Juror 11 this question, he failed to question Juror 11 at all about his criminal history, including the act(s) underlying the malicious mischief charge. See id. at 208-11. As the Supreme Court has taught us, the government's failure to address a subject at voir dire is evidence of pretext. Miller-El, 545 U.S. at 246. Respondent counters that the malicious mischief charge is substantially different from (that is, less serious than) Thompson's petty theft charge and, thus, the prosecutor's failure to question Juror 11 is justifiable. This argument, however, is premised on unsupported assumptions about Juror 11's age at the time of this offense (he was in his early-twenties as opposed to his late-twenties) and the prosecutor's familiarity with the history of the malicious mischief charge. See Am. Answer at 20-21. This argument is also beside the point. The point here is that the prosecutor did not question Juror 11 at all about his criminal history, but did question Thompson about hers and did rely on her criminal conviction for three of his nine reasons for striking her.

Further, while Juror 11 attributed his criminal history to "growing pains" on his juror questionnaire, see ER at 416, there is nothing to suggest that Thompson's petty theft conviction could not have been attributed to as much. Indeed, Thompson's criminal history was without blemish but for the then-seventeen year old petty theft conviction.

On this record, then, the court concludes that the prosecutor's second of nine reasons provided for excusing Thompson is evidence suggesting pretext.

/////

/////

1                c.      Petty theft and honesty

2          Also related to the petty theft conviction was the prosecutor's concern that it spoke

3    to Thompson's truthfulness: "[I]t also goes to the issue of honesty.  It's not, say, a DUI that may

4    have unrelated credibility problems.  Honesty is something that's important, and she had stolen

5    something in the past.  That concerned me."  ER at 327.

6          The prosecutor's concern as to this factor is well-founded.  Unfortunately, the

7    court cannot reconcile this concern with the prosecutor's failure to question Juror 11, the juror

8    referenced in Section (C)(2)(b) supra, about his response on the juror questionnaire when asked

9    "Have you, a close friend or relative ever been arrested for a crime . . . ?"  ER at 408.  Juror 11

10   responded "Yes. Forgery."  Id.  Juror 11 did not, however, specify whether he or another person

11   was arrested for forgery, and it is undisputed that forgery is an offense that "goes to the issue of

12   honesty."  The prosecutor did not ask any questions regarding this ambiguity.  See id. at 208-11.

13         Respondent asserts that there was no ambiguity in the first place.  Although Juror

14   11 noted that someone was arrested for forgery, respondent argues that his exclusion of the

15   forgery arrest when listing his own crimes shows that someone else was arrested for forgery.

16   Compare ER at 408 with id. at 416.  Reading these responses together with Juror 11's other

17   responses on the juror questionnaire, respondent concludes that Juror 11 was actually the *victim*

18   of an alleged forgery perpetrated by a close friend or relative.  This is a creative interpretation of

19   the record, but improper for consideration as there is nothing in the record to suggest that the

20   prosecutor actually thought this.

21               d.      Prior bad experience with police

22         In the juror questionnaire, Thompson noted that she had both a good and bad

23   experience with a law enforcement officer.  When asked about the bad experience during voir

24   dire, Thompson stated that it occurred four to five years prior, two motorcycles cops were

25   involved and that it no longer bothered her.  ER at 248-49.

26   /////

                                        24

The prosecutor cited to this exchange when explaining his peremptory strike: "She had indicated that she had had a bad experience with an officer.  It was unclear where in her questionnaire she mentioned she had a bad experience.  When I asked her in court about it, it was unclear whether it was one or two, and I felt the interaction between questions that I asked her, there was some tension that I was feeling from her, just questioning her."  ER at 327.

The record reveals that no other empaneled juror had a bad experience with an officer, the transcript of this exchange reveals tension as Thompson attempted to clarify the prosecutor's misunderstanding of the number of bad experiences Thompson had (one, instead of two), and, finally, review of the voir dire transcript reveals that the prosecutor did not have a tense interaction with any other juror.  Thus, the court finds no evidence of pretext here.

> e.   Strong agreement with the proposition "It is better for society to let some guilty people go free than to risk convicting an innocent person"

In response to Question 38, which asked potential jurors how strongly they agreed or disagreed with the proposition "It is better for society to let some guilty people to go free than to risk convicting an innocent person," Thompson indicated that she agreed strongly.  ER at 478.  The prosecutor referred to this answer when exercising a peremptory strike against Thompson: "She also indicated that she strongly agrees that it is better to let guilty people go free, rather than risking an innocent person.  There are other responses she could have checked.  To me that shows specific bias.  That concerns me."  ER at 327-28.

It is a basic proposition of our criminal justice system that "[i]t is better for society to let some guilty people to go free than to risk convicting an innocent person."  Indeed, the Supreme Court has noted this proposition time and again:

> [C]oncern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected ... in the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.

/////

/////

Schlup v. Delo, 513 U.S. 298, 325 (1995) (quoting In re Winshop, 397 U.S. 358, 372 (1970)

(Harlan, J., concurring).  That Thompson strongly agreed with Question 38 simply reflects her

alignment with this country's "fundamental value determination," not a "specific bias."

A comparative juror analysis shows further evidence of pretext.  In the juror

questionnaires, Juror 9 also noted strong agreement with Question 38.  ER at 373.  Yet Juror 9

was neither questioned about this response nor removed from the panel.  See ER at 160-62.

The voir dire transcript is more problematic to the prosecutor's purported concern

with "specific bias."  Although only Juror 9 noted strong agreement to Question 38 on the juror

questionnaires, three of the retained jurors changed their position during voir dire to the same

position espoused by Thompson, namely, that it is better to let a guilty person go free than to

imprison an innocent person.

Juror 1, for example, noted somewhat agreement with Question 38 on the juror

questionnaire, but changed her position while being questioned by defense counsel:

> [DEFENSE COUNSEL]: Another one of your statements dealt with letting some
> guilty people go free even if it means convicting an innocent person.  Now, is that
> what you meant or would you feel that it's more important to not convict an
> innocent person even if it meant to let some guilty people go free?
>
> [JUROR 1]: I think it's more important that we don't convict an innocent person.
> It is a tragedy and it shouldn't happen.  It should *never* happen. . . .

ER at 285-86 (emphasis added).  The prosecutor did not question this juror about her change of

position and did not strike her.  Id. at 286.

Juror 7 strongly disagreed with Question 38 on the questionnaire, see ER at 448,

but she, too, changed her answer during voir dire:

> [DEFENSE COUNSEL]: . . . [Y]our answer was that you disagree strongly.
>
> [JUROR 7]: Umm, no, I answered that wrong, also.
>
> [DEFENSE COUNSEL]: What would your answer be?
>
> [JUROR 7]: I don't think that *any* innocent person should be found guilty.  And I
> would rather, if there's *any doubt at all*, let the person go.

ER at 231 (emphasis added).  The prosecutor did not question Juror 7 about this change of

position other than to clarify the meaning of reasonable doubt.  See id.  The prosecutor did not

exercise a peremptory strike as to this juror.

Finally, Juror 11, who somewhat disagreed with Question 38 on his juror

questionnaire, also changed his position during voir dire:

> [DEFENSE COUNSEL]: We've been talking about the proposition that letting
> some of the guilty go free and your response was, umm, you disagreed with that
> proposition.  And I still would like to ask you about if you can elaborate on that,
> because where you have someone who may be guilty, umm, I guess how would
> you – how could you balance that?
>
> [JUROR 11]: Could you read the question to me? Because I was thinking if that's
> pertaining to, umm – well please read the question.
>
> [DEFENSE COUNSEL]: Okay. It is better for society to let some guilty people
> go free than to risk convicting an innocent person.  And your response was you
> disagreed somewhat.
>
> [JUROR 11]: Somewhat, yes. I would much rather, also putting myself in the
> same position and knowing myself as being totally innocent, you know? I would
> much rather you know, see the individual who was really guilty go free than to
> see the – the individual who is not guilty suffer the consequences.
>
> [DEFENSE COUNSEL]: Right.
>
> [JUROR 11]: Of such a devastating situation, I would think.
>
> [DEFENSE COUNSEL]: Okay. So you're actually changing that answer?
>
> [JUROR 11]: I wouldn't think so.
>
> [DEFENSE COUNSEL]: Well, I understand that you would not want a guilty
> person to go free, but if it meant risking convicting an innocent person, your
> position is that you would rather see the guilty person go free?
>
> [JUROR 11]: Right.
>
> [DEFENSE COUNSEL]: Is that correct? I don't want to put words in your mouth.
>
> [JUROR 11]: Right.
>
> [DEFENSE COUNSEL]: Okay.

ER at 208-09.  The prosecutor did not question Juror 11 about his change of position as to

Question 38.  See id. at 210-11.  The prosecutor did not strike this juror, either.

27

Taken together, the court finds strong evidence of pretext here.  The prosecutor's concern with "specific bias" is undermined by Thompson's alignment with the fundamental values of our criminal justice system.  It is also undercut by the prosecutor's failure to be similarly concerned with the same response given by one non-African-American empaneled juror on the juror questionnaire and three non-African American empaneled jurors during voir dire. That the prosecutor did not strike these jurors or, at the very least, question them about their positions (particularly those who changed their position during voir dire) leads to a finding of pretext.

> f.   Strong disagreement with the proposition "If the prosecution brings someone to trial, that person is probably guilty"

Question 39 of the juror questionnaire asked whether the potential jurors agreed or disagreed with the proposition "If the prosecution brings someone to trial, that person is probably guilty."  Thompson indicated that she "strongly disagreed" with this statement.  ER at 478.  When asked by the prosecutor during voir dire to clarify what she meant by her response, Thompson stated: "I mean that I wouldn't assume that because someone is brought forward by the prosecution that they're guilty.  That's what I mean."  ER at 249.

The prosecutor cited to this response as a reason for his peremptory strike of Thompson: "I can understand someone saying I disagree with [Question 39] somewhat.  When you strongly disagree, that shows a specific bias.  You may not trust law enforcement or you may not trust the prosecution and feel they are simply bringing people to trial that they don't believe are guilty or have no evidence.  I'm concerned about that."

As with the prosecutor's concern with Thompson's answer to Question 38, this proffered race-neutral reason shows strong evidence of pretext.  Question 39 speaks to the issue of the presumption of innocence.  The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice.  The Supreme Court has stated:

> The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.

Coffin v. United States, 156 U.S. 432, 453 (1895).  Thompson's agreement with Question 39 merely reflected her correct understanding of this "axiomatic and elementary" component of our criminal justice system.  It is not evidence of "specific bias."

Furthermore, "'[i]f a prosecutor's proffered reason for striking a [minority] panelist applies just as well to an otherwise-similar [nonminority] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step.'" Kesser, 465 F.3d at 360 (quoting Miller–El, 125 S. Ct. at 2325).  Of the twelve empaneled jurors and three alternate jurors, six also strongly disagreed with Question 39: Juror 5 (ER at 388), Juror 7 (ER at 448), Juror 9 (ER at 373), Juror 10 (ER at 508), Alternate Juror 1 (ER at 568) and Alternate Juror 2 (ER at 538).  The prosecutor's failure to question any of these jurors regarding their response to Question 39 and his failure to strike any of them tends to show that the prosecutor attributed specific bias to Thompson on account of her race, but not to any of the non-African-American jurors who expressed the same position.

Insofar as respondent argues that the prosecutor was concerned with Thompson's combined responses to Questions 38 and 39, the court notes that, as to Question 38, Juror 7 stated during voir dire that "if there's any doubt at all, let the [innocent] person go," ER at 231, and noted on her questionnaire, like Thompson, that she "disagreed strong[ly]" with Question 39, ER at 448.  Additionally, Juror 9 provided the same combined responses to Questions 38 and 39 on the juror questionnaire as did Thompson.  See ER at 373.  Yet neither of these two non-African American empaneled jurors were removed by the prosecutor.

       g.    Belief that the criminal justice system treats people unfairly because of their race, ethnic background or lifestyle

Question 46 of the juror questionnaires asked "Do you feel that the criminal justice system treats people unfairly, either as defendants, as victims, or as witnesses, because of their

race or ethnic background or because of the different lifestyle they may lead?" Thompson

answered this question affirmatively and wrote, "I believe it's unintentional for the most part, but

racial disparities in the treatment of black defendants is pretty well documented." See ER at 479.

In response to Question 47, which asked for examples of defendants who had not received a fair

trial because of their race, ethnic background or lifestyle, Thompson wrote "Geronimo Pratt,

Mumia Jamal." Id. The prosecutor asked Thompson about these responses during voir dire. See

ER at 250-51.

When exercising a peremptory strike against Thompson, the prosecutor referred to

these responses:

> She had indicated that she felt the criminal justice system specifically
> treats people unfairly. That's a specific bias that she has. And that was in
> question 46. I'm concerned about any person that believes the system treats
> people unfairly. I'm concerned about having those people participate as a juror in
> a criminal justice system from the People's point of view.
>
> She also indicated that this unfairness was clearly documented or
> documented in her response, and that's as to question 47.

ER at 328.

The court finds no evidence of pretext here. Challenging a prospective juror on

the basis of her expressed opinions about the judicial system does not violate Batson. See Tolbert

v. Gomez, 190 F.3d 985 (9th Cir. 1999). A prospective juror's belief that the criminal justice

treats people unfairly is not race-specific. It is not peculiar to any racial group and it does not

stand as a proxy for race. Id. at 989.

       h.    Single and never married

The prosecutor also relied on Thompson's marital status (single and never married,

ER at 473)) as a reason for striking her. ER at 328-29. Although a "minor point," the prosecutor

stated that he "generally like[s] people who are married, living with people, people who are in a

relationship where there is communication going on, group interaction," and that he "sometimes

/////

1    ha[s] a problem with single people who have never . . . been married.  They may be a very

2    strongly opinionated person that may not work well in a group setting."  ER at 328-29.

3              Of the empaneled jurors, two women were also single and never married – Juror

4    No. 3 (see ER at 333) and Juror No. 7 (see ER at 438), yet neither were stricken.  While

5    respondent is correct to argue that a prosecutor is entitled to peremptorily strike a potential juror

6    on account of his or her marital status, see, e.g., United States v. Omuruyi, 7 F.3d 880, 881 (9th

7    Cir. 1993) (finding that a peremptory challenge based on marital status does not violate Batson)

8    (citations omitted), the prosecutor may not use marital status as a guise to dismiss an African

9    American juror yet pass over two non-African American jurors who were also single and never

10   married.  This is especially true here considering that Juror 7, like Thompson, strongly agreed

11   with Question 38 and strongly disagreed with Question 39.  Likewise, the prosecutor's inclusion

12   of this weak reason as one of his nine reasons for striking Thompson convinces the court that this

13   reason was pretextual.

14              I.       Other jurors were better suited to hear the case

15              Lastly, the prosecutor asserted that other jurors in the jury pool were better suited

16   for the panel.  The undersigned does not find this reason to be credible.  The prosecutor's failure

17   to explain how or why other jurors would have been better suited for the panel renders this reason

18   pretextual.  However, even assuming this reason to be true, the court nonetheless finds that the

19   pretextual reasons identified above outweigh this reason.

20              In sum, a comparative juror analysis demonstrative the unpersuasiveness of many

21   of the prosecutor's proffered non-racial rationales for striking Thompson.  For all of the foregoing

22   reasons, the court finds that petitioner has carried his ultimate burden of proving that the

23   prosecutor was motivated in substantial part by race in exercising a peremptory strike as to

24   Thompson.  Johnson, 545 U.S. at 171; Kesser, 465 F.3d at 359-60; McClain, 217 F.3d at 1220-24.

25   /////

26   /////

31

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1.  Petitioner's amended application for a writ of habeas corpus be granted, and

2.  An order be issued directing respondent to release petitioner unless the State of California elects to retry petitioner within sixty (60) days.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 28, 2012.

UNITED STATES MAGISTRATE JUDGE

/014;will0721.157remand