1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RICHARD ALEX WILLIAMS,                No.  2:03-cv-0721 LKK AC

12              Petitioner,

13        v.                              ORDER AND FINDINGS &
                                          RECOMMENDATIONS
14   CHERYL PLILER,

15              Respondent.

16

17        Petitioner is a state prisoner proceeding through counsel with an application for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1998 conviction for one

19   count of murder, in violation of Cal. Penal Code § 187(a),[1] with the special circumstance that the

20   murder was committed "by means of discharging a firearm from a motor vehicle, intentionally at

21   another person outside the vehicle with the intent to inflict death," § 190.2(a)(21), and two counts

22   of attempted murder, in violation of §§ 664, 187(a).  Petitioner is presently serving a sentence of

23   life imprisonment without the possibility of parole as to the murder conviction, and an aggregate

24   determinate term of 10 years and eight months for his convictions on the attempted murder

25   charges.

26        This action is before the undersigned on remand from the Ninth Circuit Court of Appeals

27   _____

     [1] All future statutory references are to the California Penal Code unless noted otherwise.

28

                                           1

1    following this court's March 17, 2008 denial of petitioner's writ of habeas corpus.  On remand,

2    the issue is whether the state trial prosecutor exercised a peremptory challenge to exclude an

3    African-American prospective juror on account of her race in violation of the Equal Protection

4    Clause of the Fourteenth Amendment.  See Batson v. Kentucky, 476 U.S. 79 (1986).  The court is

5    directed to determine whether race played "a substantial part" in the prosecutor's decision to

6    exclude the prospective juror.  ECF No. 50 (memorandum opinion of Court of Appeals); see

7    Crittenden v. Ayers, 624 F.3d 943 (9th Cir. 2010).

8         An evidentiary hearing was held before U.S. Magistrate Judge John F. Moulds on

9    February 14, 2013, and the matter was submitted.  The case was subsequently reassigned to the

10   undersigned on November 5, 2013.  The undersigned has independently reviewed the state court

11   record and the record of proceedings in this court, including both the transcript and the audio

12   recording of the evidentiary hearing conducted by Judge Moulds.  As the court's discussion will

13   make clear, no factual determinations material to these findings and recommendations require

14   visual observation of witness demeanor at the evidentiary hearing.  Accordingly, it is unnecessary

15   for the newly-assigned magistrate judge to conduct a repeat evidentiary hearing.

16                              FACTUAL BACKGROUND

17        On August 15, 1996, the Sacramento County District Attorney's Office filed a complaint

18   charging petitioner with one count of murder, in violation of § 187(a), with a special circumstance

19   that the murder had been perpetrated by discharging a firearm from a motor vehicle at a person

20   outside said motor vehicle, and two counts of attempted murder, in violation of §§ 187(a) and

21   664.[2]  Clerk's Transcript ("CT") I at 18-20.  As to all three charges, it was alleged pursuant to

22   § 12022.5(a) that petitioner had personally used a firearm.  Id.

23        Petitioner was tried twice on these charges.  The first trial resulted in a hung jury after two

24   African-American jurors voted not guilty.  See CT II at 310-12; Excerpts of Record[3] ("ER") at

25   _____

26   [2] A recitation of the facts underlying these charges is unnecessary to the resolution of the Batson
     claim presently before this court.

27   [3] The record in this case is voluminous.  For ease of reference, citation therefore will be made,
     when available, to the Excerpts of Record filed by petitioner in the Ninth Circuit Court of

28   (continued…)

1   325-27.  On retrial, jury selection commenced on July 7, 1998 with the distribution of juror

2   questionnaires.  See CT II at 313.  On July 8, 1998, voir dire began, and on July 9, 1998, Detria

3   Thompson ("Thompson"), an African-American woman, was called as a prospective juror.  ER at

4   104, 192 and 245.

5   A.      Voir Dire of Thompson

6           During voir dire, Thompson was initially questioned briefly by defense counsel.  See ER

7   at 245-46.  She was then questioned by the prosecutor, who began by referring to a notation on

8   Thompson's juror questionnaire indicating that she wished to discuss a matter privately.  See id.

9   at 246.  The trial court thus excused the jury for a break and, outside of the presence of the other

10   prospective jurors, Thompson shared information regarding a petty theft conviction she sustained

11   while she was a student at California State University, Los Angeles.  See id. at 246-48.

12   Thompson stated that she was caught shoplifting some items from a campus bookstore and

13   charged with petty theft, to which she pled guilty and received summary probation.  See id.

14   When asked whether she felt she was treated fairly, Thompson answered affirmatively and noted

15   that the incident did not have an effect on her education.  See id. at 247.  Following this

16   discussion, the other prospective jurors were allowed to return to the courtroom.  See id. at 248.

17           Back in the presence of the other jurors, the prosecutor questioned Thompson about

18   certain responses that she provided on the juror questionnaire, including one response concerning

19   her prior experience with police officers:

20           [PROSECUTOR]: Miss Thompson, you mentioned in your
             questionnaire that you had had a particularly bad experience with a
21           law enforcement officer.  A motorcycle officer who pulled you over
             for what you felt was no reason.
22
             [THOMPSON]: Yes.
23
             [PROSECUTOR]: When did that occur?
24
             [THOMPSON]: There were actually two cops.  I didn't indicate
25           that.  It happened probably four years ago.  Four or five years ago.

26           [PROSECUTOR]: Is that in Sacramento?

27   _____

28   Appeals.

3

[THOMPSON]: It was in Long Beach.

[PROSECUTOR]: Both times?

[THOMPSON]: Umm, I believe I only mentioned one incident. That was in Long Beach.

[PROSECUTOR]: Okay.  So there were two times you felt you were pulled over for no reason.

[THOMPSON]: Once. I'm referring to what happened in Long Beach. I don't think I said more than once.

[PROSECUTOR]: Okay. What was the other bad experience that you felt you had?

[THOMPSON]: I said one bad experience.

[PROSECUTOR]: Oh, I'm sorry. Okay.

ER at 248-49.

Ms. Thompson was not asked about the positive experience with a police officer that she also reported on the questionnaire.  Compare id.; ER at 477.

Next, the prosecutor asked Thompson what she meant when she indicated that she disagreed strongly with the proposition "If the prosecution brings someone to trial, that person is probably guilty."  ER at 249.  Thompson responded, "I mean that I wouldn't assume that because someone is brought forward by the prosecution that they're guilty."  Id.

Finally, the prosecutor asked Thompson about her opinion that the criminal justice system treats some people unfairly:

[PROSECUTOR]: . . . [T]here's some questions about race, and you felt that, umm, criminal justice system intentionally or unintentionally treats people unfairly because of their race or their ethnic background.

[THOMPSON]: That can happen, yes.

[PROSECUTOR]: And that you felt that specifically happened in a couple of cases and you mentioned Mr. Pratt, and there's another name I'm not familiar with that case.  Who is that?

[THOMPSON]: William Mobia Jamal [sic].[4]

---

[4] The correct name of the defendant in that case is Mumia Abu-Jamal.

4

[PROSECUTOR]: Can you briefly explain what that case was about?

[THOMPSON]: What I read about the case, I believe he is or was in Philadelphia and he was a journalist and he was accused of murdering a police officer. And the information that I read seemed to indicate that he did not receive a fair trial. And there has been some media coverage on that case. He's been appealing his case for a number of years now.

[PROSECUTOR]: And [ ] your belief about that was based on the account that you had read?

[THOMPSON]: A few accounts, yes.

[PROSECUTOR]: About Mr. Pratt? What is that based on?

[THOMPSON]: What is the case based on?

[PROSECUTOR]: No, I'm familiar with that one. Why don't you feel he received a fair trial?

[THOMPSON]: I believe he was acquitted after 30 years, or something like that. 25 to 30 years, that he had been convicted and he served time in prison for a long period of time, and eventually he was acquitted.

[PROSECUTOR]: Was he acquitted, or did he get a new trial because of it, or do you know?

[THOMPSON]: I believe it was a new trial.

[PROSECUTOR]: Do you know if that had anything to do with racial or ethnic issues?

[THOMPSON]: Probably. Partially, he was a Black Panther, and I think that probably had something to do with it. And I'm sure there were politics involved as well.

ER at 250-51.

Thompson was ultimately excused when the prosecutor exercised a peremptory strike. ER at 258.

B.      The *Wheeler* Hearing

After Thompson was stricken, petitioner filed a motion to dismiss the entire jury panel pursuant to People v. Wheeler, 22 Cal.3d 258 (1978).[5] ER at 324. On July 16, 1998, the trial

_____

[5] In Wheeler, the California Supreme Court held that peremptory challenges may not be used to (continued…)

5

1   court held a hearing on the motion:

2       THE COURT: Okay.  You can, umm, if I understand your motion, you are making the motion to dismiss the entire panel by reason of the prosecutor's use of peremptory challenges to strike jurors on the ground of group bias alone based on the People versus Wheeler; is that correct?

5       [DEFENSE COUNSEL]: That is one motion, yes.

6       THE COURT: Since it's the burden of the moving party to establish a prima facie case of discrimination as well as make the record, I'll give you the opportunity to proceed first, and you must show from all the circumstances in this case a strong likelihood that the persons challenged were challenged due to group classifications rather than specific bias.  First, you must show that the jurors struck are members of some identifiable group or cognizant group [–] you indicated they were black or African American, and therefore [–] that is I'd like to ask you, Mr. Gold [the prosecutor], do you wish to stipulate that for the purposes of the representative cross section rule that the jurors struck are all members of the same cognizable group?

13      [PROSECUTOR]: Your Honor, are you saying jurors plural, or singular.

14      THE COURT: Well, I think similar in regards to the actual jurors struck.

16      [PROSECUTOR]: I would agree that the one juror in question was African-American.

17      THE COURT: Okay. [Defense counsel.]

18      [DEFENSE COUNSEL]: Thank you. I do not have her name, however I believe she was juror number – well, it was Diedra [sic] Thompson, I believe was her name.   She's African American. Female who was struck by the District Attorney.  This is interesting in this case, because I believe that it was a use of the peremptory challenge, because she was African-American.  Number one, in the first trial of [petitioner] it was a hung jury.  Initially it was hung 10 to two, my understanding, and eventually was hung 11 to one.  The two jurors who voted for not guilty were African American.  One of those jurors was removed during the deliberation process, leaving one African American juror.  That juror held out and voted not guilty throughout.

25      In this case, I think that there was an intention to exclude African American jurors for that same reason.  The threat or the concern

27  exclude from a jury all or most members of a cognizable group solely on the ground of presumed "group bias."  Wheeler is "the California counterpart to Batson."  Yee v. Duncan, 463 F.3d 893, 896 (9th Cir. 2006), cert. denied, 552 U.S. 1043 (2007).

that they might vote not guilty or have a reasonable doubt.  In this particular instance, while Miss Thompson had a prior petty theft, some 15 years or more ago, which incident that occurred at her school, she was at the university, apparently she stole some books or something to that effect.  She was placed on probation, she acknowledged that nothing was done to her in the process in terms of being treated wrongfully.  She admitted wrongdoing, she was on probation, she cleared probation and she eventually graduated from that university.  I don't think that there was anything about her, particularly, that would otherwise cause the prosecutor to use his peremptory challenge.  I think that, um, given the nature of this case, the persons who are involved in this case and even given the fact that out of 70 people that we had to select from, there were only three African-Americans out of the whole pool.  So the – it was very easy to use the peremptory challenge in that manner, and that is what was done.  I don't think that there was any legitimate reason to excuse the juror, and the only reason why it was done was because of her race.

THE COURT: [Prosecutor], I'll give you the opportunity if you wish to state anything.  I'm not requiring.

[PROSECUTOR]: Okay.  Umm, I would state my reasons.  I would also ask the Court, though, to perhaps make a ruling for the record whether prima faci[e] case has been made.  I understand the law is if you rule there has not been a prima facie, I don't have to give reasons.

THE COURT: That's why I am not requiring you.  I do not believe a prima facie case has been met, but I will give you an opportunity to make a record if you desire.

[PROSECUTOR]: I will take the opportunity, your Honor.  I would note, however, a couple of factors.  I think [defense counsel] said it was a pool of 70.  I believe it was a pool of 65.  I don't agree there was just three African Americans.  I can say there appeared to be three people that were clearly African American, but I don't know if there's mixtures or what the other makeup of all the other people were.  And I don't think that's on the record.  So I don't agree with that.  I would mention that the last case has absolutely nothing to do with my choices in this case, or any of the result in that, I would mention that Miss Thompson I had passed several times before she arrived.  When she arrived, I believe she was number 34.  I found it unusual that her petty theft, one, because she had discussed it in private.  If it was a minor incident, I believe a lot of people talk candidly about problems in their past.  DUIs, things like that.  She felt she wanted to talk about it privately.  That concerned me some.  What she also indicated [was] that it occurred when I believe she was 21 years old.  She said it happened in 1981.  She was – she's 38 years old.  I find it unusual that you are stealing something when you are 21 years of age.  To me, that's a problem.  And it also goes to the issue of honesty.  It's not, say, a DUI that may have unrelated credibility problems.  Honesty is something that's important, and she had stolen something in the past.  That concerned me.

7

She had indicated that she had had a bad experience with an officer. It was unclear where in her questionnaire she mentioned she had a bad experience. When I asked her in court about it, it was unclear whether it was one or two, and I felt the interaction between questions that I asked her, there was some tension that I was feeling from her, just questioning her.

She mentioned that as to questions 38 and 39, which are purposefully worded, I guess, in a[n] ambiguous way to get certain response, she indicated that the People bring someone to trial, question asked are they probably guilty. She strongly disagreed with that. I have a problem with that. I can understand someone saying I disagree with it somewhat. When you strongly disagree, that shows a specific bias. You may not trust law enforcement or you may not trust the prosecution and feel they are simply bringing people to trial that they don't believe are guilty or have no evidence. I'm concerned about that.

She also indicated that she strongly agrees that it is better to let guilty people go free, rather than risking an innocent person. There are other responses she could have checked. To me that shows specific bias. That concerns me.

She had indicated that she felt the criminal justice system specifically treats people unfairly. That's a specific bias that she has. And that was in question 46. I'm concerned about any person that believes the system treats people unfairly. I'm concerned about having those people participate as a juror in a criminal justice system from the People's point of view.

She also indicated that this unfairness was clearly documented or documented in her response, and that's as to question 46.

She is a single person who has never been married. That is a minor point, but I believe in a group setting people are going to have to work together. People are going to have to be tolerant of each other's views. And I generally like people who are married, living with people, people who are in a relationship where there is communication going on, group interaction. And I sometimes have a problem with single people who have never . . . been married. They may be a very strongly opinioned person that may not work well in a group setting.

I also felt, based on the process that both of the lawyers agreed to, that the Court had provided us with the random list, so we had the opportunity to know who was coming up next in order, and we had the questionnaires that we had read, and I believe that there were other jurors that were better suited to hear this case that were after Miss Thompson, that I felt a lot more comfortable with that were better jurors in my opinion than Miss Thompson. So for all of those reasons, she was excused.

ER at 324-29.

The trial court eventually denied petitioner's <u>Wheeler</u> motion. <u>See</u> ER at 330-32.

8

1   Thereafter, following a jury trial, petitioner was convicted on all charges on August 3, 1998.  See

2   CT 441-46.  The jury also found the arming allegations and the special circumstance allegation to

3   be true.  See id.  The court initially sentenced petitioner on October 16, 1998 to three consecutive

4   life terms plus three years: in count one, life without the possibility of parole, plus a one-year

5   enhancement; in count two, life with the possibility of parole, plus a one-year enhancement; and

6   in count three, life with the possibility of parole, plus a one-year enhancement.  Following

7   remand by the California Court of Appeal for the Third Appellate District, the court re-sentenced

8   petitioner on August 2, 2002 on counts two and three to a cumulative total of 10 years and eight

9   months, consecutive to the term of life without parole plus one year for count one.

10                          RELEVANT PROCEDURAL BACKGROUND

11   A.      State Direct Appeal

12           On petitioner's direct appeal, the California Court of Appeal addressed petitioner's Batson

13   claim as follows:

14               Citing *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), defense
                 counsel challenged the prosecutor's use of a peremptory challenge
15               to remove the last African-American from the jury.  [Petitioner]
                 contends the trial court used the wrong test in ruling the defense
16               counsel failed to establish a prima facie case of discrimination. . . .
                 We conclude there was no error[.]
17
                 A.  Factual Background:
18
                 During jury selection, Prospective Juror Thompson revealed to the
19               court in private that she had received summary probation for
                 shoplifting while a college student in 1981.  When the other
20               prospective jurors returned to the courtroom, she described a "bad
                 experience" four years before with two law enforcement officers
21               she claimed pulled her over for "no reason."  Thompson also noted
                 two cases where she believed defendants had been treated unfairly
22               because of their race.  These included the Pratt Black Panthers case
                 and the William Mobia Jamal capital case.  The prosecutor
23               exercised a peremptory challenge against Ms. Thompson.

24               At the hearing on [petitioner's] *Wheeler* motion, the court explained
                 to defense counsel, "Since it's the burden of the moving party to
25               establish a prima facie case of discrimination as well as make the
                 record, I'll give you the opportunity to proceed first, and you must
26               show from all the circumstances in this case a strong likelihood that
                 the persons challenged were challenged due to group classification
27               rather than specific bias."

28               Thereafter,  defense  counsel  argued  the  prosecutor  excused

9

Thompson because she was African-American.  He noted that two African-American jurors had voted not guilty in [petitioner's] first trial resulting in a hung jury.

The court found that [petitioner] failed to establish a prima facie case under *Wheeler*.  It gave the prosecutor the opportunity to make a record, although the prosecutor was not required to do so in light of the court's findings.  The prosecutor explained he was concerned about several matters revealed during voir dire: (1) Thompson's prior petty theft; (2) her desire to discuss the incident only in private; (3) the age at which she committed the petty theft; (4) her bad experience with law enforcement; (5) her response to the jury questionnaire, including the view that the criminal justice system treated some people unfairly; and (6) her perceived unwillingness to work together with other jurors.

The court again concluded [petitioner] failed to sustain his burden to establish a prima facie case of discrimination.

B.  Discussion:

"If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in a timely fashion and make a prima facie case of such discrimination to the satisfaction of the court.  First, he should make as complete a record of the circumstances as is feasible.  Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule.  Third, from all the circumstances of the case he must show a *strong likelihood* that such persons are being challenged because of their group association."  (*Wheeler*, *supra*, 22 Cal.3d at p. 280, emphasis added, fn. omitted.)  Under *Batson*, decided by the United States Supreme Court eight years after *Wheeler*, the defendant must show facts and relevant circumstances that *raise an inference* that the prosecution excluded the prospective juror because of race.  (*Batson*, *supra*, 476 U.S. at p. 96, [90 L.Ed.2d at pp. 87-88].)  California courts have read the state and federal tests together to require that [petitioner] show a strong likelihood of discrimination.  (See *People v. Turner* (1994) 8 Cal.4th 137, 164.)

"There is a presumption a party exercising a peremptory challenge is doing so on a constitutionally firm ground."  (*People v. Bernard* (1994) 27 Cal.App.4th 458, 465, disapproved on other grounds in *People v. Box* (2000) 23 Cal.4th 1153, 1188, fn. 7.)  When considering the denial of a *Wheeler* motion, we also give considerable deference to the trial court's ruling.  (*People v. Sanders* (1990) 51 Cal.3d 471, 501.)  We will affirm if a review of the entire voir dire record "'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question."  (*People v. Howard* (1992) 1 Cal.4th 1132, 1155.)

Two years after the trial in this case, the Ninth Circuit ruled in *Wade v. Terhune* that "the *Wheeler* standard, as currently interpreted by the California courts, does not satisfy the constitutional requirement laid down in *Batson*."  (*Wade v. Terhune*

1     (2000) 202 F.3d 1190, 1192.)  In that case, the defense relied on
2     both *Wheeler* and *Batson* in challenging the prosecutor's
      peremptory challenge in the state trial court.  (*Wade v. Terhune*,
3     *supra*, at p. 1194.)  The California Supreme Court clarified the
      matter in *People v. Box*, explaining that in California, a "strong
4     likelihood" means a "reasonable inference."  (*People v. Box*, *supra*,
      23 Cal.4th at p. 1188, fn. 7.)

5     We begin by noting the *Batson* test was not, in fact, at issue in this
      case. [Petitioner's] motion was based solely on *Wheeler*.  The court
6     recited the "strong likelihood" test, and denied the motion on the
      ground [petitioner] did not establish a prima facie case of
7     discrimination under that standard.  [Petitioner] does not dispute
      that he failed to satisfy the requirements of *Wheeler*.  In any event,
8     there is no basis for [petitioner's] claim the trial court applied the
      wrong test since "strong likelihood" means the same as "reasonable
9     inference" under California law.  (*People v. Box*, *supra*, 23 Cal.4th
      at p. 1188, fn. 7.)

10
      Even if we were to conclude [petitioner] established a prima facie
11    case of discrimination under *Wheeler*, the voir dire record and
      hearing transcript demonstrates [petitioner's] motion was doomed
12    to fail.  During voir dire, Prospective Juror Thompson raised
      several matters the prosecutor could and expressly did reasonably
13    view as grounds for peremptory challenge.  Although not required
      to do so after the court made its ruling, the prosecutor nonetheless
14    detailed his reasons for challenging Thompson.  Those reasons
      were, in fact, proper.
15

16    People v. Williams, slip op. at 16-20.

17         The California Supreme Court summarily denied review on December 17, 2001.  ER at

18    48.  Petitioner did not file a state habeas petition.

19    B.    Federal Habeas Petition

20         On April 9, 2003, petitioner filed a petition for writ of habeas corpus raising the following

21    claims: (1) the trial court violated the constitutional guarantee against double jeopardy by

22    unjustifiably dismissing the first jury selected in petitioner's case; (2) the State violated

23    petitioner's right to equal protection when it impermissibly challenged a minority juror; (3) an

24    eyewitness identification made in this case was unduly suggestive; (4) the court violated the

25    Confrontation Clause and due process principles by admitting into evidence prior inconsistent

26    statements for substantive purposes made by declarants who did not testify at trial; (5) the trial

27    court permitted fundamentally unfair testimony about threats to and intimidation of a key witness;

28    (6) the trial court permitted the introduction of overly prejudicial, uncharged character evidence

11

1  when it allowed testimony about .25 caliber shell casings found in petitioner's car; (7) the

2  evidence against petitioner was insufficient; (8) the trial court erred in its instruction to the jury

3  regarding the elements of first degree murder; (9) the evidence at trial was insufficient to support

4  the true finding as to the special circumstance of discharging a firearm from a vehicle; and (10)

5  habeas relief is warranted as a result of the cumulative impact of the errors and irregularities

6  committed by the trial judge and the prosecutor during the trial.

7          On December 20, 2006, the magistrate judge previously assigned to the case issued

8  findings and recommendations recommending that the petition be denied.  ECF No. 23.  As to

9  petitioner's Batson claim, deference was given to the trial court's opinion that the prosecutor was

10  telling the truth and it was concluded that the prosecutor's stated reasons for exercising a

11  peremptory challenge were valid.  Id. at 13-20.  It was also determined that the record failed to

12  demonstrate that retained non-minority jurors were similarly situated to the excused juror.

13  However, in conducting the third step of the Batson analysis, the court conducted comparative

14  juror analysis only as to a stricken juror instead of to the retained jurors.  See id. at 20.

15          On March 17, 2008, the Honorable Ralph R. Beistline adopted the findings and

16  recommendations in full and denied petitioner's application for a writ of habeas corpus.  ECF No.

17  40.

18          Petitioner appealed to the United States Court of Appeals for the Ninth Circuit.  On

19  January 25, 2011, the Ninth Circuit reversed the judgment of this court as to petitioner's Batson

20  claim.  The appellate court concluded that it was error to accord deference to the trial court's

21  credibility determination, because the record reflects that the state trial court did not conduct the

22  third step of analysis as required by Batson.  The appellate court also concluded that it was error

23  to conduct a limited comparative juror analysis by comparing the stricken juror to one other

24  struck juror as opposed to jurors who were allowed to serve.  With reference to Crittenden v.

25  Ayers, 624 F.3d 943 (9th Cir. 2010), the Ninth Circuit remanded this matter solely on petitioner's

26  Batson claim with direction to "conduct a full step-three inquiry that includes a proper

27  comparative juror analysis," including consideration of all of the juror questionnaires from

28  petitioner's trial.  ECF No. 50.

1   After the matter was remanded, the court directed petitioner to file an amended habeas

2   petition, which he did on August 9, 2011.  Respondent answered the amended habeas petition on

3   October 18, 2011 and petitioner filed a traverse on October 26, 2011.

4   On June 29, 2012, the court issued Findings and Recommendations which recommended

5   that the amended habeas petition be granted.  ECF No. 73.  Respondent objected to the Findings

6   and Recommendations, and moved for an evidentiary hearing.  The district judge referred the

7   motion for an evidentiary hearing to Judge Moulds.  On November 15, 2012, respondent's motion

8   for an evidentiary hearing was granted.  ECF No. 89.  Petitioner objected to the order granting the

9   evidentiary hearing, and the district judge affirmed the order on December 21, 2012.  ECF No.

10   95.

11   C.   Evidentiary Hearing

12   The evidentiary hearing was conducted on February 14, 2013.  Deputy District Attorney

13   Robert Gold was the sole witness.  In his testimony Mr. Gold described his process for evaluating

14   and scoring the juror questionnaires prior to voir dire, explained his thinking regarding the

15   reasons for the Thompson strike that he had given at the Wheeler hearing in 1998, and explained

16   why he had kept many of the seated jurors.  He denied that he had exercised a peremptory

17   challenge against Ms. Thompson because of her race, stating that to do so "would be

18   unconstitutional.  It would be against my oath as a prosecutor.  Against my ethics.  And it would

19   be cheating."  ECF No. 102 (evidentiary hearing transcript) at 25.[6]

20   STANDARD GOVERNING HABEAS REVIEW

21   An application for writ of habeas corpus by a person in custody under judgment of a state

22   court can only be granted for violations of the Constitution or laws of the United States.  See 28

23   U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v.

24   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

25   Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death

26

27   ───────────────────
    [6] Citations to court documents refer to the page numbers assigned by the court's electronic
    docketing system.

28

13

1   Penalty Act of 1996 ("AEDPA"), which limits the authority of the federal court to provide habeas

2   relief.  See Lindh v. Murphy, 521 U.S. 320, 326 (1997).  AEDPA's limitations on relief do not

3   apply, however, where the state court's prior adjudication of the claim was "contrary to, or

4   involved an unreasonable application of, clearly established federal law, as determined by the

5   Supreme Court of the United States."  See 28 U.S.C. 2254(d)(1).

6       On appeal from this court's previous denial of habeas relief, the Ninth Circuit expressly

7   held that   ". . . AEDPA deference does not apply here because the state trial court applied the

8   wrong legal standard in determining whether Williams made out a prima facie violation at

9   Batson['s] step one.  Therefore, the federal courts review William's habeas petition de novo."

10  ECF No. 50 at 2.  This is the law of the case.  See Lower Elwha Band of S'Klallams v. Lummi

11  Indian Tribe, 235 F.3d 443, 452 (9th Cir. 2000) (under the law of the case doctrine, "a court is

12  generally precluded from reconsidering an issue previously decided by the same court, or a higher

13  court in the identical case.").

14      Judge Moulds found in 2006 that AEDPA deference did not apply to petitioner's Batson

15  claim.[7]  Judge Beistline adopted that finding in 2008, and the Ninth Circuit affirmed in 2011.[8]

16  Given this history, it would constitute an abuse of discretion for the undersigned to apply any

17  standard other than de novo review.  See Lower Elwha Band of S'Klallams, 235 F.3d at 452.

18  Respondents' "Notification of Invocation of AEDPA Standard," ECF No. 92, is therefore without

19  effect.

20      Respondent argues that the state court's use of the wrong standard for a prima facie case

21  does not take the claim outside the scope of AEDPA, because the California Court of Appeal held

22  in the alternative that the prosecutor's stated reasons for the strike were "proper."  ECF No. 92 at

23  2.  This argument is not based on changed circumstances or new law, and therefore does not

24  support an exception to the law of the case doctrine.  See id.  Moreover, respondent's

_____

[7] See ECF No. 23 at 17.

[8] This consensus is compelled by well-established circuit precedent.  See Wade v. Terhune, 202 F.3d 1190, 1197 (9th Cir. 2000) (Wheeler "likelihood of discrimination" standard for prima facie case is "contrary to" Batson, resulting in de novo habeas review); Fernandez v. Roe, 286 F.3d 1073, 1077 (9th Cir.) (same), cert. denied, 537 U.S. 1000 (2002).

1   "invocation" of AEDPA deference is directly contrary to the position it took in the Ninth Circuit.

2   See ECF No. 50 at 2 (Ninth Circuit opinion) ("The state concedes that AEDPA deference does

3   not apply here. . ."); ECF No. 92 at 1 (acknowledging changed position).  Respondent either

4   waived this argument by failing to pursue it on appeal, is estopped from changing its position

5   here, or both.  Finally, the "invocation" of AEDPA deference on remand is contrary to

6   respondent's insistence that an evidentiary hearing was necessary.  In Cullen v. Pinholster, 131

7   S.Ct. 1388, 1398, 1400 (2011), the Supreme Court stated that federal habeas review under 28

8   U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the

9   claim on the merits" and "that evidence introduced in federal court has no bearing" on such

10  review.  Thus, if AEDPA standards governed respondent would be unable to rely on evidence

11  obtained during the evidentiary hearing that it requested.

12          For all these reasons, petitioner's Batson claim will be reviewed de novo.

13                                              ANALYSIS

14          Purposeful discrimination on the basis of race or gender in the exercise of peremptory

15  challenges violates the Equal Protection Clause of the United States Constitution. See Batson, 476

16  U.S. 79; Johnson v. California, 545 U.S. 162 (2005).  So-called Batson claims are evaluated

17  pursuant to a three-step test:

18                  First, the defendant must make out a prima facie case 'by showing
                    that the totality of the relevant facts gives rise to an inference of
19                  discriminatory purpose.' [Citations].  Second, once the defendant
                    has made out a prima facie case, the 'burden shifts to the State to
20                  explain adequately the racial exclusion' by offering permissible
                    race-neutral justifications for the strikes.  [Citations .]  Third, '[i]f a
21                  race-neutral explanation is tendered, the trial court must then decide
                    . . . whether the opponent of the strike has proved purposeful racial
22                  discrimination.' [Citation.]

23  Johnson, 545 U.S. at 168 (footnote omitted); see also Tolbert v. Gomez, 190 F.3d 985, 987-88

24  (9th Cir. 1999) (en banc).

25  A.      The Prima Facie Case of Discrimination

26          At the first step of the Batson analysis, petitioner must make out a prima facie case "by

27  showing that the totality of the relevant facts gives rise to an inference of discriminatory

28  purpose." Johnson, 545 U.S. at 168 (footnote omitted).  In order to establish a prima facie case of

                                                    15

racial discrimination, a petitioner must show that "(1) the prospective juror is a member of a 'cognizable racial group,' (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motived by race." Boyd v. Newland, 467 F.3d 1139, 1143 (2006) (citing Batson, 476 U.S. at 96, and Cooperwood v. Cambra, 245 F.3d 1042, 1045-46 (9th Cir. 2001)), cert. denied, 550 U.S. 933 (2007). A prima facie case of discrimination "can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" Johnson v. California, 545 U.S. at 169 (quoting Batson, 476 U.S. at 94.)[9]  In evaluating whether a petitioner has established a prima facie case, a reviewing court should consider the "'totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike." Boyd, 467 F.3d 1146 (quoting Batson, 476 U.S. at 94, 96).   The petitioner's burden at the first Batson step is "not an onerous burden." Crittenden, 624 F.3d at 955. As the Supreme Court clarified in Johnson,

> We did not intend the first step to be so onerous that a defendant would have to persuade the judge – on the basis of all the facts, some of which are impossible for the defendant to know with certainty – that the challenge was more likely than not the product of purposeful discrimination.  Instead, a defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.

545 U.S. at 170.

In this case, petitioner objected to the peremptory strike of Thompson as racially motivated based, in part, on Thompson's membership in a cognizable racial group. ER at 325-26. Although the prosecutor's peremptory strike of a single African-American prospective juror does not, standing alone, support an inference that discrimination occurred, see United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir.), cert. denied, 513 U.S. 891 (1994), it is afforded weight in combination with the other factors offered by defense counsel.  Those include the facts

---

[9] In Batson, defense counsel timely objected to the prosecutor's use of peremptory challenges because they resulted in striking "all black persons on the venire." Id., 476 U.S. at 100.  The Supreme Court held that this was a sufficient basis to find an inference of racial discrimination and that the trial court erred when it "flatly rejected the objection without requiring the prosecutor to give an explanation for his action." Id.

1   that (1) petitioner is African-American; (2) his first trial resulted in a hung jury after the only two

2   African-Americans on that jury voted not guilty, and (3) Thompson was the only African-

3   American juror who could serve, so her exclusion left the jury without a single African-American

4   member.[10]  Upon consideration of these circumstances, the court finds that petitioner has

5   produced evidence sufficient to draw an inference that discrimination occurred.  Thus, petitioner

6   satisfies the first Batson step.

7   B.      The Prosecutor's Proffered Race-Neutral Reasons

8          At the second step of the Batson analysis, "the issue is the facial validity of the

9   prosecutor's explanation."  Hernandez v. New York, 500 U.S. 352, 360 (1991).  At this step, "a

10   neutral explanation in the context of our analysis here means an explanation based on something

11   other than the race of the juror."  Id. at 360.  "Unless a discriminatory intent is inherent in the

12   prosecutor's explanation, the reason offered will be deemed race-neutral."  Stubbs v. Gomez, 189

13   F.3d 1099, 1105 (9th Cir. 1999) (quoting Hernandez, 500 U.S. at 360), cert. denied, 531 U.S. 832

14   (2000).  For purposes of step two, the prosecutor's explanation need not be "persuasive, or even

15   plausible."  Purkett v. Elem, 514 U.S. at 765, 768 (1995).  Indeed, "to accept a prosecutor's stated

16   nonracial reasons, the court need not agree with them."  Kesser v. Cambra, 465 F.3d at 351, 359

17   (9th Cir. 2006).  "It is not until the third step that the persuasiveness of the justification becomes

18   relevant--the step in which the trial court determines whether the opponent of the strike has

19   carried his burden of proving purposeful discrimination."  Purkett, 514 U.S. at 768.

20          Here, though the trial judge concluded that petitioner did not make a prima facie showing,

21

22   _____

23   [10] At the hearing on petitioner's Wheeler motion, defense counsel asserted that there were only
     three African-American jurors in the jury pool and that, of those three, Thompson was the only
24   African-American who could serve.  ER at 326.  The record reflects that one woman was
     dismissed because her husband was involved in a car accident during voir dire, see ER at; CT II at
25   315, but the record is silent as to the third African-American prospective juror.  At the hearing,
     the prosecutor countered that it was not possible to determine how many people in the jury pool
26   were African-American, though he conceded that three were "clearly" so.  See ER at 326-27.  In
     addition, during oral arguments before the Ninth Circuit Court of Appeals, respondent
27   acknowledged that Thompson was the only African-American prospective juror who could serve
     on the jury.  See Ninth Circuit Oral Argument at 26:40, Williams v. Pliler, (No. 08-16806),
28   available at http://www.ca9.uscourts.gov/media/view_subpage.php?pk_id=0000006645.

17

1   he nonetheless granted the prosecutor an opportunity to make a record for his peremptory strike

2   of Thompson.  The prosecutor took the opportunity to set forth nine reasons for striking

3   Thompson:[11] (1) Thompson wanted to discuss her petty theft conviction in private, (2) the petty

4   theft occurred when Thompson was 21, (3) Thompson's arrest for petty theft speaks to her

5   honesty, (4) Thompson had a bad experience with a police officer, (5) Thompson strongly

6   disagreed with the proposition "If the prosecution brings someone to trial, that person is probably

7   guilty," (6) Thompson strongly agreed with the proposition "It is better for society to let some

8   guilty people go free than to risk convicting an innocent person," (7) Thompson felt the criminal

9   justice system treats people unfairly because of their race, ethnic background or lifestyle,

10  (8) Thompson was single and never married, and, finally, (9) other jurors were better suited to

11  hear the case than Thompson.  ER at 324-29.

12    Because none of the prosecutor's proffered reasons are facially race-based, the court finds

13  that the prosecution met its burden of offering race-neutral reasons at the second step of the

14  Batson analysis.

15  C. Purposeful Discrimination

16    1. Legal Standard

17    An en banc panel of the Ninth Circuit in Kesser discussed the analysis that is required at

18  the third step of Batson:

19     At this stage, "the trial court determines whether the opponent of
    the strike has carried his burden of proving purposeful
20     discrimination."  Purkett, 514 U.S. at 768.  Although the burden
    remains with the defendant to show purposeful discrimination, the
21     third step of Batson primarily involves the trier of fact. After the
    prosecution puts forward a race-neutral reason, the court is required
22     to evaluate "the persuasiveness of the justification."  Id.  To accept
    a prosecutor's stated nonracial reasons, the court need not agree
23

24  _____
    [11] In the amended petition and the amended answer, both petitioner and respondent identify a
25  different number of race-neutral reasons purportedly offered by the prosecutor.  On review, the
    court finds that the nine reasons it has identified above fairly reflect the prosecutor's statements.
26  Additionally, the court notes that petitioner discusses reasons that are not remotely referenced in
    the prosecutor's stated race-neutral reasons for striking Thompson.  See ECF No. 63 (Am. Pet.) at
    25.  These include Thompson's employment with the State of California, Thompson's statements
27  as to whether she could return a guilty verdict if the prosecution proved its case beyond a
    reasonable doubt, and Thompson's agreement with the principles of aider and abetter liability.  Id.

28

with them.  The question is not whether the stated reason represents a sound strategic judgment, but "whether counsel's race-neutral explanation for a peremptory challenge should be believed." Hernandez v. New York, 500 U.S. 352, 365, 111 S. Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion).  "It is true that peremptories are often the subjects of instinct," and that "it can sometimes be hard to say what the reason is." Miller–El, 125 S. Ct. at 2332.  "But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." Id.  "While subjective factors may play a legitimate role in the exercise of challenges, reliance on such factors alone cannot overcome strong objective indicia of discrimination...."  Burks v. Borg, 27 F.3d 1424, 1429 (9th Cir. 1994).

The trier of fact may not turn a blind eye to purposeful discrimination obscured by race-neutral excuses. "[T]he prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." Batson, 476 U.S. at 98 n.20 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 258, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).  "A Batson challenge does not call for a mere exercise in thinking up any rational basis." Miller–El, 125 S. Ct. at 2332.  Reasons must be "related to the particular case to be tried." Batson, 476 U.S. at 98.  "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Purkett, 514 U.S. at 768.

The court need not accept any proffered rationale.  We have recognized that "[w]hen there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it." Johnson, 3 F.3d at 1331.  The court must evaluate the record and consider each explanation within the context of the trial as a whole because "'[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.'"  Hernandez, 500 U.S. at 363, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (quoting Washington v. Davis, 426 U.S. 229, 242, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976)); see also Miller–El, 125 S. Ct. at 2324 (noting that Batson requires inquiry into "'the totality of the relevant facts' about a prosecutor's conduct" (quoting Batson, 476 U.S. at 94, 106 S. Ct. 1712, 90 L. Ed. 2d 69)); Batson, 476 U.S. at 93, 106 S. Ct. 1712, 90 L. Ed. 2d 69 ("In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence as may be available." (internal quotation marks omitted)).  A court need not find all nonracial reasons pretextual in order to find racial discrimination. "[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination." Lewis v. Lewis, 321 F.3d 824, 830 (9th Cir. 2003); see also United States v. Chinchilla, 874 F.2d 695, 699 (9th Cir. 1989) ("Thus, the court is left with only two acceptable bases for the challenges.... Although these criteria would normally be adequately 'neutral' explanations taken at face value, the fact

19

1  that two of the four proffered reasons do not hold up under judicial
   scrutiny militates against their sufficiency.").

2

3  Kesser, 465 F.3d at 359-60; see also Green v. LaMarque, 532 F.3d 1028, 1030 (9th Cir. 2008)

4  (discussing the court's inquiry at the third step of a Batson analysis).

5      Third step analysis should include a review of the entire transcript of jury voir dire in

6  order to compare the jurors who were stricken with the jurors who were allowed to remain.

7  Boyd, 467 F.3d 1144, 1149 ("We believe, however, that Supreme Court precedent requires a

8  comparative juror analysis even when the trial court has concluded that the defendant failed to

9  make a prima facie case").  See also Miller-El v. Dretke, 545 U.S. 231 (2005) (using comparative

10  analysis, in a case in which a prima facie showing had been made, to determine whether the

11  prosecutor had been motivated by racial bias in exercising peremptory challenges).  The court

12  must compare the prosecutor's treatment of challenged jurors with that of any retained jurors who

13  are of a different race but share characteristics identified as objectionable by the prosecutor.

14  Disparate treatment of similarly situated jurors may demonstrate that a prosecutor's facially race-

15  neutral reasons are a pretext for discrimination.  See Snyder v. Louisiana, 552 U.S. 472, 482-83

16  (2008); Miller-El, 545 U.S. at 240; Mitleider v. Hall, 391 F.3d 1039, 1047 n.5 (9th Cir. 2004),

17  cert. denied, 545 U.S. 1143 (2005); Lewis v. Lewis, 321 F.3d 824, 830-31 (9th Cir. 2003); Turner

18  v. Marshall, 121 F.3d 1248, 1251-52 (9th Cir. 1997) (as amended), cert. denied, 522 U.S. 1153

19  (1998).  Thus, if a reason articulated by a prosecutor as a basis to strike a prospective juror who is

20  a member of a cognizable racial group applies equally to a retained juror not of that race, the

21  reason may be considered pretextual.  See Miller-El, 545 U.S. at 241 ("If a prosecutor's proffered

22  reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is

23  permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at

24  Batson's third step") (citation omitted); see also, e.g., McClain v. Prunty, 217 F.3d 1209, 1221

25  (9th Cir. 2000) ("A prosecutor's motives may be revealed as pretextual where a given explanation

26  is equally applicable to a juror of a different race who was not stricken by the exercise of a

27  peremptory challenge") (citation omitted).

28      The ultimate question is whether the strike was "motivated in substantial part" by race.

20

1    Cook v. LaMarque, 593 F.3d 810, 815 (9th Cir. 2010).  If so, relief must be granted.  "Mixed

2    motives" analysis does not apply in the Batson context.  Accordingly, where both permissible and

3    impermissible factors motivated a strike, the court does not ask whether the discriminatory

4    motive was the "but for" cause.  The inquiry is limited to whether the prosecutor was motivated

5    in substantial part by discriminatory intent.  Id. at 814-15.

6         Petitioner bears the burden of persuasion to prove the existence of unlawful

7    discrimination.  Batson, 476 U.S. at 93.  "This burden of persuasion 'rests with, and never shifts

8    from, the opponent of the strike.'"  Johnson, 545 U.S. at 171 (quoting Purkett v. Elem, 514 U.S.

9    765, 768 (1995) (per curiam)).  However, petitioner is "entitled to rely on the fact, as to which

10   there can be no dispute, that peremptory challenges constitute a jury selection practice that

11   permits 'those to discriminate who are of a mind to discriminate.'"  Batson, 476 U.S. at 96

12   (quoting Avery v. Georgia, 345 U.S. 559, 562 (1953)).

13        2.    Analysis

14             a.   Number of Pretextual Reasons Necessary to Demonstrate Discrimination

15        Respondent asserts that all of the prosecutor's proffered reasons must be shown to be

16   pretextual for a finding of Batson error.  See Am. Answer at 1.  This is incorrect.  As the Ninth

17   Circuit stated in the order remanding this matter,

18            "A court need not find all nonracial reasons pretextual in order to
         find racial discrimination. If a review of the record undermines the
19       prosecutor's stated reasons, or many of the proffered reasons, the
         reasons may be deemed a pretext for racial discrimination." Kesser,
20       465 F.3d at 360 (emphasis added). In Kesser, we cited approvingly
         to our decision in United States v. Chinchilla, 874 F.2d 695 (9th
21       Cir.1989), where we held that when two of the four reasons were
         pretextual, the prosecutor's reasons may be deemed a pretext for
22       racial discrimination. 465 F.3d at 360 (citing Chinchilla, 874 F.2d
         at 699).
23

24   See ECF No. 50 at 5 n.3.

25             b.   Number of Differences Between Struck Jurors and Empaneled Jurors

26        Second, respondent suggests that comparative juror analysis lacks probative value if there

27   exists any difference between the struck juror and the empaneled juror(s).  See, e.g., Am. Answer

28   at 28-30.  This is also erroneous.  As the Supreme Court clarified in Kesser, "[a] per se rule that a

1    defendant cannot win a <u>Batson</u> claim unless there is an exactly identical white juror would leave

2    <u>Batson</u> inoperable; potential jurors are not products of a set of cookie cutters." 545 U.S. at 247

3    n.6.

4                    c. <u>Judge Gunther Declaration</u>

5         On January 31, 2013, respondent requested the admission of the declaration of retired

6    Sacramento Superior Court Judge Jeffrey L. Gunther, who presided at petitioner's state jury trial.

7    <u>See</u> ECF No. 98. The declaration states as follows:

8           I am a retired Judge of the Sacramento County Superior Court. As
            a result of my many years of experience on the bench, I am well
9           aware of Supervising Deputy District Attorney Robert Gold's
            reputation in the legal community and have personally observed
10          Mr. Gold's courtroom conduct. Mr. Gold enjoys an outstanding
            reputation for honesty and integrity. He is a person of high moral
11          character who seeks justice.

12          As part of my normal practice in considering any motion under
            <u>People v. Wheeler</u> (1978) 22 Cal.3d 258 and <u>Batson v. Kentucky</u>
13          (1986) 476 U.S. 7, I would have taken into account the prosecutor's
            reputation as well as his conduct in court. I did so not only because
14          it is an appropriate consideration but also because I have no
            tolerance for racial prejudice.
15

16   ECF No. 98 Ex. A. Respondent stated in its request that Judge Gunther was unable to testify on

17   February 14, 2013 because he lives in Southern California and had medical appointments

18   scheduled. Respondent claims that the declaration should be admitted as it relates to the

19   prosecutor's reputation and credibility. In further support of its request to admit the declaration,

20   respondent cites to 28 U.S.C. § 2245. Section 2245 states as follows:

21          On the hearing of an application for a writ of habeas corpus to
            inquire into the legality of the detention of a person pursuant to a
22          judgment the certificate of the judge who presided at the trial
            resulting in the judgment, setting forth the facts occurring at the
23          trial, shall be admissible in evidence. Copies of the certificate shall
            be filed with the court in which the application is pending and in the
24          court in which the trial took place.

25   Id.

26        Petitioner opposes admission of Judge Gunther's declaration on several grounds. First, he

27   argues that it is irrelevant to the instant action because the Ninth Circuit specifically found that

28   Judge Gunther did not reach the third step of <u>Batson</u>. Thus, petitioner argues that his opinion

1  concerning Mr. Gold's credibility and reputation is not relevant.  Additionally, petitioner asserts

2  that this court is limited to assessing the reasons that the prosecutor gave for striking the

3  prospective juror and the trial judge's assessment has no bearing on this review.  Finally,

4  petitioner argues that the declaration should not be admitted because it does not allow him to

5  cross-examine Judge Gunther.

6      As previously stated, respondent relies at least in part on 28 U.S.C. § 2245 to support its

7  position that Judge Gunther's declaration should be admitted.  One court has noted, "[t]here are

8  few precedential appellate decisions addressing the standard of review for a certificate submitted

9  to the district court in a habeas proceeding pursuant to 28 U.S.C. § 2245."  Saunders v. Tennis,

10  Civ. No. 09-1916, 2011 WL 2117559, at *9 (E.D. Pa. May 26, 2011), aff'd by, 483 Fed. Appx.

11  738 (3d Cir. 2012).  Saunders discussed the few cases that have analyzed section 2245;

12  specifically it noted as follows:

> Bassette v. Thompson, 915 F.2d 932 (4th Cir. 1990), determined
> that a state court's findings of fact submitted in a § 2245 certificate
> should be "presumed to be correct under 28 U.S.C. § 2245(c).
> Nonetheless, in Bell v. Jarvis, 198 F.3d 432, 441 (4th Cir. 1999),
> apparently the only circuit court case construing § 2245 post-
> AEDPA, the Fourth Circuit later counseled against allowing
> "posttrial assertions [to] satisfy the deficiencies in the trial court's
> record.'"  Id. at 441 (concluding that "findings of fact provided in
> the certificate on the basis for closure of the courtroom during trial
> "submitted . . . four years after trial" could not "conclusively
> justif[y] closure where Waller required adequate findings on the
> record).  The Fourth Circuit has also rejected a certificate where the
> trial judge's statements were too equivocal, see, e.g., Strader v.
> Troy, 571 F.2d 1263 (4th Cir. 1978), while the Sixth Circuit
> declined to credit a certificate the court found to be at odds with the
> trial record.  Wang v. Withworth, 811 F.2d 952, 957 (6th Cir.
> 1987).
>
> In Weidner v. Thieret, 932 F.2d 626, 632 (7th Cir. 1991), the
> Seventh Circuit indicated a need to approach a § 2245 certificate
> with scrutiny when the certificate "involve[s] inquiries into the
> mental processes of state trial court judges," not simply fact
> findings.   The court noted that, while the statute allows for
> certificates elaborating on "facts occurring at trial," courts have
> construed this phrase broadly, to include "the trial judge's state of
> mind with respect to a particular issue at a particular time at trial."
> Id.  Recognizing concerns with "human memory and cognition,"
> the Seventh Circuit concluded that recourse to the testimony of a
> state trial judge concerning the mental processes that underlay [a]
> ruling should be had only" where those reasons "are wholly
> unavailable from the record."  Id. at 633.  "Even then, the

certifications or affidavits must be carefully evaluated to determine if they are consistent with relevant record evidence." 932 F.2d at 633. Saunders, 2011 WL 2117559, at *9 (internal citations omitted). Judge Gunther's declaration appears to be inconsistent with the relevant record evidence. The Ninth Circuit has already made clear that the trial court did not reach the third step of Batson in this case. Judge Gunther cannot have considered the prosecutor's reputation and conduct in court, because he did not evaluate the truthfulness of the prosecutor's reasons for striking Ms. Thompson.

Additionally, the Supreme Court has stated that the best evidence of discriminatory intent will often be the prosecutor's demeanor during jury selection and at the time of the challenge. See Snyder, 552 U.S. at 477. Judge Gunther's declaration does not describe or discuss the demeanor of the prosecutor during voir dire or at hearing on the Wheeler motion. For these reasons, the declaration will not be admitted.[12]

d. Prosecutor's Proffered Race-Neutral Reasons

i. Reasons Related To Petty Theft Conviction

The first three of the prosecutor's nine stated reasons for striking Ms. Thompson involve her conviction for shoplifting from a campus bookstore when she was a college student, seventeen years prior to jury selection. Prospective jurors completed both a one-page questionnaire covering basic information, and a detailed 14-page questionnaire containing 63 questions. The short questionnaire asked whether "you, a close friend or relative [has] ever been arrested for a crime. . ." The long questionnaire asked more specifically, "Have you, or any close friends or relatives ever been accused, arrested or charged with a crime, including driving under the influence of alcohol?" If so, prospective jurors were instructed to list the person charged, the crime(s), and the case outcome. In response to these questions, Ms. Thomson indicated that she

---

[12] Even if the declaration was admitted, the court finds that it would not change the outcome. Judge Gunther's general opinion of Mr. Gold's honesty and integrity are of little to no probative value regarding the question whether the strike of Ms. Thompson was discriminatory. Many otherwise upright persons are motivated on occasion by prejudices that are endemic to society. In this case, as explained more fully below, comparative juror analysis provides the most weighty evidence of prosecutorial intent.

1    had been placed on summary probation in 1981 for petty theft.  ER at 468,[13] 476.  She indicated

2    that she wished to discuss the matter in private.  Id.  During voir dire, Thompson discussed her

3    petty theft conviction outside of the presence of the jury.  ER at 246-48.

4          Several seated jurors gave affirmative responses to the initial question regarding arrests,

5    without specifying whether they or a friend or relative had been arrested.  In most cases, the

6    responses to the second questionnaire clarified that the listed arrests had been of friends or family

7    members.[14]  The questionnaires of two seated jurors, however, presented ambiguous information

8    on the arrest issue.  In response to the initial question, Juror 8 wrote:  "yes [space] daughter

9    [space] petty theft," followed by a longer blank space and then the word "DUI."  ER 423.  On the

10   second questionnaire, Juror 8 provided information about her daughter's petty theft charge only.

11   ER 431.  The second questionnaire response did not mention a DUI, and Juror 8 was not asked on

12   voir dire whether she or someone else had been arrested for DUI.  See ER at 220-24.

13         Juror 11 provided entirely different information in response to the two similar questions.

14   In response to the initial inquiry, Juror 11 wrote "Yes [space] Forgery," without indicating

15   whether it was himself or someone close to him who had been arrested for this offense.  ER at

16   408.  On the second questionnaire, Juror 11 listed three incidents in which he had been arrested or

17   charged: (1) a curfew violation for which he spent a weekend in juvenile hall, (2) a malicious

18   mischief charge for which he spent the night in jail, and (3) a drunkenness arrest that resulted in

19   "8 hours in drunk tank."  ER at 416.  The prosecutor asked no questions about this history,[15] and

20   did not ask whether or not the prospective juror had been arrested for forgery.  ER at 208-11.

21         Both Thompson and Juror 11 indicated that their cases had been handled appropriately by

22   law enforcement and the criminal justice system.  ER at 416 (Juror 11), 476 (Thompson).

23

24   ---

[13] The short form erroneously gave the date as 1991.  On voir dire, Thompson confirmed that the actual date was 1981.  ER at 248.

25   [14] This was the case for Jurors 2, 5, 9, 10 and Alternate Juror 1.

26   [15] At the evidentiary hearing, the prosecutor testified that he "took [the malicious mischief charge] to be vandalism."  ECF No. 102 at 39.  That assumption may or may not have been

27   warranted, as the juror was never asked to explain.

28

1    The prosecutor's differing treatment of these jurors demonstrates that his concerns about

2    juror criminal history were not consistently applied. Such inconsistent concern about a facially

3    legitimate factor suggests pretext. See Lewis, 321 F.3d at 830-31. With this background in mind,

4    the court turns to the specific reasons the prosecutor gave for striking Ms. Thompson.

5         • Discussion of petty theft in private

6    Ms. Thompson's 1991 arrest was discussed in private at her request.[16] This was the first

7    race-neutral reason that the prosecutor offered for his peremptory strike: "I found it unusual that

8    . . . she had discussed it in private. If it was a minor incident, I believe a lot of people talk

9    candidly about problems in their past. DUIs, things like that. She felt she wanted to talk about it

10   privately. That concerned me some." ER at 327. See also ECF No. 102 at 36-37, 41-42.

11   Examination of the voir dire transcript and the juror questionnaires reveals that no other

12   empaneled juror requested to be questioned or was in fact questioned about any matter in private.

13   Accordingly, comparative juror analysis does not provide any insight into the legitimacy of this

14   proffered reason for the strike.

15   However, a prospective juror's request to speak of a criminal matter in private does not

16   present any cause for concern. See Hernandez, 500 U.S. at 365. Thompson may have wished to

17   keep her conviction private because she was a public employee,[17] or because she was a private

18   person in general, or because, as the prosecutor himself later noted, a petty theft conviction

19   speaks to an individual's honesty and thus carries more of a social stigma than a DUI arrest.

20   Because this was Thompson's only arrest, and apparently a youthful aberration in an otherwise

21   law-abiding life, her desire to keep it private is objectively unremarkable. In short, the

22   prosecutor's concern with Thompson's request to speak privately was based on an unfounded

23

24   [16] The questionnaire itself directed prospective jurors to indicate matters that they wished to discuss privately, outside the presence of the entire venire. The judge also told prospective jurors

25   that they could request to discuss any answer privately. ER at 125. Several prospective jurors did so, regarding a variety of matters. No seated juror was questioned privately.

26   [17] Thompson was a disability insurance specialist employed by the State of California. ER at 468. In addition to earning a BA in social welfare after her arrest and probation, she studied public

27   administration in graduate school. ER 472.

28

1   characterization of that request.  The prosecutor's oblique reference to candor concerns at the

2   Wheeler hearing does not constitute the "'clear and reasonably specific' explanation" that Batson

3   requires.  See Batson, 476 U.S. at 98 n.20.

4           At the evidentiary hearing fifteen years after the fact, the prosecutor's attempt to clarify

5   his concern only muddied the waters further: "[I]t seemed to me that perhaps she wanted to not

6   reveal certain things so she could have a little better, higher moral ground.  I want people who are

7   humble, who have humility, that can let it all be. . . .  Someone that – who wants to say something

8   that's negative to them, and not include that, that's just something that concerns me."  ECF No.

9   102 at 42.  The record is devoid of any information about Thompson's demeanor that might

10  indicate a lack of humility, or support the notion that she was hiding her criminal history from

11  other prospective jurors in order to enhance her own "moral ground."  None of her questionnaire

12  or voir dire answers reflect a sense of moral superiority.

13          Both in the trial court and in this court, the prosecutor failed to plausibly explain how a

14  prospective juror's request to discuss a 17-year old criminal matter in private would impact her

15  ability to serve as a juror.  See Kesser, 465 F.3d at 364.  The prosecutor's unpersuasive attempts

16  to explain his concern do not, standing alone, constitute evidence of pretext.  They do, however,

17  raise credibility concerns that affect the court's evaluation of the arrest-related reasons for the

18  strike taken as a whole.

19                  •   Age at time of petty theft

20          The prosecutor next referred to the age at which Thompson committed the petty theft.

21  That incident occurred in 1981.  ER at 248, 476.  At the time of petitioner's trial in 1998,

22  Thompson was 38 years old.  ER at 471.  Accordingly, Thompson was approximately 21 years

23  old when she stole items from the campus book store.  In justifying the peremptory strike, the

24  prosecutor stated, "I find it unusual that you are stealing something when you are 21 years of age.

25  To me, that's a problem."  Id. at 327.

26          On its face, this explanation is reasonable enough: theft as an adult means something

27  different than theft as a child, and a prospective juror who commits a crime in adulthood may be

28  undesirable to a prosecutor.  This prosecutor, however, did not demonstrate an equal concern

1  about identifying the age at which other prospective jurors experienced run-ins with the law.

2  Juror 11 had specified that one of his law enforcement contacts was a juvenile incident, and

3  attributed all three incidents to "growing pains." ER at 416. The incidents that resulted

4  respectively in a night in jail and eight hours in a "drunk tank," id., were plainly not juvenile

5  offenses because they resulted in adult forms of custody. The "growing pains" reference,

6  however, implies that they may have occurred in early adulthood just like Thompson's arrest.

7  The prosecutor's lack of concern about Juror 11's "growing pains" misbehavior is inconsistent

8  with his focus on Thompson's undergraduate misbehavior. More specifically, the prosecutor's

9  failure to ask about Juror 11's age at the time of these offenses undercuts his claim to have been

10  concerned about Thompson's age at the time of her arrest.

11       At the evidentiary hearing, the prosecutor emphasized that no one else on the jury had

12  been "convicted of something at a later age." ECF No. 102 at 39. Because the prosecutor did not

13  know how old Juror 11 was at the time of his adult offenses -- and regardless of whether one

14  considers 21 to be youthful or "late in age"[18] -- the fact remains that the prosecutor did not know

15  whether any other juror had been convicted at a similar age because he did not ask.

16       Not only did the prosecutor fail to ask Juror 11 about his age at the time of his arrests, he

17  failed to ask any questions at all about Juror 11's criminal history, including the act(s) underlying

18  the malicious mischief charge. See ER at 208-11. Similarly, the prosecutor failed to ask Juror 8

19  about the DUI arrest disclosed on her questionnaire. See ER at 221-224. The failure to inquire

20  about the criminal histories of these jurors, who are not black, strongly suggests that this reason

21  for striking Thompson is pretextual. See Miller-El, 545 U.S. at 246.

22       Although respondent is correct that none of the seated jurors were convicted of a theft

23  offense at the age of 21, the fact that none of the empaneled jurors were convicted of the same

24  type of offense at the same age as Thompson is not dispositive. "A per se rule that a defendant

25  cannot win a Batson claim unless there is an exactly identical white juror would leave Batson

26

---

27  [18] Thompson's conviction "concerned me because she was relatively late in age, she was in
    college, she was 21 years old. . .." ECF No. 102 at 38.

28

1    inoperable."  Miller-El, 545 U.S. at 247 n.6.

2         On this record, the court concludes that the prosecutor's second stated reason for excusing

3    Thompson supports an inference of pretext.

4         • Petty theft and honesty

5         The prosecutor expressed concern that the petty theft conviction spoke to Thompson's

6    truthfulness: "[I]t also goes to the issue of honesty.  It's not, say, a DUI that may have unrelated

7    credibility problems.  Honesty is something that's important, and she had stolen something in the

8    past.  That concerned me."  ER at 327.

9         In the previously filed Findings and Recommendations, ECF No. 73, Judge Moulds found

10   that this concern could not be reconciled with the prosecutor's failure to question Juror 11 about

11   the reference in his questionnaire to a forgery conviction.  As previously noted, Juror 11 did not

12   indicate on the questionnaire whether he or another person had been arrested for forgery.  A

13   prosecutor genuinely concerned with weeding out jurors who had committed crimes "go[ing] to

14   the issue of honesty" would surely have asked follow-up questions about this red flag.

15        At the evidentiary hearing, the prosecutor testified that he thought Juror 11 had been the

16   victim of a forgery.  See Feb. 14, 2013 Tr. at p. 38.[19]  Juror 11's short questionnaire did give the

17   answer "forgery" in response to two consecutive questions: whether the juror or a close friend or

18   relative had been arrested for a crime, and whether the juror or a close friend or relative had been

19   the victim of a crime.  ER at 408.  However, Juror 11 stated on the long questionnaire that he had

20   not ever been the victim of a crime.  ER at 415.   On this record, the prosecutor's dual

21   assumptions that Juror 11 had personally been the victim of a forgery, and had not been arrested

22   for forgery, were unsupported to say the least.  Moreover, given the ambiguity and contradictions

23   in the questionnaire responses about something the prosecutor claims to have taken so seriously,

24   the failure to inquire on voir dire remains troubling.

25   _____
     [19] The only reason given for this assumption was that Juror 11 was in the business of buying and
26   selling used merchandise and antiques, ER 412, which may have put him in a position to be
     victimized by forgery.  Feb. 14, 2013 Tr. at p. 38.  This speculation may or may not have been
27   accurate.  Juror 11's questionnaires did not give a date for the forgery incident(s) or specify how
     long he had been in sales.  His previous occupation was stated as "laborer."  ER 408.
28

1   Nonetheless, the prosecutor's misreading of the questionnaire or unfounded assumptions

2   about Juror 11 do not support an inference of pretext if they were honestly though erroneously

3   held.  Because the prosecutor testified that he thought Juror 11 was the victim of a forgery,[20] the

4   disparate treatment of Thompson and Juror 11 regarding honesty-related offenses does not

5   independently support an inference of pretext.

6                              ii.      Prior bad experience with police

7       In the juror questionnaire, Thompson noted that she had both a good and a bad experience

8   with law enforcement officers.  When asked about the bad experience during voir dire, Thompson

9   stated that it had occurred four to five years prior, involved two motorcycles officers, and no

10  longer bothered her.  ER at 248-49.  The prosecutor cited to this exchange when explaining his

11  peremptory strike: "She had indicated that she had had a bad experience with an officer.  It was

12  unclear where in her questionnaire she mentioned she had a bad experience.  When I asked her in

13  court about it, it was unclear whether it was one or two, and I felt the interaction between

14  questions that I asked her, there was some tension that I was feeling from her, just questioning

15  her."  ER at 327.  The tension that resulted from the miscommunication was the subject of

16  testimony at the evidentiary hearing.  ECF No. 102 at 42-45.

17      The transcript of the exchange, quoted above at pages 3-4, reflects that the prosecutor

18  misunderstood Thompson's statement that two officers had been involved in the single incident.

19  The tone of the exchange, and responsibility for the miscommunication, are impossible to

20  determine from the cold transcript, but the undersigned credits the evidentiary hearing testimony

21  that the atmosphere became "tense."  Review of the entire voir dire transcript reveals that the

22

23  [20] Because review at Batson's third step is limited to the reasons that the prosecutor proffered for
    the strike at the time, Miller-El, 545 U.S. at 251, Mr. Gold's evidentiary hearing testimony was
24  limited to explanation of the reasons that he provided in 1998 in response to petitioner's Wheeler
    motion.  Although Mr. Gold's explanation of his understanding of Juror 11's questionnaire was
25  not presented to the trial court (because that court did not conduct any comparative juror
    analysis), this court may consider the testimony because it is relevant to the credibility of a
26  previously-asserted basis for the strike.  This testimony does not involve an additional, post-hoc
    ground for the strike.
27

28

prosecutor did not have an obvious miscommunication with any other juror.  The primary issue was not the miscommunication or resulting tension, however, but the fact that Thompson had a negative experience with law enforcement.[21]  As the prosecutor testified at the evidentiary hearing:

> I want jurors that are going to be comfortable with law enforcement.  Law enforcement, several of them are witnesses in this case.  They, as a juror, are going to be participating in the justice system and I want a juror that has a belief that the system works, and that the system's fair, and if they have negative experience about that. I understand that. I'm not saying the system is perfect, but if they have a negative experience about it, whether it's real or imaginary, that concerns me. I don't want to take a risk on a juror like that, that that may affect them and come into play if they have to serve on a jury. . . .

ECF No. 102 at 40-41.

The record reveals that no empaneled juror reported a negative personal experience with an officer.  However, one seated juror felt strongly enough about the negative experiences of his African-American friends with the police to volunteer that information on his questionnaire.  In response to an inquiry about perceptions of African-American males, Alternate Juror 3 wrote, "I have acquaintances who have told me of unwarranted harassment.  I believe them." ER at 555.  He elaborated on voir dire:

> [DEFENSE COUNSEL]:   [I]n one of your questions or your answers relating to the perception in society of African-American males you gave a response that you have acquaintances who have been harassed or told you that you [sic] were harassed and that you believed them.  Could you give an example?
>
> [ALTERNATE JUROR 3]:  I have an acquaintance that I know, a guy that I attended school with, it has been years ago but he talked about being pulled over by police officers for what he thought was no reason and not just pulled over but being asked to get out of the vehicle and cuffed at the scene and, you know, the cops themselves searched and everything.  I myself had driven and frequented the same areas that that person had and I was approximately the same age and I had never been pulled over by any officer and had never been, you know, addressed in any way.  There were enough of the people – I had several friends – I would say this was in college.  I had enough people tell me about that that I believed that it occurred.

---

[21] See ER at 327.

31

1    These people had no reason to lie to me.  So I do believe that it
     occurs.
2
         [DEFENSE COUNSEL]:  So in the example you gave these were
3    African-Americans or members of other races?

4    [ALTERNATE JUROR 3]:  In this case African-Americans.  Yes.

5        [DEFENSE COUNSEL]:  And it appeared that they were – because
     of their race – they were having contact with the police or harassed
6    or whatever for no apparent reason?

7        [ALTERNATE JUROR 3]:  It seemed as though that was the only
     difference between themselves and myself.  I couldn't come up – I
8    mean, you know, we drove similar cars, we drove similar areas and
     at similar times of day and night.  There didn't seem to be any other
9    differences.

10   ER at 307-08.

11       The prosecutor asked no questions.  ER at 309.

12       Although Alternate Juror 3 had not personally been pulled over for "driving while black,"

13   his obvious concern about racial profiling by police raised the same issues that the prosecutor

14   cited as a problem regarding Ms. Thompson.  The fact that a non-black person concerned about

15   law enforcement fairness was neither questioned nor excused while Thompson was struck

16   supports an inference of discrimination.  See McClain, 270 F.3d at 1221 ("A prosecutor's motives

17   may be revealed as pretextual where a given explanation is equally applicable to a juror of a

18   different race who was not stricken by the exercise of a peremptory challenge").

19                   iii.    Strong agreement with the proposition "It is better for society to let
                            some guilty people go free than to risk convicting an innocent
20                          person"

21       Question 38 asked potential jurors how strongly they agreed or disagreed with the

22   proposition "It is better for society to let some guilty people go free than to risk convicting an

23   innocent person."  Thompson indicated that she agreed strongly.  ER at 478.  The prosecutor

24   referred to this answer when exercising a peremptory strike against Thompson: "She also

25   indicated that she strongly agrees that it is better to let guilty people go free, rather than risking an

26   innocent person.  There are other responses she could have checked.  To me that shows specific

27   bias.  That concerns me."  ER at 327-28.  At the evidentiary hearing, the prosecutor elaborated:

28   ". . . it indicates to me, especially when you have a strong opinion about it, that they may have an

                                              32

1    issue with the reasonable doubt standard, and they may also not have the strength to say someone

2    is guilty."  ECF No. 102 at 43.

3           It is a basic proposition of our criminal justice system that "it is better for society to let

4    some guilty people go free than to risk convicting an innocent person."  Indeed, the Supreme

5    Court has noted this proposition time and again:

6                    [C]oncern about the injustice that results from the conviction of an
                     innocent person has long been at the core of our criminal justice
7                    system. That concern is reflected ... in the "fundamental value
                     determination of our society that it is far worse to convict an
8                    innocent man than to let a guilty man go free."

9    Schlup v. Delo, 513 U.S. 298, 325 (1995) (quoting In re Winship, 397 U.S. 358, 372 (1970)

10   (Harlan, J., concurring)).  That Thompson strongly agreed with Question 38 simply reflects her

11   alignment with this country's "fundamental value determination," not a "specific bias."

12          A comparative juror analysis supports a finding that this reason for the strike is pretextual.

13   In the juror questionnaires, Juror 9 also noted strong agreement with Question 38.  ER at 373.

14   Yet Juror 9 was neither questioned about this response nor removed from the panel.  See ER at

15   160-62.  Three other jurors changed their position on this question during voir dire to agree with

16   the position espoused by Thompson, namely, that it is better to let a guilty person go free than to

17   imprison an innocent person.

18          Juror 1, for example, indicated on the questionnaire that she agreed "somewhat" with the

19   statement.  On voir dire the following exchange occurred:

20                   [DEFENSE COUNSEL]: Another one of your statements dealt with
                     letting some guilty people go free even if it means convicting an
21                   innocent person.  Now, is that what you meant or would you feel
                     that it's more important to not convict an innocent person even if it
22                   meant to let some guilty people go free?

23                   [JUROR 1]: I think it's more important that we don't convict an
                     innocent person.  It is a tragedy and it shouldn't happen.  It should
24                   never happen. . . .

25   ER at 285-86 (emphasis added).  The prosecutor did not question this juror about the

26   strengthening of her position and did not strike her.  Id. at 286.

27          Juror 7 strongly disagreed with Question 38 on the questionnaire, see ER at 448, but she

28   also changed her answer during voir dire:

[DEFENSE COUNSEL]: . . . [Y]our answer was that you disagree strongly.

[JUROR 7]: Umm, no, I answered that wrong, also.

[DEFENSE COUNSEL]: What would your answer be?

[JUROR 7]: I don't think that *any* innocent person should be found guilty.  And I would rather, if there's *any doubt at all*, let the person go.

ER at 231 (emphasis added).  The prosecutor did not question Juror 7 about this change of position other than to clarify the meaning of reasonable doubt.  See id.  The prosecutor did not exercise a peremptory strike as to this juror.

Finally, Juror 11, who "somewhat" disagreed with Question 38 on his questionnaire, also strengthened his position during voir dire:

[DEFENSE COUNSEL]: We've been talking about the proposition that letting some of the guilty go free and your response was, umm, you disagreed with that proposition.  And I still would like to ask you about if you can elaborate on that, because where you have someone who may be guilty, umm, I guess how would you – how could you balance that?

[JUROR 11]: Could you read the question to me? Because I was thinking if that's pertaining to, umm – well please read the question.

[DEFENSE COUNSEL]: Okay. It is better for society to let some guilty people go free than to risk convicting an innocent person. And your response was you disagreed somewhat.

[JUROR 11]: Somewhat, yes. I would much rather, also putting myself in the same position and knowing myself as being totally innocent, you know? I would much rather you know, see the individual who was really guilty go free than to see the – the individual who is not guilty suffer the consequences.

[DEFENSE COUNSEL]: Right.

[JUROR 11]: Of such a devastating situation, I would think.

[DEFENSE COUNSEL]: Okay. So you're actually changing that answer?

[JUROR 11]: I wouldn't think so.

[DEFENSE COUNSEL]: Well, I understand that you would not want a guilty person to go free, but if it meant risking convicting an

1   innocent person, your position is that you would rather see the
    guilty person go free?

2
    [JUROR 11]: Right.
3
    [DEFENSE COUNSEL]: Is that correct? I don't want to put words
4   in your mouth.

5   [JUROR 11]: Right.

6   [DEFENSE COUNSEL]: Okay.

7   ER at 208-09.  The prosecutor did not question Juror 11 about his change of position as to

8   Question 38.  See id. at 210-11.  The prosecutor did not strike this juror, either.

9        On this record taken as a whole, the court finds strong evidence of pretext.  The

10  prosecutor's concern with "specific bias" is undermined by Thompson's alignment with the

11  fundamental values of our criminal justice system.  It is also undercut by the prosecutor's failure

12  to be similarly concerned with the same response given by one non-African-American empaneled

13  juror on the juror questionnaire and three non-African-American empaneled jurors during voir

14  dire.   That the prosecutor did not strike these jurors, or even question them about their positions,

15  leads to a finding of pretext.

16              iv.    Strong disagreement with the proposition "If the prosecution brings
                       someone to trial, that person is probably guilty"
17
         Question 39 of the juror questionnaire asked whether the potential jurors agreed or
18
    disagreed with the proposition "If the prosecution brings someone to trial, that person is probably
19
    guilty."  Thompson indicated that she "strongly disagreed" with this statement.  ER at 478.  When
20
    asked by the prosecutor during voir dire to clarify what she meant by her response, Thompson
21
    stated: "I mean that I wouldn't assume that because someone is brought forward by the
22
    prosecution that they're guilty.  That's what I mean."  ER at 249.
23
         The prosecutor cited to this response as a reason for his peremptory strike of Thompson:
24
    "I can understand someone saying I disagree with [Question 39] somewhat.  When you strongly
25
    disagree, that shows a specific bias.  You may not trust law enforcement or you may not trust the
26
    prosecution and feel they are simply bringing people to trial that they don't believe are guilty or
27
    have no evidence.  I'm concerned about that."
28
                                          35

As with the prosecutor's concern with Thompson's answer to Question 38, this proffered race-neutral reason shows strong evidence of pretext. Question 39 speaks to the issue of the presumption of innocence. The presumption of innocence, although not expressly articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice. The Supreme Court has stated:

> The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.

Coffin v. United States, 156 U.S. 432, 453 (1895). Thompson's strong disagreement with Question 39 merely reflected her correct understanding of this "axiomatic and elementary" component of our criminal justice system. It is not evidence of "specific bias."

Furthermore, "'[i]f a prosecutor's proffered reason for striking a [minority] panelist applies just as well to an otherwise-similar [nonminority] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step.'" Kesser, 465 F.3d at 360 (quoting Miller–El, 125 S. Ct. at 2325). Of the twelve empaneled jurors and three alternate jurors, six also "strongly" disagreed with Question 39: Juror 5 (ER at 388), Juror 7 (ER at 448), Juror 9 (ER at 373), Juror 10 (ER at 508), Alternate Juror 1 (ER at 568) and Alternate Juror 2 (ER at 538). The prosecutor's failure to question any of these jurors regarding their response to Question 39 and his failure to strike any of them tends to show that the prosecutor attributed specific bias to Thompson on account of her race.

Insofar as respondent argues that the prosecutor was concerned with Thompson's combined responses to Questions 38 and 39, the court notes that, as to Question 38, Juror 7 stated during voir dire that "if there's any doubt at all, let the [innocent] person go," ER at 231, and noted on her questionnaire, like Thompson, that she "disagreed strong[ly]" with Question 39, ER at 448. Additionally, Juror 9 provided the same combined responses to Questions 38 and 39 on the juror questionnaire as did Thompson. See ER at 373. Yet neither of these two non-African-American empaneled jurors were removed by the prosecutor. The undersigned finds this proffered reason for the strike to be a pretext.

36

1

                v.      Belief that the criminal justice system treats people unfairly because of their race, ethnic background or lifestyle

2

3         Question 46 of the juror questionnaires asked "Do you feel that the criminal justice system

4  treats people unfairly, either as defendants, as victims, or as witnesses, because of their race or

5  ethnic background or because of the different lifestyle they may lead?"  Thompson answered this

6  question affirmatively and wrote, "I believe it's unintentional for the most part, but racial

7  disparities in the treatment of black defendants is pretty well documented."  See ER at 479.  In

8  response to Question 47, which asked for examples of defendants who had not received a fair trial

9  because of their race, ethnic background or lifestyle, Thompson wrote "Geronimo Pratt, Mumia

10  Jamal."  Id.  The prosecutor asked Thompson about these responses during voir dire.  See ER at

11  250-51.

12         When exercising a peremptory strike against Thompson, the prosecutor referred to these

13  responses:

14                She had indicated that she felt the criminal justice system specifically treats people unfairly.  That's a specific bias that she

15                has.  And that was in question 46.  I'm concerned about any person that believes the system treats people unfairly.  I'm concerned about

16                having those people participate as a juror in a criminal justice system from the People's point of view.

17

                She also indicated that this unfairness was clearly documented or

18                documented in her response, and that's as to question 47.

19

ER at 328.

20

         Alternate Juror 3 also gave an affirmative answer to question 46.  ER at 554.  Although he

21  checked both the "yes" and "no" boxes, the "yes" box is marked most heavily, as if for emphasis.

22  Id.  Alternate Juror 3 commented ambiguously, "Sometimes people get into situations they

23  wouldn't otherwise."  This is the same juror who disclosed and discussed his friends' experiences

24  with race-based police "harassment."  See ER at 307-08, 555, and discussion supra (incorporated

25  by reference here).  The prosecutor did not question this non-black juror on voir dire about his

26  belief that the justice system treats people unfairly on the basis of characteristics including race.

27         Although Ms. Thompson referred to the existence of empirical data and to cases that had

28

1   been the subject of national publicity, while Alternate Juror 3 relied on anecdotes from friends,

2   both concluded that African-Americans sometimes experience disparate treatment by law

3   enforcement and in the criminal justice system.  This common concern was deemed a reason to

4   strike Thompson, but not Alternate Juror 3 – which suggests that the prosecutor thought that a

5   black person concerned about unfairness to black people demonstrated "specific bias" and could

6   not be impartial, while a white person concerned about unfairness to black people was a qualified

7   juror.[22]  That is precisely the kind of discrimination that Batson forbids.

8          The Ninth Circuit has held that a peremptory challenge based on a prospective juror's

9   opinions about the judicial system does not, without more, raise an inference of racial

10  discrimination at the first step of Batson.  See Tolbert v. Gomez, 190 F.3d 985 (9th Cir. 1999).

11  This so even when the opinion involves the racism of the system.  Id. at 989.  This principle does

12  not apply in the present context, however, which involves pretext analysis at Batson's third step.

13  Here, the question is whether the prosecutor's asserted reliance on Thompson's opinions about

14  the judicial system was the actual reason for the strike.  The fact that Alternate Juror 3 was

15  permitted to serve, and was not even scrutinized by the prosecutor regarding his similar views,

16  supports an inference that it was not.  See McClain, 270 F.3d at 1221 ("A prosecutor's motives

17  may be revealed as pretextual where a given explanation is equally applicable to a juror of a

18  different race who was not stricken by the exercise of a peremptory challenge").  The court

19

20  [22] Juror 5, while giving a negative response to question 46, commented that unfairness in the
    criminal justice system "does happen from time to time."  ER 389.  He was not questioned about

21  this comment.  See ER at 189-94.  In response to other, related questions, many seated jurors gave
    answers that reflected awareness of societal prejudices and media stereotypes regarding African-

22  American criminality.  See, e.g., ER at 345 (Juror 3), 360 (Juror 6), 375 (Juror 9), 390 (Juror 5),
    465 (Juror 2), 495 (Juror 12), 555 (Alternate Juror 3), 570 (Alternate Juror 1).  The prosecutor did

23  not individually question any of these non-black jurors about their views on racism in society
    and/or the criminal justice system.  The defense lawyer did question Juror 6 (among others) about

24  her opinion that the media exacerbates a negative image of African American males as criminals.
    When defense counsel asked whether this societal perception might negatively affect the

25  defendant as an African American male charged with a crime, Juror 6 answered in the
    affirmative.  ER at 152.  The prosecutor asked no follow-up questions and did not strike the juror

26  for questioning the fairness of the proceedings.

27

28

1    accordingly finds that this proffered reason for the strike was pretextual.

2                           vi.      Single and never married

3           The prosecutor also relied on Thompson's marital status (single and never married, ER at

4    473) as a reason for striking her.  ER at 328-29.  Although a "minor point," the prosecutor stated

5    that he "generally like[s] people who are married, living with people, people who are in a

6    relationship where there is communication going on, group interaction," and that he "sometimes

7    ha[s] a problem with single people who have never . . . been married.  They may be a very

8    strongly opinionated person that may not work well in a group setting."  ER at 328-29; see also

9    ECF No. 102 at 47.

10          Of the empaneled jurors, two women were also single and never married – Juror No. 3

11   (see ER at 333) and Juror No. 7 (see ER at 438).  While respondent is correct that a prosecutor is

12   entitled to peremptorily strike a potential juror on account of his or her marital status, see, e.g.,

13   United States v. Omuruyi, 7 F.3d 880, 881 (9th Cir. 1993) (finding that a peremptory challenge

14   based on marital status does not violate Batson), the prosecutor may not use marital status as a

15   guise to dismiss an African-American juror.  The fact that the prosecutor here accepted two non-

16   African-American jurors who had never been married suggests that this reason is pretextual.  The

17   inference of pretext is especially strong considering that Juror 7, like Thompson, strongly agreed

18   with Question 38 and strongly disagreed with Question 39.  Likewise, the prosecutor's inclusion

19   of this weak reason as one of his nine reasons for striking Thompson persuades the court that this

20   reason was pretextual.

21                          vii.     Other jurors were better suited to hear the case

22          Lastly, the prosecutor asserted that other jurors in the jury pool were better suited for the

23   panel.  During the February 14, 2013 evidentiary hearing, the prosecutor explained this reason as

24   follows:

25                   That means in a trial like this where we have the random list
                     already, and we already have their questionnaires that we've
26                   already read, and I already have evaluations, I know who is coming
                     down the road.  That's not true in all cases, but it's common in
27                   homicides, and I can look after Ms. Thompson at my notes, and I
                     am looking at my notes, and I'm also evaluating – my general
28                   practice is, is I will pass several times when I'm comfortable with
                     the panel and have extra perempts than the defense would to then at

1
2
3

the end trade.  And so I will choose what I feel – even if I'm okay with them, I may want to pass to get, or excuse to get better jurors, and there were a number of better jurors after Ms. Thompson and a number of them actually served.

4   ECF No. 102 at 51-52.  The undersigned finds this testimony to be credible.  The prosecutor

5   explained at the evidentiary hearing the criteria he used for determining which jurors were better

6   than others.  The criteria included using the one-page questionnaire, the large questionnaire and

7   voir dire.  See id. at p. 50.  However, even though this reason may be true, the court nonetheless

8   finds that the evidence of pretext identified above significantly outweighs this catch-all

9   justification.  Because the record supports a conclusion that the prosecutor's unfavorable view of

10   Thompson was due in substantial part to her race, the fact that other jurors were viewed more

11   favorably does not defeat a finding of discrimination.

12               viii.    Other evidence regarding discriminatory intent

13          At the evidentiary hearing, the prosecutor's jury selection notes and juror seating chart

14   were entered into evidence.  Resp. Exh. B.  The notes reflected the prosecutor's preliminary

15   review of the questionnaires.  A system of check marks and plus and minus signs indicated his

16   preliminary assessment of the prospective jurors.  See ECF No. 102 at 13-14 (testimony of Robert

17   Gold).  Other notations indicated basic demographic information, such as age and occupation, and

18   areas for questioning on voir dire.  Resp. Exh. B.

19          Ms. Thompson received a low mark based on the prosecutor's review of the

20   questionnaires,[23] but this rating is not probative of the presence or absence of discrimination

21   because it was not race-blind.  Had the prosecutor given Thompson a low mark without

22   knowledge of her race, on grounds later asserted as race-neutral bases for the strike, that would

23   weigh against a finding of pretext.  However, the prosecutor knew from the questionnaire that

24   Thompson was African-American.  The questionnaires did not ask prospective jurors to identify

25   their race, but Thompson mentioned in response to a question about race that she is black.  ER at

26   _____

27   [23] The prosecutor put a minus sign next to her name, his symbol for "someone that I'm not comfortable with."  ECF No. 102 at 16; Resp. Exh. B at 3.

28

480. The prosecutor testified at the evidentiary hearing that he therefore would have been aware of Thompson's race when he reviewed her questionnaire, prior to voir dire. ECF No. 102 at 25. For this reason, his notes do not reflect a race-blind assessment of Thompson's suitability as a juror.

The notes reflect that the prosecutor was concerned with Thompson's marital status, her request to discuss matters in private, and her response to the question about the conviction of innocent people. Resp. Exh. B at 3. Because these concerns were not identified in a race-blind context, however, they beg questions about pretext rather than answering them. The question remains whether the prosecutor's concerns about Thompson's marital status, her request to discuss matters in private, and her questionnaire responses were pretexts for discrimination. For this reason, the court finds that the notes have no probative value at the third step of the <u>Batson</u> analysis.

Finally, the court gives little weight to the prosecutor's testimony at the evidentiary hearing denying a discriminatory purpose and insisting, in essence, that he would not do such a thing as exercise a racially-motivate peremptory challenge. Even fully crediting the general sincerity of the witness, the prosecutor's self-serving testimony has little probative value on the question before this court. <u>See</u> <u>Kesser</u>, 465 F.3d at 358 (criticizing state court' reliance on prosecutor's "self-serving testimony"). Even a person who understands that discrimination is wrong can make judgments that are racially discriminatory. Commitment to constitutional principles does not necessarily provide immunity from racial stereotyping or bias. Accordingly, analysis at <u>Batson</u>'s third step does not focus on the general racism or color-blindness of the prosecutor as a person, but on the credibility of the asserted race-neutral reasons for the strike as revealed by the jury selection record as a whole. <u>See</u> <u>Miller-El</u>, 545 U.S. at 252; <u>Cook</u>, 281 F.3d at 815.

For the same reason, the court finds that Mr. Gold's testimony regarding his own general professional integrity, and the illustrative anecdote that he told regarding his disclosure of late-discovered exculpatory evidence in another case, ECF 102 at 25-27, are irrelevant. Mr. Gold's general character is not the issue. Even persons of good character and good intentions have been

1  known to make racially discriminatory decisions on occasion.  The only question before this court

2  is whether the strike of Ms. Thompson was such an occasion.

3                          ix.       The totality of the circumstances

4          In order to determine whether a peremptory challenge was substantially motivated by

5  race, the court must consider each proffered race-neutral justification within the context of the

6  entire record, because "[a]n invidious discriminatory purpose may often be inferred from the

7  totality of the relevant facts."  Hernandez, 500 U.S. at 363; see also Snyder, 128 S.Ct. at 1208

8  ("all of the circumstances that bear upon the issue of racial animosity must be consulted") (citing

9  Miller-El, 545 U.S. at 239).  Here, the court has found that a majority of the reasons given for the

10  strike of Ms. Thompson were pretextual.  The Ninth Circuit has found discrimination where half

11  of the proffered justifications for a strike were pretexual or inconsistent with the record.  See

12  United States v. Chinchilla, 874 F.2d 695, 699 (9th Cir. 1989) ("Thus, the court is left with only

13  two acceptable bases for the challenges. . . .  Although these criteria would normally be

14  adequately 'neutral' explanations taken at face value, the fact that two of the four proffered

15  reasons do not hold up under judicial scrutiny militates against their sufficiency."); see also

16  Lewis, 321 F.3d at 830 (appropriate to find pretext where "many of the proffered reasons" for the

17  strike are undermined by the record).  Although the inference of pretext is stronger regarding

18  some of the prosecutor's reasons than others, the totality of the circumstances demonstrates that

19  the prosecutor's negative evaluation of Ms. Thompson was sufficiently inconsistent with his

20  evaluation of non-African-American jurors to support a finding that race was a substantial factor

21  in the strike.

22          For all the reasons set forth above, the undersigned finds that petitioner has carried his

23  burden of proving that the prosecutor was motivated in substantial part by race.  See Johnson, 545

24  U.S. at 171; Kesser, 465 F.3d at 359-60; McClain, 217 F.3d at 1220-24.  "'[T]he Constitution

25  forbids striking even a single prospective juror for a discriminatory purpose.'"  United States v.

26  Collins, 551 F.3d 914, 919 (9th Cir. 2009) (quoting United States v. Vasquez–Lopez, 22 F.3d

27  900, 902 (9th Cir. 1994)).  Accordingly, habeas relief should be granted.

28

CONCLUSION

Accordingly, IT IS HEREBY ORDERED that the June 29, 2012 Findings and Recommendations, ECF No. 73, are VACATED.

Furthermore, IT IS RECOMMENDED that:

1. Petitioner's amended application for a writ of habeas corpus be granted, and

2. An order be issued directing respondent to release petitioner unless the State of California elects to retry petitioner within sixty (60) days.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: November 20, 2013

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

43